Leland Eugene Backus, Esq.
Nevada State Bar No. 473
**BACKUS, CARRANZA & BURDEN**
3050 South Durango Drive
Las Vegas, NV 89117
(702) 872-5555
gbackus@backuslaw.com
Attorneys for Plaintiff,
*Cincinnati Insurance Company*

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, an Ohio corporation<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL PRINT GROUP, INC., an inactive qualified non-survivor merged Tennessee corporation; ROCK-TENN COMPANY, a Georgia corporation; NATIONAL LAS VEGAS, INC., a merge dissolved Nevada corporation; NATIONAL LAS VEGAS, LLC, a merge dissolved Nevada limited liability company; SN INVESTMENT PROPERTIES, LLC, a Delaware limited liability company; HARSCH INVESTMENT PROPERTIES, LLC, an Oregon limited liability company; and HARSCH INVESTMENT PROPERTIES NEVADA, LLC, an Oregon limited liability company; FIREMAN'S FUND INSURANCE COMPANY, a California corporation;<br><br>Defendants. | **Case No.**<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT, SUBROGATION, INDEMNITY, CONTRIBUTION, AND UNJUST ENRICHMENT** |

**COMPLAINT FOR DECLARATORY JUDGMENT, SUBROGATION, INDEMNITY, CONTRIBUTION AND UNJUST ENRICHMENT**

PLAINTIFF, CINCINNATI INSURANCE COMPANY ("Cincinnati"), by and through counsel, Backus, Carranza & Burden, alleges the following claims against NATIONAL PRINT GROUP, INC. ("NPG"); ROCK-TENN COMPANY ("ROCK-TENN"); NATIONAL LAS VEGAS, INC. ("NLVINC"); NATIONAL LAS VEGAS, LLC ("NLVLLC"); SN INVESTMENT PROPERTIES, LLC ("SNIP"); HARSCH INVESTMENT PROPERTIES, LLC ("HIP"); and HARSCH INVESTMENT PROPERTIES NEVADA, LLC ("HIPN"): and FIREMAN'S FUND INSURANCE COMPANY.

## I. PARTIES

1. Plaintiff CINCINNATI is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business located in Fairfield, Ohio.

2. Plaintiff CINCINNATI is duly authorized to transact business as an insurance company in the State of Nevada and within the geographical jurisdiction of the United States District Court for the District of Nevada.

3. Defendant NPG was a corporation organized and existing under the laws of the State of Tennessee with its principal place of business located in Chattanooga, Tennessee.

4. On March 27, 2014, Defendant NPG became a non-survivor merged entity having been merged into ROCKTENN RSC.

5. ROCKTENN RSC is a Delaware corporation with its principal place of business in Chattanooga, Tennessee.

6. Effective April 1, 2014, ROCKTENN RSC merged dissolved into ROCK-TENN CONVERTING COMPANY.

7. ROCK-TENN CONVERTING COMPANY is a Georgia corporation and the surviving corporation of the ROCKTENN RSC merger, and is a foreign corporation registered to do business in Nevada.

8. Defendant ROCK-TENN is a Georgia corporation with its principal place of

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

business in Norcross, Georgia and is the parent corporation of ROCKTENN RSC.

9. Defendant NPG was the Named Insured on policy number PRN 300 22 95 (the "Policy") issued by Plaintiff CINCINNATI on an occurrence basis for the period March 1, 2010 to March 1, 2011 with limits of liability under the Commercial General Liability Coverage, GA 501 10 01, of $1,000,000 for each occurrence limit and $2,000,000 for general aggregate limit ("Underlying Limits"). The Policy further provides a medical expense limit of $5,000. Attached to and forming a part of Policy PRN 300 22 95 effective March 1, 2010 was the Commercial Umbrella Liability Coverage, form USC 504 12 04 ("Umbrella Coverage") with limits of insurance of $10,000,000 per occurrence and $10,000,000 aggregate limit ("Umbrella Limits"). A certified copy of the Policy and Umbrella Coverage is attached hereto as Exhibit 1 and incorporated herein by reference.

10. Defendant NLVINC was a Nevada corporation incorporated on March 1, 1994 having its principal place of business in Nevada at 4535 West Diablo Drive, Suite A, Las Vegas, NV 89118.

11. Defendant NLVINC registered with the Office of the Clerk for the County of Clark, State of Nevada to do business under the fictitious firm name National Print Group on July 12, 2011 under instrument number 20110712100106850.

12. On September 26, 2007, Defendant NLVINC merged out into Defendant NLVLLC and Defendant NLVINC was merged dissolved and is no longer in existence.

13. Defendant NLVLLC was a Nevada limited liability company having its principal place of business in Nevada and on March 28, 2014 was merger dissolved and no longer in existence.

14. Plaintiff is informed and believes, and upon such information and belief alleges that Defendant NLVLLC was merger dissolved into either ROCK TENN LLC, a Nevada limited liability company or Defendant ROCK-TENN.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

15. Defendant SNIP is a Delaware limited liability company registered as a foreign limited liability company in Nevada.

16. Defendant HIP is an Oregon limited liability company registered as a foreign limited liability company in Nevada.

17. Defendant HIPN is an Oregon limited liability company registered as a foreign limited liability company in Nevada.

18. Defendant HIP is the Managing Member of Defendant HIPN.

19. Harsch Investment Properties Management, LLC, a Delaware limited liability company, is the Manager of Defendant SNIP.

20. Defendant FIREMAN'S FUND INSURANCE COMPANY ("FFIC") issued a commercial general liability policy ("FFIC Policy") to Defendants SNIP, HIP and HIPN.

21. Defendant FFIC is a California corporation with its principal place of business in Novato, California.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

## II. JURISDICTION AND VENUE

22. This is an action for declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57, for the purpose of determining a question of actual controversy between the parties.

23. This action is ripe for adjudication.

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the controversy is between citizens of different states and the matter in controversy exceeds $75,000 exclusive of interest and costs.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events giving rise to this declaratory relief action occurred and several of the Defendants have engaged in business in this judicial district.

## III. SALIENT FACTS

26. On August 8, 2011, Douglas Newson and Christine Newson commenced a civil action in the Eighth Judicial District Court bearing case no. A-11-646266-C ("Underlying Lawsuit") which named Defendants SNIP, HIP and HIPN and alleged that SNIP, HIP and HIPN were owners and occupiers of property located at 4545 W. Diablo Drive, Clark County, Nevada.

27. The Underlying Lawsuit alleged that on December 20, 2010, the roof and related structures leaked resulting in an accumulation of water on the floor and that on said date, Douglas Newson slipped and fell upon entering his office, suffering severe injuries.

28. On December 1, 2014, Defendants SNIP, HIP and HIPN lodged with the state court a motion for leave to amend their third-party complaint to name *inter alia* NPG, NLVINC, NLVLLC and ROCK-TENN as third-party defendants.

29. On December 18, 2014, the presiding judge in the Underlying Lawsuit entered an Order Granting SNIP, HIP and HIPN's Amended Motion for Leave to Amend Third-Party Complaint.

30. The third-party complaint already named Cleanseal Service of Nevada, Inc., Commercial Roofers, Inc., Eberhard/Southwest Roofing, Inc., Kelleher, Boyd & Associates, Inc. and Windy City Air-Conditioning & Heating, LLC as contractors and/or consultants who Defendants SNIP, HIP and HIPN retained to service the roof under the terms of their lease.

31. The motion seeking leave to amend was supporting by an affidavit an attorney, Shelly L. Murray, Esq. of Wood, Smith, Henning & Berman, LLP which misrepresented that Plaintiff CINCINNATI had accepted a tender to both defend and indemnify Defendants SNIP, HIP and HIPN in the Underlying Lawsuit.

32. Defendant CINCINNATI had agreed to defend Defendants SNIP, HIP and HIPN under a reservation of rights reserving the right to deny indemnity under the Policy and Umbrella Policy. A copy of the reservation of rights letter is attached hereto as Exhibit 2 and incorporated herein by reference.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

33. In the reservation of rights letter dated April 9, 2012, Plaintiff CINCINNATI reserved the right to file a declaratory judgment action to determine its duties under the Policy or Umbrella Policy to defend or indemnify Defendants SNIP, HIP and/or HIPN.

34. Prior to the submission of this most recent motion seeking leave to amend third-party complaint, counsel for the Newson's in the Underlying Lawsuit submitted his evaluation of the potential damages sustained by the Newson's in a stated alleged value of $7,091,310.16.

35. Subsequent to this submitted evaluation by counsel to defense counsel for Defendants SNIP, HIP and HIPN, a claims handler for FFIC contacted Plaintiff CINCINATTI to discern if there would be any contribution to any possible settlement offers by Plaintiff CINCINATTI.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

36. Plaintiff CINCINATTI through its representative indicated that it did not appear there was coverage for Defendants SNIP, HIP and HIPN and that there further did not appear to be any liability for indemnity or otherwise for the Named Insured NPG to trigger any coverage under the additional insured provisions of the Policy.

37. Plaintiff CINCINNATI is informed and believes, and upon such information and belief alleges that Defendant FFIC as the insurer for Defendants SNIP, HIP and HIPN directed the law firm of Wood, Smith, Henning & Berman, LLP to file the motion seeking leave to amend the third-party complaint naming three entities that no longer are in existence, to wit: NPG, NLVINC and NLVLLC, and to further name without any contractual entitlement ROCK-TENN.

38. The premises upon which the alleged injuries were sustained by Douglas Newson were leased premises.

39. The original lease titled "Industrial Lease" (attached as Exhibit 3) was entered into between RMS Limited Partnership and Castle Manufacturing, Inc. November 2, 1995. This Industrial Lease provided as follows:

8.01 **<u>Landlord's Obligations.</u>**

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

(A) During the Lease Term, Landlord shall, at its expense, maintain only the roof, foundation and the structural soundness of the exterior walls ... in good repair and condition .... Landlord also shall maintain .... (iii) if Landlord elects, in its sole discretion, the Building heating, ventilation and air conditioning systems.

(B) Tenant shall, at its sole cost, pay for any damage to the roof ... caused by any act, omission, negligence or fault of Tenant or any employee, agent or contractor of Tenant.

8.02 **Tenant's Obligations.**

(A) During the Lease Term, Tenant shall, at its risk and at its own sole cost and expense, maintain all other parts of the Building and other improvements in or on the Premises in good repair and condition (including all necessary replacements), including, but not limited to, heating, ventilation and air conditioning systems (if Landlord has elected not to maintain under Section 8.01) ....

9.05 **Roof Access.** ANYTHING IN THIS LEASE TO THE CONTRARY NOTWITHSTANDING, TENANT SHALL NOT AND SHALL NOT PERMIT ANY OF ITS EMPLOYEES, AGENTS, CONTRACTORS OR INVITEES TO ENTER ON OR IN ANY WAY MOVE ABOUT ON THE ROOF OF THE BUILDING, FOR ANY PURPOSES WHATSOEVER, WITHOUT THE PRIOR CONSENT OF, COORDINATION WITH, AND SUPERVISION OF THE LANDLORD OR ITS SELECTED AGENTS OR CONTRACTORS.

10.01 **Indemnification.** Tenant shall protect, indemnify, hold harmless and defend Landlord and any mortgagees or ground lessor, and each of their respective partners, directors, officers, agents and employees, successors and assigns, from and against:

(A) any and all loss, cost, damage, liability or expense as incurred (including but not limited to actual attorneys' fees and legal costs) arising out of or related to any claim, suit or judgment brought by or in favor of any person or persons for damage, loss or expense due to, but not limited to, bodily injury, including death, or property damage sustained by such person or persons which arises out of, is occasioned by or is in any way attributable to the use or occupancy of the Premises or any portion of the Building by Tenant or the acts or omissions of Tenant or its agents, employees, contractors, clients, invitees or subtenants except that caused by the intentional or negligent acts or omissions of Landlord or its agents or employees. ...

Notwithstanding anything to the contrary contained herein, nothing in this Section 10.01 shall be interpreted, construed or used to (i) affect, limit, reduce or abrogate any insurance coverage provided by any insurers to either Tenant or Landlord or (ii) infer or imply that Tenant is a partner, joint venturer, agent, employee, or otherwise acting by or at the direction of Landlord.

10.03 **Liability Insurance.**

(A) At all times during the Lease Term, Tenant shall procure and maintain, at its

> sole expense, general liability insurance applying to the use and occupancy of the Premises and the business operated by Tenant. Such insurance shall have a minimum combined single limit of liability of at least $2,000,000 per occurrence and a general aggregate limit of at least $3,000,000. All such policies shall be written to apply to all bodily injury, property damage, personal injury losses and shall be endorsed to include Landlord and its agents, beneficiaries, partners, employees, and any deed of trust holder or mortgagee of Landlord or any ground lessor as additional insureds. (A list of the current persons and entities to be named as additional insureds is attached hereto as Exhibit 10.03(a).) Such liability insurance shall be written as primary policies, not excess or contributing with or secondary to any other insurance as may be available to the Landlord or additional insureds.
>
> 10.06 **Policy Requirements.** ... A certificate of insurance (or, at Landlord's option, copies of the applicable policies) evidencing the insurance required under this Article X shall be delivered to Landlord immediately following the execution by Landlord of the Lease.

40. On or about October 3, 2000, an "Amendment to Lease" was entered into by and between RMS Limited Partnership as Landlord and Adera Corporation as Tenant for a lease term of January 1, 2001 to December 31, 2005.

41. On or about December 20, 2005, an "Amendment No. 2 to Lease" (attached as Exhibit 4) was entered into by and between RMS Limited Partnership as Landlord and Defendant NPG as Tenant.

42. This Amendment No. 2 to Lease recited that on July 27, 2004, Defendant NPG had acquired a 100% ownership interest in the former Tenant, Adera Corporation, a Nevada corporation and further than Defendant NPG had changed the name of the business it conducted on the premises from "Adera Corporation" to "National Print Las Vegas."

43. Under Amendment No. 2, the lease term was extended for 4 years from January 1, 2006 to December 31, 2009.

44. On or about May 27, 2009, a "Third Amendment to Lease" (attached hereto as Exhibit 5) was entered into by and between Defendant SNIP as Landlord and Defendant NLVINC as Tenant.

45. This Third Amendment to Lease recited that RMS Limited Partnership had

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

assigned its Landlord interest to Defendant SNIP and that Defendant NPG had assigned its Tenant interest to Defendant NLVINC.

46. The lease term under this Third Amendment to Lease was extended 3 years through December 31, 2012 and was the operative lease when the accident which is the subject matter of the Underlying Lawsuit involving Douglas Newson occurred.

47. The Third Amendment to Lease acknowledged the complete assignment and transfer of the Tenant's obligations to Defendant NLVINC from Defendant NPG.

48. The Indemnification clause in the Industrial Lease did not require Defendant NLVINC to indemnify Defendant SNIP for the intentional or negligent acts or omissions of Defendant SNIP and under Nevada law enunciated in *Reyburn Lawn & Landscape Designers, Inc. v. Plaster Development Co., Inc.*, 127 Nev. Adv. Op. 26, 255 P. 3d 268 (2011) there would be no obligation of Defendant NLVINC to indemnify Defendant SNIP under the terms of the Industrial Lease as amended, since the roof leaks were the responsibility of the Landlord under the above cited lease provisions and attributable to the acts or omissions of the contractors or consultants retained by Defendant SNIP.

49. Under the Industrial Lease as amended Defendant SNIP had the obligation to repair the roof.

50. Defendant SNIP acknowledged this responsibility in retaining Cleanseal Service of Nevada, Inc., Commercial Roofers, Inc., Eberhard/Southwest Roofing, Inc., Kelleher, Boyd & Associates, Inc. and Windy City Air-Conditioning & Heating, LLC as contractors and/or consultants.

## IV. POLICY AND UMBRELLA COVERAGE PROVISIONS

51. Neither the Policy nor the Umbrella Coverage name Defendants NLVINC or NLVLLC as insureds.

52. The Umbrella Coverage in the Commercial Umbrella Liability Coverage Part

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

Declarations denotes that the Named Insured is "the same as it appears in the Common Policy Declarations unless another entry is made here (and no entry is made on this Declarations form)."

53. Only Defendant NPG is a Named Insured set forth in the Declarations under the Policy and Umbrella Coverage.

54. Under the Policy in the Commercial General Liability Coverage Form, Section II, the Policy defines "Who is an Insured" as follows:

> 1. If you are designated in the Declarations as:
>
> ***
>
> d. An organization other than a partnership, joint venture or limited liability company, you are an insured. …
>
> ***
>
> 3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:
>
> a. Insurance under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier. …
>
> No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

55. Only NPG was shown in the Common Policy Declarations as the Named Insured (Form IW 501 05 09, page 1 of 2).

56. The effective period of coverage under the Policy was March 1, 2010 to March 1, 2011 ("Policy Period").

57. During this Policy Period, Defendant NLVINC was no longer in existence and had merged into Defendant NLVLLC which was then the Tenant under the Third Amendment to Lease.

58. During the Policy Period, the Named Insured NPG was not under any lease

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

agreement or lease obligation to Defendant SNIP, HIP or HIPN.

59. Defendant NLVINC was formed on March 1, 1994 and was thus not acquired or formed within 180 days of the Newson accident or the policy period for the Policy.Defendant NLVLLC was formed on September 19, 2007 and was thus not acquired or formed within 180 days of the Newson accident or the policy period for the Policy.

60. The filing of a fictitious firm name by Defendant NLVINC does not constitute an organization Defendant NPG newly acquired or formed, other than a partnership, joint venture or limited liability company, and over which Defendant NPG maintained ownership or majority interest, which might qualify as a Named Insured if there is no other similar insurance available to that organization.

61. The Policy in the Commercial General Liability Coverage Form (GA 101 12 04) provided the following additional definition of an insured under the Policy in Section II (3):

> Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:
>
> a. Insurance under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier . ...
>
> No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

62. The Policy contained a Commercial General Liability Extended Liability Endorsement (GA 227 02 07) which further provided:

5. 180 Day Coverage for Newly Formed or Acquired Organizations

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

SECTION II - WHO IS AN INSURED is amended as follows:

Subparagraph a. of Paragraph 4, is hereby deleted and replaced by the following:

a. Insurance under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier.

63. Defendant NPG and Plaintiff CINCINNATI entered into a Non-Waiver Agreement on October 25, 2011 wherein they agreed that any action taken by Plaintiff CINCINNATI in investigating the cause of loss, or investigating and ascertaining the amount of sound value, or the amount of loss and damage which occurred on December 20, 2011 would not waive or invalidate any of the terms and conditions of the Policy or Umbrella Coverage and would not waive or invalidate any rights of Plaintiff CINCINNATI.

64. Under the Umbrella Coverage, Commercial Umbrella Liability Coverage Form (US 101 UM 12 04), the word "insured" means any person or organization qualifying as such under SECTION II - WHO IS AN INSURED.

65. The Umbrella Coverage provides:

a. If you are designated in the Declarations as:

(4) An organization other than a partnership, joint venture, or limited liability company, you are an insured. ... Each of the following is also a Named Insured:

(a) Any "subsidiary" company of such organization, including any "subsidiary" of such "subsidiary":

1) Existing at the inception of this Coverage Part; or

2) Formed or acquired on or after the inception of this Coverage Part

(b) Any other company controlled and actively managed by such organization or any "subsidiary" thereof:



BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

1) At the inception of this Coverage Part; or

2) If the control and active management thereof is acquired on or after the inception of this Coverage Part.

***

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

66. The Underlying Lawsuit is based upon the acts or omissions of the Tenant as of 2010, to wit: Defendant NLVLLC, a limited liability company, and as a consequence, since this entity was not shown on the Declarations it is not an insured under the Umbrella Coverage, even if it was a subsidiary or a company controlled and actively managed by Defendant NPG.

67. A Certificate of Liability Insurance had been issued by the Producer, BB&T Huffaker & Trimble for Defendant NPG to Defendant HIP and All of its Affiliates for the Policy.

68. The Certificate of Liability Insurance was received by HIP on March 2, 2010.

69. This Certificate further stated in bold and conspicuous print the following:

**THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER, THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW**

70. Accordingly, in order to determine whether coverage is afforded to Defendants NPG, NLVINC, NLVLLC, ROCK-TENN, SNIP, HIP or HIPN, one must examine the pertinent parts of the Policy and under said Policy only Defendant NPG is an insured and neither Defendants NLVINC, NLVLLC, ROCK-TENN, SNIP, HIP or HIPN would be deemed to be insureds.

71. Had theTenant under the Third Amendment to Lease, Defendant NLVLLC, been

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

insured under the Policy, the policy provided the following in regard to additional insureds under the Commercial General Liability Extended Liability Endorsement in A(7)(a)(1):

7. **Automatic Additional Insured - Specified Relationships**

a. The following is hereby added to **SECTION II - WHO IS AN INSURED.**

(1) Any person or organization described in Paragraph 7.a(2) below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:

(a) A written contract or agreement ....

is an insured, provided:

(a) The written or oral contract or agreement is:

(1) Currently in effect or becomes effective during the policy period; and

(2) Executed prior to an "occurrence" or offense to which this insurance would apply: and ....

(2) Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:

(a) The manager or lessor of a premises leased to you with whom you have agreed per Paragraph 7.a(1) above to provide insurance, but only with respect to liability arising out of the ownership, maintenance or use of that part of a premises leased to you, subject to the following additional exclusions:

This insurance does not apply to:

1) Any "occurrence" which takes place after you cease to be a tenant in that premises.

2) Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured

72. Relative to Defendant NPG, said Defendant ceased being a Tenant in the premises as of the date of the accident to Mr. Newson which is the subject matter of the Underlying Lawsuit.

73. Relative to Defendant NVINC, although this was the name of the Tenant under the Third Amendment to Lease, in fact this entity ceased to exist prior to the Third Amendment and

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

was merge dissolved into a surviving limited liability company, Defendant NVLLC.

74. Defendant NVLLC was not an insured under the policy to activate the above cited provisions for additional insureds under contract or lessor.

75. The Policy in A(7)(d)(3) further states:

> Any insurance provided to an additional insured designated under Paragraph 7.a.(2) Subparagraphs (a), (b) and (d) does not apply to "bodily injury", "property damage" or, "personal and advertising injury" arising out of the sole negligence or willful misconduct of the additional insured or their agents, "employees" or any other representative of the additional insured.

76. Thus, since the lease obligated the Landlord, either Defendant SNIP, HIP or HIPN to maintain the roofing and they did in fact perform this work, no insurance would in any event be provided even if either qualified as an additional insured since the bodily injury to Newson in the Underlying Lawsuit resulted from the sole negligence or willful misconduct of said Defendants SNIP, HIP or HIPN.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

77. The Policy further in the Commercial General Liability Coverage Form, I(A)(2) states:

> Where required by a written contract or agreement, this insurance is primary and/or noncontributory as respects any other insurance policy issued to the additional insured, and such other insurance policy shall be excess and/or noncontributing, whichever applies, with this insurance.

78. The Policy also provides:

> WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" for that Additional Insured by you or on your behalf.

79. Pursuant to Nevada law stated in *Federal Insurance v. American Hardware Mutual Insurance*, 184 P.3d 390 (Nev. 2008), where the policy contains explicit limiting language, as does this Policy excluding coverage for an additional insured for bodily injury claims "arising out of the sole negligence or willful misconduct of the additional insured or their agents, 'employees' or any other representative of the additional insured" that there would be no coverage for an additional

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

insured.

80. Accordingly, since it appears that the roofing leak was the sole negligence or act or omission of the Landlord, or its roofing contractor agents or consultants, then the Policy by explicitly and specifically excluding coverage for an additional insured for bodily injury claims "arising out of the sole negligence or willful misconduct of the additional insured or their agents, 'employees' or any other representative of the additional insured" should be adjudicated by declaratory judgment to render no coverage to Defendants SNIP, HIP or HIPN.

81. Neither Defendants NLVINC nor NLVLLC are insureds under this policy, and thus neither Defendants SNIP, HIP or HIPN could be additional insureds, since no "insured" was required to name provide additional insured coverage to a lessor.

82. Even if Defendants NLVINC or NLVLLC could either be construed to be an insured, then neither of Defendants SNIP, HIP or HIPN would be covered since the cause of the roof leak was the sole negligence or willful misconduct of Defendants SNIP, HIP or HIPN or their agents, employees or other representatives.

83. The Policy under the CGL Coverage, GA 101 12 04, provides a further exclusion in Paragraph 2(r) **Additional Insured Prior Knowledge** which provides:

> An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit," if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.
>
> An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employee" assigned to give or receive notice of an "occurrence," "personal and advertising injury" offense, claim or "suit":
>
> (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
> (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;"

(3) First observes, or reasonably should have first observed, the "bodily injury" or "property damage;"
(4) Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or
(5) Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur. [emphasis supplied]

84. Given the history of roof leaks on the premises, Defendants SNIP, HIP and HIPN became aware, or reasonably should have become aware, of this condition from which bodily injury was substantially certain to occur.

85. By the merger and assignment transactions, neither ROCKTENN RSC, Defendant ROCK-TENN, nor ROCK-TENN CONVERTING COMPANY are insureds under the Policy or Umbrella Coverage.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

## IV. CAUSES OF ACTION

### Count I - Declaratory Judgment (No Coverage for Defendant NPG)

86. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

87. Defendant NPG was not a Tenant of the premises for purposes of potentially triggering coverage under the Policy or Umbrella Coverage when the Newson accident occurred.

88. Plaintiff CINCINNATI is entitled to a declaratory judgment that there is no coverage under the Policy or Umbrella Coverage for Defendant NPG for this alleged loss in the Underlying Lawsuit and, therefore, Plaintiff CINCINNATI has no duty under the Policy or Umbrella Coverage to indemnify Defendants SNIP, HIP or HIPN for any losses they may sustain for which they seek in regard to the Newson claims.

89. An actual, present and justiciable controversy has arisen and now exists between Plaintiff CINCINNATI and Defendant NPG concerning their respective rights under the Policy and Umbrella Coverage as follows:

a. Plaintiff CINCINNATI contends that, pursuant to the terms of the Policy and Umbrella Coverage, Plaintiff CINCINNATI owes no duty to Defendant NPG to defend or indemnify it for losses associated with the Underlying Lawsuit.

90. By reason of the foregoing, a judicial determination of the parties' respective duties, if any, under the Policy and Umbrella Coverage in connection with the Underlying Lawsuit, and the defense and indemnity of Defendant NPG, is both necessary and proper.

**Count II - Declaratory Judgment (No Coverage for Defendants NLVINC or NLVLLC)**

91. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

92. Under the terms and conditions of the Policy and Umbrella Coverage, neither Defendant NLVINC or Defendant NLVLLC are deemed "insureds" for whom coverage needs to be provided for either defense of the third-party complaint or indemnity for the losses sustained by Defendants SNIP, HIP or HIPN arising out of the Newson claims.

93. Plaintiff CINCINNATI is entitled to a declaratory judgment that there is no coverage under the Policy or Umbrella Coverage for Defendants NLVINC or NLVLLC for this alleged loss in the Underlying Lawsuit and, therefore, Plaintiff CINCINNATI has no duty under the Policy or Umbrella Coverage to indemnify Defendants SNIP, HIP or HIPN for any losses they may sustain for which they seek in regard to the Newson claims against said Defendants.

94. An actual, present and justiciable controversy has arisen and now exists between Plaintiff CINCINNATI and Defendants NLVINC and NLVLLC concerning their respective rights under the Policy and Umbrella Coverage as follows:

a. Plaintiff CINCINNATI contends that, pursuant to the terms of the Policy and Umbrella Coverage, Plaintiff CINCINNATI owes no duty to Defendants NLVINC and NLVLLC to defend or indemnify either of them for losses associated with the Underlying Lawsuit.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

95. By reason of the foregoing, a judicial determination of the parties' respective duties, if any, under the Policy and Umbrella Coverage in connection with the Underlying Lawsuit, and the defense and indemnity of Defendants NLVINC and/or NLVLLC, is both necessary and proper.

**Count III - Declaratory Judgment (No Coverage for Defendants SNIP, HIP or HIPN)**

96. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

97. Due to the express language of the Policy and Umbrella Coverage, neither Defendant SNIP, Defendant HIP or Defendant HIPN are additional insureds under the Policy or Umbrella Coverage for whom coverage needs to be afforded for defense and/or indemnity.

98. Plaintiff CINCINNATI is entitled to a declaratory judgment that there is no coverage under the Policy or Umbrella Coverage for Defendants SNIP, HIP or HIPN for this alleged loss in the Underlying Lawsuit and, therefore, Plaintiff CINCINNATI has no duty under the Policy or Umbrella Coverage to either defend nor indemnify Defendants SNIP, HIP or HIPN for any losses they may sustain for which they seek in regard to the Newson claims.

99. An actual, present and justiciable controversy has arisen and now exists between Plaintiff CINCINNATI and Defendants SNIP, HIP and HIPN concerning their respective rights under the Policy and Umbrella Coverage as follows:

a. Plaintiff CINCINNATI contends that, pursuant to the terms of the Policy and Umbrella Coverage, Plaintiff CINCINNATI owes no duty to Defendants SNIP, HIP or HIPN to defend or indemnify either of them for losses associated with the Underlying Lawsuit.

100. By reason of the foregoing, a judicial determination of the parties' respective duties, if any, under the Policy and Umbrella Coverage in connection with the Underlying Lawsuit, and the defense and indemnity of Defendants SNIP, HIP and/or HIPN, is both necessary and proper.

**Count IV - Declaratory Judgment (No Coverage for ROCK-TENN)**

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

101. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

102. Due to merger and assignment transactions involving ROCKTENN RSC, ROCK-TENN, and ROCK-TENN CONVERTING COMPANY, neither of these entities are deemed insureds under the Policy or Umbrella Coverage and Plaintiff CINCINNATI owes no duty to defend or indemnify either of such Defendants relative to the Underlying Lawsuit and claims sought by Defendant SNIP, Defendant HIP or Defendant HIPN.

103. Plaintiff CINCINNATI is entitled to a declaratory judgment that there is no coverage under the Policy or Umbrella Coverage for Defendant ROCK-TENN for this alleged loss in the Underlying Lawsuit and, therefore, Plaintiff CINCINNATI has no duty under the Policy or Umbrella Coverage to either defend nor indemnify Defendant ROCK-TENN for any losses it may sustain in regard to the Newson claims.

104. An actual, present and justiciable controversy has arisen and now exists between Plaintiff CINCINNATI and Defendant ROCK-TENN concerning their respective rights under the Policy and Umbrella Coverage as follows:

a. Plaintiff CINCINNATI contends that, pursuant to the terms of the Policy and Umbrella Coverage, Plaintiff CINCINNATI owes no duty to Defendant ROCK-TENN to defend or indemnify it for losses associated with the Underlying Lawsuit.

105. By reason of the foregoing, a judicial determination of the parties' respective duties, if any, under the Policy and Umbrella Coverage in connection with the Underlying Lawsuit, and the defense and indemnity of Defendant ROCK-TENN is both necessary and proper.

**Count V - Declaratory Judgment Against Defendant FFIC**

106. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

107. Plaintiff CINCINNATI contends that Defendant FFIC had a duty to defend and indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, and that said Defendant has failed and refused to defend or participate in the defense of Defendants SNIP, HIP or HIPN.

108. Plaintiff CINCINNATI seeks a judicial determination of Defendant FFIC's obligations under its respective insurance policy, to wit: FFIC Policy or any other policies it has issued to Defendants SNIP, HIP or HIPN sued in the Underlying Lawsuit.

109. Plaintiff CINCINNATI further seeks a declaration that Defendant FFIC is obligated to pay all defense costs and fees and fully indemnify Defendants SNIP, HIP or HIPN sued in the Underlying Lawsuit.

**Count VI - Equitable Subrogation Against FFIC**

110. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

111. Defendant FFIC under its commercial general liability policy issued to Defendants SNIP, HIP and/or HIPN had a complete and indivisible duty to defend Defendants SNIP, HIP and HIPN under said policy in the Underlying Lawsuit.

112. Prior to Plaintiff CINCINNATI agreeing to defend Defendants SNIP, HIP and HIPN in 2012, Defendant FFIC accepted the defense of said Defendants under the FFIC Policy, but after the agreement by Plaintiff CINCINNATI to undertake the defense of Defendants SNIP, HIP and HIPN in the Underlying Lawsuit, Defendant FFIC pulled its defense and discontinued paying attorneys' fees and costs for which it was obligated to pay.

113. Defendant FFIC has acted unreasonably by failing to pay the defense fees and costs and failing to offer sums under its FFIC Policy for settlement to resolve the Underlying Lawsuit.

114. Defendant FFIC is solely obligated to provide a defense and indemnity to Defendants SNIP, HIP and HIPN in connection with the Underlying Lawsuit.

115. To this date, Defendant FFIC has wrongfully refused to pay the defense fees and

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

costs in the Underlying Lawsuit being incurred and having been incurred by Defendants SNIP, HIP and HIPN through the law firm of Wood, Smith, Henning & Berman, LLP, experts and others in the defense in the Underlying Lawsuit.

116. Upon this Court granting declaratory judgment in favor of Plaintiff CINCINNATI and said judgment holding that Plaintiff CINCINNATI has no duty to defend or indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to full reimbursement of all defense fees and costs it has paid in defending under a reservation of rights.

117. To the extent this Court would find that Plaintiff CINCINNATI had an obligation to defend Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI has paid more than its fair and equitable share of the costs incurred to defend Defendants SNIP, HIP and HIPN in the Underlying Lawsuit.

118. As such, Plaintiff CINCINNATI has been damaged by Defendant FFIC's breaches and has a right of reimbursement via subrogation against said Defendant FFIC.

119. Plaintiff CINCINNATI has sustained a pecuniary loss in connection with paying the defense fees and costs incurred through Wood, Smith, Henning & Berman, LLP in the Underlying Lawsuit.

**Count VII - Equitable Contribution Against Defendant FFIC**

120. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

121. Defendant FFIC under its commercial general liability policy issued to Defendants SNIP, HIP and/or HIPN had a complete and indivisible duty to defend Defendants SNIP, HIP and HIPN under said policy in the Underlying Lawsuit.

122. Plaintiff CINCINNATI has paid more than its fair and equitable share of the fees and costs incurred to defend Defendants SNIP, HIP or HIPN in the Underlying Lawsuit.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

123. Such costs should have been equitably shared and paid by Defendant FFIC under the FFIC Policy.

**Count VIII - Equitable Indemnity Against Defendant FFIC**

124. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

125. Plaintiff CINCINNATI has paid the fees and costs to defend Defendants SNIP, HIP and HIPN under said policy in the Underlying Lawsuit that equitably should have been paid in full by Defendant FFIC under its FFIC Policy.

126. By reason of its payments of fees and costs to defend Defendants SNIP, HIP and HIPN under said policy in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to equitable indemnity from Defendant FFIC for defense costs and fees that should have been paid by Defendant FFIC.

**Count IX - Unjust Enrichment Against Defendant FFIC**

127. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

128. Plaintiff CINCINNATI has been since April of 2012 been providing and is currently providing a defense to Defendants SNIP, HIP and HIPN in the Underlying Lawsuit under a reservation of rights.

129. Plaintiff CINCINNATI owes no duty to defend or indemnify the Defendants SNIP, HIP or HIPN in the Underlying Lawsuit and Defendant FFIC has been unjustly enriched by Plaintiff CINCINNATI providing a defense.

130. Plaintiff CINCINNATI is entitled to a money judgment against Defendant FFIC on the grounds of unjust enrichment, reimbursing Plaintiff CINCINNATI for all attorneys' fees, costs expense and disbursements incurred in the defense of Defendants SNIP, HIP and HIPN in the Underlying Lawsuit, plus interest thereon.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

**Count X - Equitable Subrogation Against Defendants SNIP, HIP and HIPN**

131. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

132. To the extent Defendant FFIC is not obligated to defend Defendants SNIP, HIP and HIPN under its commercial general liability policy issued to Defendants SNIP, HIP and/or HIPN, since Plaintiff has no obligation to defend under the Policy or Umbrella Coverage, Plaintiff CINCINNATI is entitled to full reimbursement of all defense fees and costs it has paid in defending under a reservation of rights.

133. Plaintiff CINCINNATI is entitled to full reimbursement from Defendants SNIP, HIP and HIPN of all fees and costs paid to date in conjunction with the Underlying Lawsuit.

**Count XI - Equitable Indemnity Against Defendants SNIP, HIP and HIPN**

134. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

135. Plaintiff CINCINNATI has paid the fees and costs to defend Defendants SNIP, HIP and HIPN under a reservation of rights that equitably should have been paid in full by Defendants SNIP, HIP and HIPN if Defendant FFIC is found to have no obligation to pay the same.

136. By reason of its payments of fees and costs to defend Defendants SNIP, HIP and HIPN under said policy in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to equitable indemnity from Defendants SNIP, HIP and HIPN for defense costs and fees that should have been paid by Defendants SNIP, HIP and HIPN.

137. Plaintiff CINCINNATI in its reservation of rights letter reserved the rights to full reimbursement of fees and costs.

**Count XII - Attorneys' Fees and Costs**

138. Plaintiff CINCINNATI incorporates all previous allegations as though fully set forth herein.

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

139. Plaintiff CINCINNATI has been required to retain the services of Backus, Carranza & Burden to prosecute this action, and has and will continue to incur reasonable attorney fees and costs relative to its prosecution of this declaratory relief action.

140. Therefore, Plaintiff CINCINNATI alleges and hereby makes claim against the Defendants and each of them for an award of its costs and reasonable attorneys' fees incurred pursuant to the provisions of Nevada Revised Statutes § 18.005, 18.010, 18.020, and Rule 54 of the Fed. R. Civ. Proc., and any other provision, statute, rule or regulation providing for an award of attorney fees and/or costs in this action.

WHEREFORE, Plaintiff CINCINNATI prays for judgment as follows:

<u>On Count I</u>

1. For declaration and judgment that Plaintiff CINCINNATI has no duty to defend nor to indemnify Defendant NPG on the third-party complaint due to said Defendant not being a Tenant under the Industrial Lease or the Third Amendment to Lease in effect and operative at the time of the slip and fall alleged in the Underlying Lawsuit;
2. For attorneys' fees;
3. For costs incurred;
4. For such other and further relief as the Court may deem just and proper;

<u>On Count II</u>

1. For declaration and judgment that Plaintiff CINCINNATI has no duty to defend nor to indemnify Defendants NLVINC or NLVLLC on the third-party complaint in the Underlying Lawsuit due to said Defendants not being insureds under the Policy or Umbrella Coverage;
2. For attorneys' fees;
3. For costs incurred;
4. For such other and further relief as the Court may deem just and proper;

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

On Count III

1. For declaration and judgment that Plaintiff CINCINNATI has no duty to defend nor to indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit due to said Defendants not being insureds under the Policy or Umbrella Coverage;
2. For attorneys' fees;
3. For costs incurred;
4. For such other and further relief as the Court may deem just and proper;

On Count IV

1. For declaration and judgment that Plaintiff CINCINNATI has no duty to defend nor to indemnify Defendant ROCK-TENN in the Underlying Lawsuit due to said Defendant not being an insured under the Policy or Umbrella Coverage;
2. For attorneys' fees;
3. For costs incurred;
4. For such other and further relief as the Court may deem just and proper.

On Count V

1. For declaration and judgment that Defendant FFIC is obligated to pay all defense costs and fees and fully indemnify Defendants SNIP, HIP or HIPN sued in the Underlying Lawsuit.
2. For declaration and judgment that the Policy does not provide coverage for any of the Defendants named in the Underlying Lawsuit and that therefore as a consequence Plaintiff CINCINNATI has no duty to defend any Defendant for amounts sought in the Underlying Lawsuit;
3. For declaration and judgment that the Umbrella Coverage does not provide coverage for any of the Defendants named in the Underlying Lawsuit and that therefore as a consequence Plaintiff CINCINNATI has no duty to indemnify any Defendant for amounts sought in the Underlying Lawsuit;

4. For declaration and judgment that the Umbrella Coverage does not provide coverage for any of the Defendants and Plaintiff CINCINNATI, therefore, has no duty to defend any Defendant for amounts sought in the Underlying Lawsuit;
5. For declaration and judgment that Defendant FFIC has an obligation under the FFIC Policy to defend and indemnify the Defendants SNIP, HIP and HIPN in the Underlying Lawsuit;
6. For judgment that Plaintiff CINCINNATI be awarded its costs and reasonable attorney fees incurred in the prosecution of this declaratory judgment action;
7. For judgment that Plaintiff CINCINNATI be reimbursed for those fees expended in defending Defendants SNIP, HIP and HIPN in the Underlying Lawsuit;
8. For judgment that Plaintiff CINCINNATI be awarded prejudgment interest; and
9. For attorneys' fees;
10. For costs incurred;
11. For judgment as to such other relief as this Court deems just and proper.

<u>On Count VI</u>

1. For equitable subrogation from Defendant FFIC in an amount equal to the full amount of defense fees and costs incurred by Plaintiff CINCINNATI in the defense of Defendants SNIP, HIP and HIPN in the Underlying Lawsuit;
2. Upon this Court granting declaratory judgment in favor of Plaintiff CINCINNATI and said judgment holding that Plaintiff CINCINNATI has no duty to defend or indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to full reimbursement of all defense fees and costs it has paid in defending under a reservation of rights.
3. To the extent this Court would find that Plaintiff CINCINNATI had an obligation to defend Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI has paid more than its fair and equitable share of the costs incurred to defend Defendants

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

SNIP, HIP and HIPN in the Underlying Lawsuit.

4. For an award of prejudgment interest;

5. For attorneys' fees incurred herein;

6. For costs of suit incurred herein; and

7. For such other and further relief as the Court may deem just and proper.

On Count VII

1. For equitable contribution from Defendant FFIC in an amount equal to the full amount of defense fees and costs incurred by Plaintiff CINCINNATI in the defense of Defendants SNIP, HIP and HIPN in the Underlying Lawsuit;

2. Upon this Court granting declaratory judgment in favor of Plaintiff CINCINNATI and said judgment holding that Plaintiff CINCINNATI has no duty to defend or indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to full reimbursement of all defense fees and costs it has paid in defending under a reservation of rights.

3. To the extent this Court would find that Plaintiff CINCINNATI had an obligation to defend Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI has paid more than its fair and equitable share of the costs incurred to defend Defendants SNIP, HIP and HIPN in the Underlying Lawsuit.

4. For an award of prejudgment interest;

5. For attorneys' fees incurred herein;

6. For costs of suit incurred herein; and

7. For such other and further relief as the Court may deem just and proper.

On Count VIII

1. For equitable indemnity from Defendant FFIC in an amount equal to the full amount of defense fees and costs incurred by Plaintiff CINCINNATI in the defense of Defendants

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

SNIP, HIP and HIPN in the Underlying Lawsuit;

2. Upon this Court granting declaratory judgment in favor of Plaintiff CINCINNATI and said judgment holding that Plaintiff CINCINNATI has no duty to defend or indemnify Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI is entitled to full reimbursement of all defense fees and costs it has paid in defending under a reservation of rights.
3. To the extent this Court would find that Plaintiff CINCINNATI had an obligation to defend Defendants SNIP, HIP or HIPN in the Underlying Lawsuit, Plaintiff CINCINNATI has paid more than its fair and equitable share of the costs incurred to defend Defendants SNIP, HIP and HIPN in the Underlying Lawsuit.
4. For an award of prejudgment interest;
5. For attorneys' fees incurred herein;
6. For costs of suit incurred herein; and
7. For such other and further relief as the Court may deem just and proper.

<u>On Count IX</u>

1. For a money judgment against Defendant FFIC on the grounds of unjust enrichment, reimbursing Plaintiff CINCINNATI for all attorneys' fees, costs expense and disbursements incurred in the defense of Defendants SNIP, HIP and HIPN in the Underlying Lawsuit, plus interest thereon.
2. For an award of prejudgment interest;
3. For attorneys' fees incurred herein;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court may deem just and proper.

<u>On Count X</u>

1. For equitable subrogation from Defendants SNIP, HIP and HIPN in an amount equal to the

full amount of defense fees and costs incurred by Plaintiff CINCINNATI in the defense of said Defendants in the Underlying Lawsuit;

2. For an award of prejudgment interest;
3. For attorneys' fees incurred herein;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court may deem just and proper.

On Count XI

1. For equitable indemnity from Defendants SNIP, HIP and HIPN in an amount equal to the full amount of defense fees and costs incurred by Plaintiff CINCINNATI in the defense of said Defendants in the Underlying Lawsuit;
2. For an award of prejudgment interest;
3. For attorneys' fees incurred herein;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court may deem just and proper.

///

///

///

///

///

///

///

///

///

///

BACKUS, CARRANZA & BURDEN
3050 SOUTH DURANGO
LAS VEGAS, NEVADA 89117
TELE: (702) 872-5555 FAX: (702) 872-5545

On Count XII

1. For an award of its costs and reasonable attorneys' fees incurred pursuant to the provisions of Nevada Revised Statutes § 18.005, 18.010, 18.020, and Rule 54 of the Fed. R. Civ. Proc., and any other provision, statute, rule or regulation providing for an award of attorney fees and/or costs in this action.

DATED this 21 day of December, 2014.

Respectfully Submitted,

**BACKUS, CARRANZA & BURDEN**

By: ______________________________
Leland Eugene Backus, Esq.
3050 South Durango Drive
Las Vegas, NV 89117
Attorneys for Plaintiff
*Cincinnati Insurance Company*

# EXHIBIT 1

# THE CINCINNATI INSURANCE COMPANY

P.O. BOX 145496, CINCINNATI, OHIO 45250-5496
513-870-2000

PRN 300 22 95/PRA 300 22 95
Previous Policy Number

A Stock Insurance Company

## PRINTERS PACKAGE COMMON POLICY DECLARATIONS

RENEWAL

DECLARATIONS POLICY NUMBER PRN 300 22 95/PRA 300 22 95

**NAMED INSURED** NATIONAL PRINT GROUP INC
PO BOX 5968
CHATTANOOGA TN 37406

**ADDRESS**
(Number & Street,
Town, County,
State & Zip No.)

**Policy Period**: At 12:01 A.M., STANDARD TIME AT YOUR MAILING ADDRESS SHOWN ABOVE

**All coverages except Automobile and / or Garage**
Policy number: PRN 300 22 95 FROM: 03-01-2010 TO: 03-01-2011

**Automobile and / or Garage coverage only**
Policy number: PRA 300 22 95 FROM: 03-01-2010 TO: 03-01-2011

Agency BB&T HUFFAKER & TRIMBLE 41-091

City CHATTANOOGA TN

**Business Description**
CORPORATION

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

FORMS APPLICABLE TO ALL COVERAGE PARTS: (show numbers)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| IA4330 | 03/08 | IA102 | 09/08 | IA904 | 04/04 | IA4109TN | 10/09 | | |
| IL0110 | 09/07 | IL0115 | 01/10 | IL0141 | 08/07 | IP404TN | 06/94 | | |
| IA4236 | 01/08 | IA4238 | 01/08 | IA4338 | 01/09 | IP446 | 08/01 | | |
| IA4006 | 09/07 | FM501 | 08/06 | GA501 | 10/01 | CA509 | 08/07 | | |
| AA501 | 03/06 | USC504 | 12/04 | | | | | | |

CW5 JWZ
03-05-2010

Countersigned ______________________ By ______________________
(Date) (Authorized Representative)

ORIGINAL
This is a true & certified copy of the General Liability & Umbrella portions of the policy.

Marc Phillips, Vice President

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

**A. Cancellation**

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.
2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:
   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or
   b. 30 days before the effective date of cancellation if we cancel for any other reason.
3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.
4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.
5. If this policy is cancelled, we will send the first Named Insured any premium refund due. The refund will be pro rata. The cancellation will be effective even if we have not made or offered a refund.
6. If notice is mailed, proof of mailing will be sufficient proof of notice.

**B. Changes**

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

**C. Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**D. Inspections and Surveys**

1. We have the right to:
   a. Make inspections and surveys at any time;
   b. Give you reports on the conditions we find; and
   c. Recommend changes.
2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:
   a. Are safe or healthful; or
   b. Comply with laws, regulations, codes or standards.
3. Paragraphs **1.** and **2.** of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.
4. Paragraph **2.** of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

**E. Premiums**

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and
2. Will be the payee for any return premiums we pay.

**F. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# FORMS AND ENDORSEMENTS SCHEDULE
# AT INCEPTION OF POLICY

POLICY NUMBER PRN 300 22 95 EFFECTIVE DATE 03-01-2010

NAMED INSURED NATIONAL PRINT GROUP INC

FORMS AND ENDORSEMENTS APPLICABLE AT INCEPTION OF POLICY

| | | |
|---|---|---|
| IW501 | 05/09 | PRINTERS PACKAGE COMMON POLICY DECLARATIONS |
| IA4330 | 03/08 | FORMS AND ENDORSEMENTS SCHEDULE AT INCEPTION OF POLICY |
| IA102 | 09/08 | SUMMARY OF PREMIUMS CHARGED |
| IA904 | 04/04 | SCHEDULE OF LOCATIONS |
| IA4109TN | 10/09 | TENNESSEE CHANGES - CANCELLATION AND NONRENEWAL |
| IL0110 | 09/07 | NEVADA CHANGES-CONCEALMENT, MISREPRESENTATION OR FRAUD |
| IL0115 | 01/10 | NEVADA CHANGES - DOMESTIC PARTNERSHIP |
| IL0141 | 08/07 | NEW JERSEY CHANGES - CIVIL UNION |
| IP404TN | 06/94 | IMPORTANT INFORMATION TO POLICYHOLDERS TENNESSEE |
| IA4236 | 01/08 | POLICYHOLDER NOTICE TERRORISM INSURANCE COVERAGE |
| IA4238 | 01/08 | CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM |
| IA4338 | 01/09 | SIGNATURE ENDORSEMENT |
| IP446 | 08/01 | NOTICE TO POLICYHOLDERS |
| IA4006 | 09/07 | SPECIAL PER OCCURRENCE DEDUCTIBLE ENDORSEMENT |
| FM501 | 08/06 | COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS |
| FA450 | 11/04 | COMMERCIAL PROPERTY CONDITIONS |
| FM101 | 04/04 | BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL |
| FA4042 | 11/07 | PROPERTY COVERAGE PART AMENDATORY ENDORSEMENT |
| IA460 | 04/04 | PROTECTIVE SAFEGUARDS |
| FA245 | 04/04 | EQUIPMENT BREAKDOWN COVERAGE (INCLUDING PRODUCTION EQUIPMENT) |
| FA4024 | 04/04 | NOTICE TO POLICYHOLDERS COMMERCIAL PROPERTY COVERAGE PART EDITION |
| FA213 | 04/04 | BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM |
| FA250 | 04/06 | CINCIPLUS COMMERCIAL PROPERTY EXPANDED COVERAGE PLUS ENDORSEMENT |
| FA302 | 04/04 | ADDITIONAL EXCLUSIONS |
| FA4053 | 04/06 | CINCIPLUS COMMERCIAL PROPERTY EXPANDED COVERAGE PLUS ENDORSEMENT |
| FW202 | 04/04 | PRINTERS COVERAGE ENHANCEMENT |
| GA501 | 10/01 | COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS |
| GA101 | 12/04 | COMMERCIAL GENERAL LIABILITY COVERAGE FORM |
| GA227 | 02/07 | COMMERCIAL GENERAL LIABILITY EXTENDED LIABILITY ENDORSEMENT |
| CG2620 | 10/93 | NEW JERSEY CHANGES-LOSS INFORMATION |
| GA4240 | 01/06 | 2004 NOTICE TO POLICYHOLDERS |
| GA4245 | 01/05 | NOTICE TO POLICYHOLDERS - EXCLUSION - VIOLATION OF STATUTES THAT |
| CG0067 | 03/05 | EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHON |
| CG2116 | 07/98 | EXCLUSION - DESIGNATED PROFESSIONAL SERVICES |
| CA509 | 08/07 | CRIME AND FIDELITY COVERAGE PART DECLARATIONS |

This is a schedule of the forms and endorsements found in this policy on its inception date. The schedule is not updated during the policy term to reflect additions to or deletions from this schedule. No coverage is provided by this schedule. It does not replace any provision of your policy. You should read your policy and review your declarations page(s) and any subsequent endorsements carefully for complete information on the coverage that you are provided. If there is any conflict between the policy and this schedule, the provisions of the policy shall prevail.

# FORMS AND ENDORSEMENTS SCHEDULE
# AT INCEPTION OF POLICY

POLICY NUMBER PRN 300 22 95 EFFECTIVE DATE 03-01-2010

NAMED INSURED NATIONAL PRINT GROUP INC

FORMS AND ENDORSEMENTS APPLICABLE AT INCEPTION OF POLICY

| | | |
|---|---|---|
| CR0020 | 05/06 | COMMERCIAL CRIME COVERAGE FORM |
| CA440 | 08/07 | COMMERCIAL CRIME COVERAGE FORM AMENDATORY ENDORSEMENT |
| CA456 | 10/08 | 2008 NOTICE TO POLICYHOLDERS CRIME AND FIDELITY COVERAGE |
| AA501 | 03/06 | BUSINESS AUTO COVERAGE PART DECLARATIONS |
| AA218 | 03/06 | AUTOMOBILE SCHEDULE - BUSINESS AUTO |
| AA101 | 03/06 | BUSINESS AUTO COVERAGE FORM |
| CA0146 | 07/01 | TENNESSEE CHANGES |
| AA480TN | 02/06 | TENNESSEE UNINSURED MOTORISTS COVERAGE |
| CA2127 | 06/08 | NEVADA UNINSURED MOTORISTS COVERAGE |
| AP401TN | 10/08 | UNINSURED MOTORISTS COVERAGE OPTION SELECTION FORM TENNESSEE |
| CA0136 | 10/01 | NEVADA CHANGES |
| AA265 | 04/09 | CINCIPLUS BUSINESS AUTO EXPANDED COVERAGE (XC) ENDORSEMENT |
| AA4120 | 10/01 | AMENDATORY ENDORSEMENT |
| AA4210 | 03/06 | NOTICE TO POLICYHOLDERS 2006 BUSINESS AUTOMOBILE REWRITE |
| AA261 | 03/06 | AUTO MEDICAL PAYMENTS COVERAGE |
| UA125 | 01/90 | |
| USC504 | 12/04 | COMMERCIAL UMBRELLA LIABILITY COVERAGE PART DECLARATIONS |
| US511 | 09/02 | ADDITIONAL SCHEDULE OF UNDERLYING INSURANCE |
| US101UM | 12/04 | COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM |
| US4060 | 12/04 | NOTICE TO POLICYHOLDERS COMMERCIAL UMBRELLA POLICY PROGRAM |
| US4062 | 11/05 | MOBILE EQUIPMENT SUBJECT TO MOTOR VEHICLE INSURANCE LAWS - |
| US4063 | 01/06 | NOTICE TO POLICYHOLDERS - MOBILE EQUIPMENT SUBJECT TO MOTOR |
| UA302 | 12/04 | EXCLUSION OF DESIGNATED PROFESSIONAL SERVICES |
| US3009 | 12/04 | PRINTERS ERRORS AND OMISSIONS LIMITATION |
| US302 | 12/04 | POLLUTANT EXCLUSION - OTHER THAN AUTO |
| US352 | 12/04 | PERSONAL PROPERTY CARE, CUSTODY OR CONTROL EXCLUSION |
| US407 | 12/04 | EMPLOYEE BENEFIT LIABILITY |

This is a schedule of the forms and endorsements found in this policy on its inception date. The schedule is not updated during the policy term to reflect additions to or deletions from this schedule. No coverage is provided by this schedule. It does not replace any provision of your policy. You should read your policy and review your declarations page(s) and any subsequent endorsements carefully for complete information on the coverage that you are provided. If there is any conflict between the policy and this schedule, the provisions of the policy shall prevail.

Attached to POLICY
NUMBER PRN 300 22 95/PRA 300 22 95

# SUMMARY OF PREMIUMS CHARGED

**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM CHARGE IS INDICATED**

| | |
|---|---|
| Commercial Property Coverage Part W/EBC | $ 57,991 |
| Commercial General Liability Coverage Part | $ 3,795 |
| Commercial Umbrella / Excess Liability Coverage Part | $ 5,314 |
| CRIME AND FIDELITY COVERAGE PART | $ 1,325 |
| FL REVENUE SURCHARGE | $ 6 |
| FHCF ASSESSMENT * | $ 1 |
| 2005 FL CITIZENS REGULAR ASSESSMENT * | $ 1 |
| 2005 FL CITIZENS EMERGENCY ASSESSMENT * | $ 1 |
| 2006 FIGA ASSESSMENT * | $ 1 |
| 2006 FIGA EMERGENCY ASSESSMENT * | $ 1 |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| Installment Charge | $ 20 |
| Sub-Total | $ 68,449 |
| Commercial Auto Coverage Part | $ 4,942 |
| Auto Installment Charge | $ INCL |
| Terrorism Coverage | $ 523 |
| *(NOT INCLUDED IN ANNUAL TOTAL) Annual Total | $ 73,914 |

**PAYMENTS** +FLORIDA ASSESSMENTS

| | All Other | | + | Auto | | = | Total Installment | |
|---|---|---|---|---|---|---|---|---|
| | First Installment | Remaining Installment | | First Installment | Remaining Installment | | First Installment | Remaining Installment |
| QUARTERLY | $ 17,240 | $ 17,240 | + | $ 1,238 | $ 1,238 | = | $ 18,478 | $ 18,478 |

Automobile Coverages, Employers Liability, Employment Practices Liability Coverage, Professional Liability Coverage, Terrorism Coverage and / or Wrongful Acts Coverage, if included in the policy, are subject to Annual Adjustment of rates and premium on each anniversary of the policy.

Commercial Umbrella and Excess Liability, if included in the policy, may be subject to Annual Adjustment of premium on each anniversary. Refer to the Commercial Umbrella or Excess Liability Coverage Part Declarations form to see if this is applicable.

**ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SCHEDULE OF LOCATIONS

| LOC. | STREET ADDRESS CITY STATE ZIP CODE |
|---|---|
| 1 | 1001 LATTA ST<br>CHATTANOOGA TN 37411 |
| 2 | 1103-1105 LATTA ST<br>CHATTANOOGA TN 37406 |
| 3 | 2402 AMNICOLA HIGHWAY<br>CHATTANOOGA TN 37406 |
| 4 | 4545 WEST DIABLO DR STE A<br>LAS VEGAS NV 89118 |
| 5 | 1601 S HOLTZCLAW AVE<br>CHATTANOOGA TN 37402 |
| 6 | 440 N FEDERAL HWY<br>BOCA RATON FL 33432 |
| 7 | 79 N FRANKLIN TURNPIKE<br>RAMSEY NJ 07446 |
| 8 | 3105 FREEMAN ST<br>CHATTANOOGA TN 37406 |
| 9 | 850 BATTERY ST<br>SAN FRANCISCO CA 94108 |

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TENNESSEE CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

**COMMERCIAL AUTOMOBILE COVERAGE PART**
**COMMERCIAL GENERAL LIABILITY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**CONTRACTORS ERRORS AND OMISSIONS COVERAGE PART**
**CONTRACTORS' LIMITED POLLUTION LIABILITY COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**
**EMPLOYEE BENEFIT LIABILITY COVERAGE PART**
**EMPLOYMENT PRACTICES LIABILITY COVERAGE PART**
**EXCESS LIABILITY COVERAGE PART**
**EXCESS WORKERS COMPENSATION AND EMPLOYERS LIABILITY COVERAGE PART**
**GOLF COURSE CHEMICAL APPLICATION LIMITED LIABILITY COVERAGE PART**
**HOLE-IN-ONE COVERAGE PART**
**INTERNET LIABILITY COVERAGE PART**
**LIQUOR LIABILITY COVERAGE PART**
**MACHINERY AND EQUIPMENT COVERAGE PART**
**POLLUTION LIABILITY COVERAGE PART**
**PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART**
**PROFESSIONAL LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**

**A.** Paragraph **5.** of the **Cancellation** Common Policy Condition is replaced by the following:

**5.** If this policy is cancelled, we will send the first Named Insured any premium refund due.

The refund will be pro rata if:

**a.** We cancel; or

**b.** The policy is cancelled at the request of a premium finance company that has financed this policy under a premium finance agreement.

The refund may be less than pro rata if the first Named Insured cancels the policy.

The cancellation will be effective even if we have not made or offered a refund.

**B.** The following is added to the **Cancellation** Common Policy Condition:

**CANCELLATION OF POLICIES IN EFFECT FOR 60 DAYS OR MORE**

If this policy has been in effect for 60 days or more, or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

**1.** Nonpayment of premium, including any additional premium, calculated in accordance with our current rating manual, justified by a physical change in the insured property or a change in its occupancy or use;

**2.** Your conviction of a crime increasing any hazard insured against;

**3.** Discovery of fraud or material misrepresentation on the part of either of the following:

**a.** You or your representative in obtaining this insurance; or

**b.** You in pursuing a claim under this policy;

**4.** Failure to comply with written loss control recommendations;

**5.** Material change in the risk which increases the risk of loss after we issued or renewed insurance coverage;

**6.** Determination by the insurance commissioner that the continuation of the policy would jeopardize our solvency or would place us in violation of the insurance laws of Tennessee or any other state;

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

7. Your violation or breach of any policy terms or conditions; or

8. Other reasons that are approved by the insurance commissioner.

Notice of cancellation will state the reason for cancellation.

C. The following is added and supersedes any provisions to the contrary.

**NONRENEWAL**

1. If we decide not to renew this policy, we will mail or deliver written notice of nonrenewal to the first Named Insured and agent, at least 60 days before the expiration date unless:

   a. We have offered to issue a renewal policy; or

   b. You have obtained replacement coverage or have agreed in writing to obtain replacement coverage.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's and agent's addresses shown in the policy. If notice is mailed, proof of mailing will be sufficient proof of notice.

D. The following is added to the **Premiums** Common Policy Condition:

Whenever an insurance policy which is financed with a premium finance company is cancelled, the insurer shall return, within 30 days after the effective date of the cancellation, whatever gross unearned premiums are due under the insurance policy directly to the premium finance company for the account of the first Named Insured.

Includes copyrighted material of Insurance Services Office, Inc., with its permission.
Includes copyrighted material of ISO Commercial Risk Services, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEVADA CHANGES - CONCEALMENT, MISREPRESENTATION OR FRAUD

This endorsement modifies insurance provided under the following:

CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART - FARM PROPERTY - OTHER FARM PROVISIONS FORM - ADDITIONAL COVERAGES, CONDITIONS, DEFINITIONS
FARM COVERAGE PART - LIVESTOCK COVERAGE FORM
FARM COVERAGE PART - MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
STANDARD PROPERTY POLICY

The **CONCEALMENT, MISREPRESENTATION OR FRAUD** Condition is replaced by the following:

**CONCEALMENT, MISREPRESENTATION OR FRAUD**

We will not pay for any loss ("loss") or damage in any case of:

1. Concealment or misrepresentation of a material fact; or
2. Fraud;

committed by an insured ("insured") at any time and relating to a claim under this policy.

 © ISO Properties, Inc., 2006 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEVADA CHANGES - DOMESTIC PARTNERSHIP

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** All references to spouse shall include an individual who is in a domestic partnership recognized under Nevada law.

**B.** Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

1. Individual Named Insured by blood, adoption, marriage or domestic partnership recognized under Nevada law, who is a resident of such Named Insured's household, including a ward or foster child; or
2. Individual named in the Schedule by blood, adoption, marriage or domestic partnership recognized under Nevada law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage - Broadened Coverage For Named Individual Endorsement is attached.

**C.** With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or domestic partnership recognized under Nevada law, who is a resident of your household, including a ward or foster child.

 © Insurance Services Office, Inc., 2009 

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NEW JERSEY CHANGES - CIVIL UNION

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL LIABILITY UMBRELLA COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
FARM COVERAGE PART
FARM UMBRELLA LIABILITY POLICY
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. The term "spouse" is replaced by the following:

Spouse or party to a civil union recognized under New Jersey law.

B. Under the Commercial Auto Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to the:

1. Individual Named Insured by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of such Named Insured's household, including a ward or foster child; or

2. Individual named in the Schedule by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of the individual's household, including a ward or foster child, if the Drive Other Car Coverage - Broadened Coverage for Named Individual Endorsement is attached.

C. With respect to coverage for the ownership, maintenance, or use of "covered autos" provided under the Commercial Liability Umbrella Coverage Part, the term "family member" is replaced by the following:

"Family member" means a person related to you by blood, adoption, marriage or civil union recognized under New Jersey law, who is a resident of your household, including a ward or foster child.

 © ISO Properties, Inc., 2007

# IMPORTANT INFORMATION TO POLICYHOLDERS
# TENNESSEE

In the event you need to contact someone about this policy for any reason please contact your agent. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number.

The Cincinnati Insurance Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

The Cincinnati Life Insurance Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

The Cincinnati Casualty Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

The Cincinnati Indemnity Company
P.O. Box 145496
Cincinnati, Ohio 45250-5496
Telephone (513) 870-2278

# POLICYHOLDER NOTICE
# TERRORISM INSURANCE COVERAGE

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

Your policy may contain coverage for certain losses caused by terrorism.

**Premium:**

In accordance with the federal Terrorism Risk Insurance Act, we are required to notify you of the portion of the premium, if any, attributable to the coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

- Refer to the SUMMARY OF PREMIUMS CHARGED or DECLARATIONS PAGE for the portion of your premium that is attributable to coverage for terrorist acts certified under the Act.

**Federal Participation:**

The Act also requires us to provide disclosure of federal participation in payment of terrorism losses.

- Under your policy, any losses caused by certified acts of terrorism would be partially reimbursed by the United States Government, Department of Treasury, under a formula established by federal law. Under this formula, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**Cap on Insurer Participation:**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**NOTE: IF YOUR POLICY IS A RENEWAL POLICY, THIS NOTICE IS PROVIDED TO SATISFY THE REQUIREMENTS UNDER THE TERRORISM RISK INSURANCE ACT FOR POLICYHOLDER DISCLOSURE: (1) AT THE TIME OF OUR OFFER TO RENEW THE POLICY AND (2) AT THE TIME THE RENEWAL IS COMPLETED.**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

**All Commercial Lines Coverage Parts, Coverage Forms, Policies and Endorsements subject to the federal Terrorism Risk Insurance Act and any amendments and extensions thereto**

**A.** The following definition is added with respect to the provisions of this endorsement:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**B. Cap On Losses from Certified Acts of Terrorism**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

**C. Application of Other Exclusions**

The terms and limitations of any terrorism exclusion, or the inapplicability, omission or absence of a terrorism exclusion, does not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part, Coverage Form, Policy or Endorsement such as losses excluded by:

1. Exclusions that address war, warlike action, insurrection, rebellion, revolution, military action, nuclear hazard, nuclear materials, nuclear reaction, radiation, or radioactive contamination;
2. Exclusions that address pollutants, contamination, deterioration, fungi or bacteria; or
3. Any other exclusion,

regardless if the "certified act of terrorism" contributes concurrently or in any sequence to the loss.

**D. Sunset Clause**

If the federal Terrorism Risk Insurance Act expires or is repealed, then this endorsement is null and void for any act of terrorism that takes place after the expiration or repeal of the Act.



Includes copyrighted material of ISO Properties, Inc. and American Association of Insurance Services, with their permission.

# SIGNATURE ENDORSEMENT

IN WITNESS WHEREOF, this policy has been signed by our President and Secretary in the City of Fairfield, Ohio, but this policy shall not be binding upon us unless countersigned by an authorized representative of ours. The failure to countersign does not void coverage in Arizona, Virginia and Wisconsin.



Secretary



President

The signature on any form, endorsement, policy, declarations, jacket or application other than the signature of the President or Secretary named above is deleted and replaced by the above signatures.

# THE CINCINNATI INSURANCE COMPANY
# THE CINCINNATI CASUALTY COMPANY
# THE CINCINNATI INDEMNITY COMPANY

## NOTICE TO POLICYHOLDERS

Please be advised that in your application for insurance you disclosed information to The Cincinnati Insurance Company, The Cincinnati Casualty Company and The Cincinnati Indemnity Company. The information disclosed in the application and all information subsequently collected by any of these companies may be shared among all three.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SPECIAL PER OCCURRENCE DEDUCTIBLE ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL PROPERTY COVERAGE PART**
**COMMERCIAL INLAND MARINE COVERAGE PART**
**CRIME AND FIDELITY COVERAGE PART**

**A. Special Per Occurrence Deductible**

1. If an "occurrence" happens to Covered Property under the Commercial Property Coverage Part and to Covered Property under at least one of the following:

   a. The Commercial Inland Marine Coverage Part, and

   b. The Commercial Crime Coverage Part;

   the most we will deduct from any loss or damage in any one "occurrence" is the deductible indicated on the **COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS.**

2. This endorsement does not apply to any of the forms listed in Paragraphs **a.** and **b.**:

   a. *** Electronic Data Processing Coverage Form, D. Deductible, 2. Specified Losses Deductible**

      **Jewelers Block Coverage Form**

      *** Water Backup from Sewers, Drains, Septic Systems or Sump Pumps Endorsement**

      **Windstorm or Hail Percentage Deductible Form**

      **Earthquake and Volcanic Eruption Endorsement**

      **Earthquake and Volcanic Eruption Endorsement (Sub-Limit Form)**

      **Flood Coverage Endorsement**

      **Equipment Breakdown Coverage (Including Production Equipment)**

      **Equipment Breakdown Coverage (Excluding Production Equipment)**

      *** Temperature Change Coverage Form**

      **Commercial Crime Coverage Form, A. Insuring Agreements, 1. Employee Theft, 2. Forgery or Alteration, 6. Computer Fraud and 7. Funds Transfer Fraud**

      **Crime Expanded Coverage (XC) Coverage Form, A. Insuring Agreements, 1. Employee Theft and 2. Forgery or Alteration**

      **Government Crime Coverage Form, A. Insuring Agreements, 1. Employee Theft - Per Loss Coverage, 2. Employee Theft - Per Employee Coverage, 3. Forgery or Alteration, 7. Computer Fraud and 8. Funds Transfer Fraud**

      *** Or such coverage as provided in the CinciPlus Commercial Property Expanded Coverage or Expanded Coverage Plus Forms**

   b. ☐ **Other**

**B. Definition**

For the purpose of this endorsement only, any definition of "occurrence" is deleted in its entirety and the following definition is added to:

1. **COMMERCIAL PROPERTY CONDITIONS,**
2. **COMMERCIAL INLAND MARINE CONDITIONS,**
3. **COMMERCIAL CRIME COVERAGE FORM,**
4. **CRIME EXPANDED COVERAGE (XC) COVERAGE FORM, and**
5. **GOVERNMENT CRIME COVERAGE FORM:**

**"Occurrence"** means all loss, damage, or a sequence of loss or damage, casualties or disasters arising from a single happening or event.

# THE CINCINNATI INSURANCE COMPANY

A STOCK INSURANCE COMPANY

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

Attached to and forming part of POLICY NUMBER: PRN 300 22 95 Effective Date: 03-01-2010

Named Insured: IS THE SAME AS IT APPEARS ON THE COMMON POLICY DECLARATIONS

**LIMITS OF INSURANCE**

| | | |
|---|---|---|
| EACH OCCURRENCE LIMIT | $ 1,000,000 | |
| GENERAL AGGREGATE LIMIT | $ 2,000,000 | |
| PRODUCTS-COMPLETED OPERATIONS AGGREGATE LIMIT | $ 2,000,000 | |
| PERSONAL & ADVERTISING INJURY LIMIT | $ 1,000,000 | ANY ONE PERSON OR ORGANIZATION |
| DAMAGE TO PREMISES RENTED TO YOU LIMIT<br>$100,000 limit unless otherwise indicated herein: | $ REFER TO GA227 | ANY ONE PREMISES |
| MEDICAL EXPENSE LIMIT<br>$5,000 limit unless otherwise indicated herein: | $ | ANYONEPERSON |

| CLASSIFICATION | CODE NO. | PREMIUM BASE<br>A - Area<br>B - Payroll<br>C - Gross Sales<br>D - Units<br>E - Other | RATE: Products / Completed Operations | RATE: All Other | ADVANCE PREMIUM: Products / Completed Operations | ADVANCE PREMIUM: All Other |
|---|---|---|---|---|---|---|
| EXTENDED LIABILITY | 20296 | | | 2% | | 125 MP |
| PRINTING<br>INCL PROD AND/OR COMP OP | 58408 | | | | | |
| LOC 1 - TN | | C 60,000,000 | | 0.044 | | 2,640 |
| LOC 4 - NV | | C 5,000,000 | | 0.0496 | | 248 |
| WAREHOUSES-PRIVATE<br>INCL PROD AND/OR COMP OP | 68706 | A 80,000 | | 9.109 | | 729 |
| BUILDINGS OR PREMISES<br>INCL PROD AND/OR COMP OP | 61212 | | | | | |
| LOC 6 - FL | | A 300 | | 33.922 | | 10 |
| LOC 7 - NJ | | A 600 | | 24.692 | | 15 |
| LOC 9 - CA | | A 600 | | 46.328 | | 28 |

The General Liability Coverage Part is subject to an annual minimum premium.

TOTAL ANNUAL PREMIUM $ 3,795

**FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GA101 | 12/04 | GA227 | 02/07 | CG2620 | 10/93 | GA4240 | 01/06 |
| GA4245 | 01/05 | CG0067 | 03/05 | CG2116 | 07/98 | | |

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED**.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS**.

**SECTION I - COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY;** or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS**.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, you did not know, per Paragraph **1.d.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part.

**c.** "Bodily injury" or "property damage" which:

**(1)** Occurs during the "coverage term"; and

**(2)** Was not, prior to the "coverage term", known by you, per Paragraph **1.d.** below, to have occurred;

includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.

**d.** You will be deemed to know that "bodily injury" or "property damage" has occurred at the earliest time when any "authorized representative":

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

**(3)** First observes, or reasonably should have first observed, the "bodily injury" or "property damage";

**(4)** Becomes aware, or reasonably should have become aware, by any means other than as described in **(3)** above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

**(5)** Becomes aware, or reasonably should have become aware, of a


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

condition from which "bodily injury" or "property damage" is substantially certain to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected or Intended Injury**

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually expected or intended. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. When a claim for such "bodily injury" or "property damage" is made, we will defend that claim provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation and Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured sustained in the "workplace";

(2) An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or

(3) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraphs (1) or (2) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

**f. Pollutant**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, Paragraph (a) does not apply to:

1) "Bodily injury" to any person injured while on any premises, site or location owned or occupied by, or rented or loaned to, you provided:


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

a) The injury is caused by the inadequate ventilation of vapors;

b) The person injured is first exposed to such vapors during the policy period; and

c) Within 30 days of such first exposure, the person injured is clinically diagnosed or treated by a physician for the medical condition caused by the exposure to such vapors. However, Paragraph **c)** does not apply if the "bodily injury" is caused by vapors produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

This exception **1)** shall apply only to Named Insureds; we shall have no duty to defend or pay damages for any person or organization that is not a Named Insured. However, this paragraph does not apply if the "bodily injury" is caused by vapors produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests.

For the purpose of the exception granted in Paragraph **1)** only, vapors means any gaseous or airborne irritant or airborne contaminant, including smoke, fumes, vapor or soot, but excluding asbestos, which is discharged, dispersed, emitted, released or escapes from materials, machinery or equipment used in the service or maintenance of the premises. Vapors does not mean any gaseous or airborne irritants or contaminants used in a manufacturing process or which is the product or by-product of any manufacturing process;

**2)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to this Coverage Part as an additional insured with respect to your ongoing operations or "your work" performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**3)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**1)** Any insured; or

**2)** Any person or organization for whom you may be legally responsible;

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, Paragraph **(d)** does not apply to:

**1)** "Bodily injury" or "property damage" arising out of the discharge, dispersal, seepage, migration, release, es-


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

cape or emission of fuels, lubricants or other operating fluids, or exhaust gases, which are needed to perform, or are the result of, the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids, or exhaust gases, escape, seep or migrate, or are discharged, dispersed, released or emitted from a vehicle part designed to hold, store or receive them. This exception does not apply if the fuels, lubricants or other operating fluids, or exhaust gases, escape, seep or migrate, or are discharged, dispersed, released or emitted with the intent to cause "bodily injury" or "property damage" or with the knowledge that "bodily injury" or "property damage" is substantially certain to occur, or if such fuels, lubricants or other operating fluids, or exhaust gases, are brought on or to the premises, site or location with such intent to escape, seep or migrate, or be discharged, dispersed, released or emitted as part of the operations being performed by such insured, contractor or subcontractor;

2) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

3) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, Paragraphs (2)(a) and (b) do not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 51 feet long; and


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is on, attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage to Property**

"Property damage" to:

(1) Property you own, rent or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of an insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire or explosion) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days, for which the amount we will pay is limited to the Damage To Premises Rented To You Limit as described in **SECTION III - LIMITS OF INSURANCE**.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal and Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Asbestos**

"Bodily injury" or "property damage" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q. Employment-Related Practices**

"Bodily injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**(2)** The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)** or **(c)** above is directed.

This exclusion applies:

**(1)** Whether the insured may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**r. Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage";

(3) First observes, or reasonably should have first observed, the "bodily injury" or "property damage";

(4) Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or

(5) Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur.

**s. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data .

**t. Distribution of Material in Violation of Statutes**

Bodily injury or property damage arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

Exclusions **c.** through **q.** do not apply to "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner, for which the amount we will pay is limited to the Damage to Premises Rented To You Limit as described in **SECTION III - LIMITS OF INSURANCE**.

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE**; and

(2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY; SECTION I - COVERAGES, COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**; or medical expenses under **SECTION I - COVERAGES, COVERAGE C. MEDICAL PAYMENTS**.

No other obligation or liability to pay sums or perform acts or services is covered unless expressly provided for under **SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**.

b. This insurance applies to "personal and advertising injury" only if:

(1) The "personal and advertising injury" is caused by an offense arising out of your business; and

(2) The "personal and advertising injury" offense was committed in the "coverage territory" during the policy period; and

(3) Prior to the "coverage term" in which the "personal and advertising injury" offense is committed, you did not know, per Paragraph **1.d.** below, that the offense had been committed or had begun to be committed, in whole or in part.

c. "Personal and advertising injury" caused by an offense which:

(1) Was committed during the "coverage term"; and


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(2) Was not, prior to the "coverage term", known by you, per Paragraph 1.d. below, to have been committed;

includes any continuation, change or resumption of that offense after the end of the "coverage term" in which it first became known by you.

d. You will be deemed to know that a "personal and advertising injury" offense has been committed at the earliest time when any "authorized representative":

(1) Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "personal and advertising injury";

(3) First observes, or reasonably should have first observed, the offense that caused the "personal and advertising injury";

(4) Becomes aware, or reasonably should have become aware, by any means, other than as described in (3) above, that the offense had been committed or had begun to be committed; or

(5) Becomes aware, or reasonably should have become aware, of a condition from which "personal and advertising injury" is substantially certain to occur.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation of Rights of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior to Coverage Term**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the later of the following:

(1) The inception of this Coverage Part; or

(2) The "coverage term" in which insurance coverage is sought.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "personal and advertising injury" is caused by or arises out of an offense committed subsequent to the execution of the contract or agreement. When a claim for such "personal and advertising injury" is made, we will defend that claim, provided the insured has assumed the obligation to defend such claim in the "insured contract". Such defense payments will not reduce the limits of insurance.

**f. Breach of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality or Performance of Goods - Failure to Conform to Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, pat-



Includes copyrighted material of Insurance Services Office, Inc., with its permission.

ent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds in Media and Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of web-sites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **17. a., b.** and **c.** of "personal and advertising injury" under **SECTION V - DEFINITIONS**.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet is not, by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board any insured hosts, owns, or over which any insured exercises control.

**l. Unauthorized Use of Another's Name or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Employment Related Practices**

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a), (b)** or **(c)** above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**n. Pollutant**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" at any time.

**o. Pollutant-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**p. Asbestos**

"Personal and advertising injury" arising out of, attributable to, or any way related to asbestos in any form or transmitted in any manner.

**q. Additional Insured Prior Knowledge**

An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit", if that additional insured knew, per the following paragraph, that a "personal and advertising injury" offense had been committed or had begun to be committed, in whole or in part, prior to the "coverage term" in which such offense


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

was committed or began to be committed.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that a "personal and advertising injury" offense has been committed or has begun to be committed at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employees" assigned to give or receive notice of an "occurrence", "personal and advertising injury" offense, claim or "suit":

(1) Reports all, or any part, of the "personal and advertising injury" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "personal and advertising injury";

(3) First observes, or reasonably should have first observed, the offense that caused the "personal and advertising injury";

(4) Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that the "personal and advertising injury" offense had been committed or had begun to be committed; or

(5) Becomes aware, or reasonably should have become aware, of a condition from which "personal and advertising injury" is substantially certain to occur.

r. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

s. **Distribution of Material in Violation of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C. MEDICAL PAYMENTS**

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within three years of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury on Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers' Compensation and Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletic Activities**

To any person injured while officiating, coaching, practicing for, instructing or participating in any physical exercises or games, sports, or athletic contests or exhibitions of an athletic or sports nature.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**.

**SUPPLEMENTARY PAYMENTS - COVERAGES A AND B**

We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

1. All expenses we incur.
2. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.
3. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.
4. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.
5. All costs taxed against the insured in the "suit".
6. Prejudgment interest awarded against the insured on that part of the judgment we become obligated to pay and which falls within the applicable limit of insurance. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.
7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**SECTION II - WHO IS AN INSURED**

1. If you are designated in the Declarations as:
   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.
   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.
   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.
   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.
2. Each of the following is also an insured:
   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by; or

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by,

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Insurance under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. a. The General Aggregate Limit is the most we will pay for the sum of:

(1) Medical expenses under **COVERAGE C. MEDICAL PAYMENTS;**

(2) Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY,** except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(3) Damages under **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY.**

This General Aggregate Limit will not apply if either the Location General Aggregate Limit of Insurance, Paragraph **2.b.**, or the Construction Project General Aggregate Limit of Insurance, Paragraph **2.c.** applies.

**b.** A separate Location General Aggregate Limit of Insurance, equal to the amount of the General Aggregate Limit shown in the Declarations, shall apply to each location owned by, or rented or leased to you and is the most we will pay for the sum of:

(1) Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

(2) Medical expenses under **COVERAGE C. MEDICAL PAYMENTS,**

which can be attributed to operations at only a single location owned by, or rented or leased to you.

**c.** A separate Construction Project General Aggregate Limit of Insurance, equal to the amount of the General Aggregate Limit shown in the Declarations, shall apply to each construction project and is the most we will pay for the sum of:

(1) Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

(2) Medical expenses under **COVERAGE C. MEDICAL PAYMENTS;**

which can be attributed only to ongoing operations and only at a single construction project.

**d.** Only for the purpose of determining which General Aggregate Limit of Insurance, **2.a., 2.b.,** or **2.c.**, applies:

(1) Location means premises involving the same or connecting lots, or premises, whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

(2) Construction project means a location you do not own, rent or lease where ongoing improvements, alterations, installation, demolition or maintenance work is performed by you or on your behalf. All connected ongoing improvements, alterations, installation, demolition or maintenance work performed by you or on your behalf at the same location for the same persons or organizations, no matter how often or under how many different contracts, will be deemed to be a single construction project.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to **2.a.** above, the Personal and Advertising Injury Limit is the most we will pay under **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

**a.** Damages under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**; and

**b.** Medical expenses under **COVERAGE C. MEDICAL PAYMENTS;**

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Damage to Premises Rented to You Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire or explosion, while rented to you or temporarily occupied by you with permission of the owner.

**7.** Subject to **5.** above, the Medical Expense Limit is the most we will pay under **COVERAGE C. MEDICAL PAYMENTS** for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each "coverage term".


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties in the Event of Occurrence, Offense, Claim or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or a "personal and advertising injury" offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

      You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Liberalization**

   If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part as of the latter of:

   a. The date we implemented the change in your state; or

   b. The date this Coverage Part became effective; and

   will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

5. **Other Insurance**

   If other valid and collectible insurance is available to the insured for a loss we cover under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** of this Coverage Part, our obligations are limited as follows:

   a. **Primary Insurance**

      This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

   b. **Excess Insurance**

      This insurance is excess over:


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar insurance for "your work";

(b) That is Fire or Explosion insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, g. Aircraft, Auto or Watercraft**.

(2) Any other primary insurance available to the insured covering liability for damages arising out of the premises or operations, or the products and completed operations, for which the insured has been added as an additional insured by attachment of an endorsement.

(3) Any other insurance:

(a) Whether primary, excess, contingent or on any other basis, except when such insurance is written specifically to be excess over this insurance; and

(b) That is a consolidated (wrap-up) insurance program which has been provided by the prime contractor/project manager or owner of the consolidated project in which you are involved.

When this insurance is excess, we will have no duty under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** or **COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**6. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If:

(1) The earned premium is less than the deposit premium, we will return the excess to the first Named Insured; or

(2) The earned premium is greater than the deposit premium, the difference will be due and payable to us by the first Named Insured upon notice from us.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**7. Representations**

By accepting this Coverage Part, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this Coverage Part in reliance upon your representations.

**8. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**9. Transfer of Rights of Recovery Against Others to Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**10. Two or More Coverage Forms or Policies Issued by Us**

If this Coverage Part and any other Coverage Form, Coverage Part or policy issued to you by us or any company affiliated with us apply to the same "occurrence" or "personal and advertising injury" offense, the aggregate maximum limit of insurance under all the Coverage Forms, Coverage Parts or policies shall not exceed the highest applicable limit of insurance under any one Coverage Form, Coverage Part or policy. This condition does not apply to any Coverage Form, Coverage Part or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Part.

**11. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast, telecast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. "Advertisement" includes a publicity article. For purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

**2.** "Authorized representative" means:

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are "authorized representatives".

**(2)** A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

**(3)** A limited liability company, your members and your managers are "authorized representatives".

**(4)** An organization other than a partnership, joint venture or limited liability company, your "executive officers" and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also "authorized representatives".

**(5)** A trust, your trustees are "authorized representatives".

**b.** Your "employees":

**(1)** Assigned to manage your insurance program; or

**(2)** Responsible for giving or receiving notice of an "occurrence", "personal and advertising injury" offense, claim or "suit";

are also "authorized representatives".

**3.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

However, "auto" does not include "mobile equipment".

4. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

5. "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

   a. The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

      (1) The day the policy period shown in the Declarations ends; or

      (2) The day the policy to which this Coverage Part is attached is terminated or cancelled.

   b. However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

6. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication,

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement to which we agree.

7. "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

10. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph **f.** does not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities;

**(4)** That indemnifies an advertising, public relations or media consulting firm for "personal and advertising injury" arising out of the planning, execution or failure to execute marketing communications programs. Marketing communications programs include but are not limited to comprehensive marketing campaigns; consumer, trade and corporate advertising for all media; media planning, buying, monitoring and analysis; direct mail; promotion; sales materials; design; presentations; point-of-sale materials; market research; public relations and new product development;

**(5)** Under which the insured, if an advertising, public relations or media consulting firm, assumes liability for "personal and advertising injury" arising out of the insured's rendering or failure to render professional services, including those services listed in Paragraph **(4)**, above;

**(6)** That indemnifies a web-site designer or content provider, or Internet search, access, content or service provider for injury or damage arising out of the planning, execution or failure to execute Internet services. Internet services include but are not limited to design, production, distribution, maintenance and administration of web-sites and web-banners; hosting web-sites; registering domain names; registering with search engines; marketing analysis; and providing access to the Internet or other similar networks; or

**(7)** Under which the insured, if a web-site designer or content provider, or Internet search, access, content or service provider, assumes liability for injury or damage arising out of the insured's rendering or failure to render Internet services, including those listed in Paragraph **(6)**, above.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing firm. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or

**c.** While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

15. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered autos .

16. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

17. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

18. "Pollutant" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include but are not limited to substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:

a. The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

b. The insured uses, generates or produces the "pollutant".

19. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed; or

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site; or

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**b.** Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a schedule, states that products-completed operations are included.

**20.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

**21.** "Suit" means a civil proceeding in which money damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

**c.** An appeal of a civil proceeding.

**22.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**23.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**24.** "Workplace" means that place and during such hours to which the "employee" sustaining "bodily injury" was assigned by you, or any other person or entity acting on your behalf, to work on the date of "occurrence".

**25.** "Your product":

**a.** Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

26. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

(2) The providing of or failure to provide warnings or instructions.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

# NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an insured under this Coverage Part is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the insured is, or had this Coverage Part not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured, or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an insured; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this exclusion:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

   "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

   "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

   "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

   "Nuclear facility" means:

   A. Any "nuclear reactor";

   B. Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

   C. Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

D. Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMMERCIAL GENERAL LIABILITY EXTENDED LIABILITY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**A. Endorsement - Table of Contents:**


| **Coverage:** | **Begins on Page:** |
|---|---|
| 1. Employee Benefit Liability Coverage | 2 |
| 2. Unintentional Failure to Disclose Hazards | 8 |
| 3. Damage to Premises Rented to You | 8 |
| 4. Supplementary Payments | 9 |
| 5. 180 Day Coverage for Newly Formed or Acquired Organizations | 9 |
| 6. Waiver of Subrogation | 9 |
| 7. Automatic Additional Insured - Specified Relationships: Managers or Lessors of Premises; Lessor of Leased Equipment; Vendors; and State or Political Subdivisions - Permits Relating to Premises | 10 |
| 8. Property Damage to Borrowed Equipment | 12 |
| 9. Employees as Insureds - Specified Health Care Services: Nurses; Emergency Medical Technicians; and Paramedics | 13 |
| 10. Broadened Notice of Occurrence | 13 |


**B. Limits of Insurance:**

The Commercial General Liability Limits of Insurance apply to the insurance provided by this endorsement, except as provided below:

1. **Employee Benefit Liability Coverage**

| | |
|---|---|
| Each Employee Limit: | $ 1,000,000 |
| Aggregate Limit: | $ 3,000,000 |
| Deductible: | $ 1,000 |

3. **Damage to Premises Rented to You**

The lesser of:

**a.** The Each Occurrence Limit shown in the Declarations; or

**b.** $500,000 unless otherwise stated $ ____________

4. **Supplementary Payments**

**a.** Bail bonds: $ 1,000

**b.** Loss of earnings: $ 350

8. **Property Damage to Borrowed Equipment**

| | |
|---|---|
| Each Occurrence Limit | $ 10,000 |
| Deductible | $ 250 |


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**C. Coverages**

**1. Employee Benefit Liability Coverage**

a. The following is added to **SECTION I - COVERAGES: Employee Benefit Liability Coverage.**

**(1) Insuring Agreement**

(a) We will pay those sums that the insured becomes legally obligated to pay as damages caused by any act, error or omission of the insured, or of any other person for whose acts the insured is legally liable, to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any report of an act, error or omission and settle any claim or "suit" that may result. But:

1) The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE;** and

2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

(b) This insurance applies to damages only if the act, error or omission, is negligently committed in the "administration" of your "employee benefit program"; and

1) Occurs during the policy period; or

2) Occurred prior to the effective date of this endorsement provided:

a) You did not have knowledge of a claim or "suit" on or before the effective date of this endorsement.

You will be deemed to have knowledge of a claim or "suit" when any "authorized representative";

i) Reports all, or any part, of the act, error or omission to us or any other insurer;

ii) Receives a written or verbal demand or claim for damages because of the act, error or omission; and

b) There is no other applicable insurance.

**(2) Exclusions**

This insurance does not apply to:

(a) **Bodily Injury, Property Damage or Personal and Advertising Injury**

"Bodily injury", "property damage" or "personal and advertising injury".

(b) **Dishonest, Fraudulent, Criminal or Malicious Act**

Damages arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, committed by any insured, including the willful or reckless violation of any statute.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(c) **Failure to Perform a Contract**

Damages arising out of failure of performance of contract by any insurer.

(d) **Insufficiency of Funds**

Damages arising out of an insufficiency of funds to meet any obligations under any plan included in the "employee benefit program".

(e) **Inadequacy of Performance of Investment / Advice Given with Respect to Participation**

Any claim based upon:

1) Failure of any investment to perform;

2) Errors in providing information on past performance of investment vehicles; or

3) Advice given to any person with respect to that person's decision to participate or not to participate in any plan included in the "employee benefit program".

(f) **Workers' Compensation and Similar Laws**

Any claim arising out of your failure to comply with the mandatory provisions of any workers' compensation, unemployment compensation insurance, social security or disability benefits law or any similar law.

(g) **ERISA**

Damages for which any insured is liable because of liability imposed on a fiduciary by the Employee Retirement Income Security Act of 1974, as now or hereafter amended, or by any similar federal, state or local laws.

(h) **Available Benefits**

Any claim for benefits to the extent that such benefits are available, with reasonable effort and cooperation of the insured, from the applicable funds accrued or other collectible insurance.

(i) **Taxes, Fines or Penalties**

Taxes, fines or penalties, including those imposed under the Internal Revenue Code or any similar state or local law.

(j) **Employment-Related Practices**

Any liability arising out of any:

(1) Refusal to employ;

(2) Termination of employment;

(3) Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or other employment - related practices, acts or omissions; or

(4) Consequential liability as a result of (1), (2) or (3) above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

(3) **Supplementary Payments**

**SECTION I - COVERAGES, SUPPLEMENTARY PAYMENTS - COVERAGES A AND B** also apply to this Coverage.

b. **Who is an Insured**

As respects Employee Benefit Liability Coverage, **SECTION II - WHO IS AN INSURED** is deleted in its entirety and replaced by the following:

(1) If you are designated in the Declarations as:

(a) An individual, you and your spouse are insureds, but



Includes copyrighted material of Insurance Services Office, Inc., with its permission.

only with respect to the conduct of a business of which you are the sole owner.

**(b)** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds but only with respect to the conduct of your business.

**(c)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**(d)** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

**(e)** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**(2)** Each of the following is also an insured:

**(a)** Each of your "employees" who is or was authorized to administer your "employee benefit program".

**(b)** Any persons, organizations or "employees" having proper temporary authorization to administer your "employee benefit program" if you die, but only until your legal representative is appointed.

**(c)** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**(3)** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if no other similar insurance applies to that organization. However, coverage under this provision:

**(a)** Is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier; and

**(b)** Does not apply to any act, error or omission that was committed before you acquired or formed the organization.

**c. Limits of Insurance**

As respects Employee Benefit Liability Coverage, **SECTION III - LIMITS OF INSURANCE** is deleted in its entirety and replaced by the following:

**(1)** The Limits of Insurance shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** and the rules below fix the most we will pay regardless of the number of:

**(a)** Insureds;

**(b)** Claims made or "suits" brought;

**(c)** Persons or organizations making claims or bringing "suits";

**(d)** Acts, errors or omissions; or

**(e)** Benefits included in your "employee benefit program".

**(2)** The Aggregate Limit shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** of this endorsement is the most we will pay for all damages because of acts, errors or omissions negligently committed in the "administration" of your "employee benefit program".

**(3)** Subject to the limit described in **(2)** above, the Each Employee Limit shown in Section **B. Limits of Insurance, 1. Employee Benefit Liability Coverage** of this endorsement is the most we


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

will pay for all damages sustained by any one "employee", including damages sustained by such "employee's" dependents and beneficiaries, as a result of:

(a) An act, error or omission; or

(b) A series of related acts, errors or omissions, regardless of the amount of time that lapses between such acts, errors or omissions.

negligently committed in the "administration" of your "employee benefit program".

However, the amount paid under this endorsement shall not exceed, and will be subject to the limits and restrictions that apply to the payment of benefits in any plan included in the "employee benefit program."

(4) **Deductible Amount**

(a) Our obligation to pay damages on behalf of the insured applies only to the amount of damages in excess of the deductible amount stated in the Declarations as applicable to Each Employee. The limits of insurance shall not be reduced by the amount of this deductible.

(b) The deductible amount stated in the Declarations applies to all damages sustained by any one "employee", including such "employee's" dependents and beneficiaries, because of all acts, errors or omissions to which this insurance applies.

(c) The terms of this insurance, including those with respect to:

1) Our right and duty to defend the insured against any "suits" seeking those damages; and

2) Your duties, and the duties of any other involved insured, in the event of an act, error or omission, or claim,

apply irrespective of the application of the deductible amount.

(d) We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as we have paid.

d. **Additional Conditions**

As respects **Employee Benefit Liability Coverage, SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is amended as follows:

(1) Item **2. Duties in the Event of Occurrence, Offense, Claim or Suit** is deleted in its entirety and replaced by the following:

2. **Duties in the Event of an Act, Error or Omission, or Claim or Suit**

a. You must see to it that we are notified as soon as practicable of an act, error or omission which may result in a claim. To the extent possible, notice should include:

(1) What the act, error or omission was and when it occurred; and

(2) The names and addresses of anyone who may suffer damages as a result of the act, error or omission.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written no-



Includes copyrighted material of Insurance Services Office, Inc., with its permission.

tice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of an act, error or omission to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent.

(2) Item **5. Other Insurance** is deleted in its entirety and replaced by the following:

5. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when **c.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **b.** below.

b. **Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

c. **No Coverage**

This insurance shall not cover any loss for which the insured is entitled to recovery under any other insurance in force previous to the effective date of this Coverage Part.

e. **Additional Definitions**

As respects **Employee Benefit Liability Coverage, SECTION V - DEFINITIONS** is amended as follows:

(1) The following definitions are added:

1. "Administration" means:

a. Providing information to "employees", including their dependents and beneficiaries, with respect to eligibility for or


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

scope of "employee benefit programs";

b. Interpreting the "employee benefit programs";

c. Handling records in connection with the "employee benefit programs"; or

d. Effecting, continuing or terminating any "employee's" participation in any benefit included in the "employee benefit program".

However, "administration" does not include:

a. Handling payroll deductions; or

b. The failure to effect or maintain any insurance or adequate limits of coverage of insurance, including but not limited to unemployment insurance, social security benefits, workers' compensation and disability benefits.

2. "Cafeteria plans" means plans authorized by applicable law to allow "employees" to elect to pay for certain benefits with pre-tax dollars.

3. "Employee benefit programs" means a program providing some of all of the following benefits to "employees", whether provided through a "cafeteria plan" or otherwise:

a. Group life insurance; group accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to those "employees" who satisfy the plan's eligibility requirements;

b. Profit sharing plans, employee savings plans, employee stock ownership plans, pension plans and stock subscription plans, provided that no one other than an "employee" may subscribe to such benefits and such benefits are made generally available to all "employees" who are eligible under the plan for such benefits;

c. Unemployment insurance, social security benefits, workers' compensation and disability benefits; and

d. Vacation plans, including buy and sell programs; leave of absence programs, including military, maternity, family, and civil leave; tuition assistance plans; transportation and health club subsidies.

(2) The following definitions are deleted in their entirety and replaced by the following:

21. "Suit" means a civil proceeding in which money damages because of an act, error or omission to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

c. An appeal of a civil proceeding.

8. "Employee" means a person actively employed, formerly


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

employed, on leave of absence or disabled, or retired. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

2. **Unintentional Failure to Disclose Hazards**

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 7. Representations** is hereby amended by the addition of the following:

Based on our dependence upon your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of your policy, we will not reject coverage under this Coverage Part based solely on such failure.

3. **Damage to Premises Rented to You**

a. The last Subparagraph of Paragraph **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY 2., Exclusions** is hereby deleted and replaced by the following:

Exclusions **c.** through **q.** do not apply to damage by fire, explosion, lightning, smoke or soot to premises while rented to you or temporarily occupied by you with permission of the owner.

b. The insurance provided under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** applies to "property damage" arising out of water damage to premises that are both rented to and occupied by you.

(1) As respects Water Damage Legal Liability, as provided in Paragraph **3.b.** above:

The exclusions under **SECTION I - COVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions**, other than **i. War** and the **Nuclear Energy Liability Exclusion**, are deleted and the following are added:

This insurance does not apply to:

**(a)** "Property damage":

1) Assumed in any contract; or

2) Loss caused by or resulting from any of the following:

a) Wear and tear;

b) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

c) Smog;

d) Mechanical breakdown including rupture or bursting caused by centrifugal force;

e) Settling, cracking, shrinking or expansion; or

f) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

**(b)** Loss caused directly or indirectly by any of the following:

1) Earthquake, volcanic eruption, landslide or any other earth movement;

2) Water that backs up or overflows from a sewer, drain or sump;

3) Water under the ground surface pressing on, or flowing or seeping through:

a) Foundations, walls, floors or paved surfaces;

b) Basements, whether paved or not; or

c) Doors, windows or other openings.

**(c)** Loss caused by or resulting from water that leaks or


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

flows from plumbing, heating, air conditioning, or fire protection systems caused by or resulting from freezing, unless:

1) You did your best to maintain heat in the building or structure; or

2) You drained the equipment and shut off the water supply if the heat was not maintained.

(d) Loss to or damage to:

1) Plumbing, heating, air conditioning, fire protection systems, or other equipment or appliances; or

2) The interior of any building or structure, or to personal property in the building or structure caused by or resulting from rain, snow, sleet or ice, whether driven by wind or not.

c. **Limit of Insurance**

The Damage to Premises Rented to You Limit as shown in the Declarations is amended as follows:

(2) Paragraph **6.** of **SECTION III - LIMITS OF INSURANCE** is hereby deleted and replaced by the following:

**6.** Subject to **5.** above, the Damage to Premises Rented to You Limit is the most we will pay under **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** for damages because of "property damage" to premises while rented to you or temporarily occupied by you with permission of the owner, arising out of any one "occurrence" to which this insurance applies.

(3) The most we will pay is limited as described in Section **B. Limits of Insurance, 3. Damage to Premises Rented to You** of this endorsement.

**4. Supplementary Payments**

Under **SECTION I - COVERAGE, SUPPLEMENTARY PAYMENTS - COVERAGES A AND B:**

**a.** Paragraph **2.** is replaced by the following:

Up to the limit shown in Section **B. Limits of Insurance, 4.a.** Bail Bonds of this endorsement for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**b.** Paragraph **4.** is replaced by the following:

All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to the limit shown in Section **B. Limits of Insurance, 4.b.** Loss of Earnings of this endorsement per day because of time off from work.

**5. 180 Day Coverage for Newly Formed or Acquired Organizations**

**SECTION II - WHO IS AN INSURED** is amended as follows:

Subparagraph **a.** of Paragraph **4.** is hereby deleted and replaced by the following:

**a.** Insurance under this provision is afforded only until the 180th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**6. Waiver of Subrogation**

**SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 9. Transfer of Rights of Recovery Against Others to Us** is hereby amended by the addition of the following:

We waive any right of recovery we may have because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a written contract requiring such waiver with that person or organization and included in the "products-completed operations hazard". However, our rights may only be waived prior to the "occurrence" giving rise to the injury or damage for which we make payment under this


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

Coverage Part. The insured must do nothing after a loss to impair our rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce those rights.

7. **Automatic Additional Insured - Specified Relationships**

a. The following is hereby added to **SECTION II - WHO IS AN INSURED**:

(1) Any person or organization described in Paragraph **7.a.(2)** below (hereinafter referred to as additional insured) whom you are required to add as an additional insured under this Coverage Part by reason of:

(a) A written contract or agreement; or

(b) An oral agreement or contract where a certificate of insurance showing that person or organization as an additional insured has been issued,

is an insured, provided:

(a) The written or oral contract or agreement is:

1) Currently in effect or becomes effective during the policy period; and

2) Executed prior to an "occurrence" or offense to which this insurance would apply; and

(b) They are not specifically named as an additional insured under any other provision of, or endorsement added to, this Coverage Part.

(2) Only the following persons or organizations are additional insureds under this endorsement, and insurance coverage provided to such additional insureds is limited as provided herein:

(a) The manager or lessor of a premises leased to you with whom you have agreed per Paragraph **7.a.(1)** above to provide insurance, but only with respect to liability arising out of the ownership, maintenance or use of that part of a premises leased to you, subject to the following additional exclusions:

This insurance does not apply to:

1) Any "occurrence" which takes place after you cease to be a tenant in that premises.

2) Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured.

(b) Any person or organization from which you lease equipment with whom you have agreed per Paragraph **7.a.(1)** above to provide insurance. Such person(s) or organization(s) are insureds solely with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person(s) or organization(s). However, this insurance does not apply to any "occurrence" which takes place after the equipment lease expires.

(c) Any person or organization (referred to below as vendor) with whom you have agreed per Paragraph **7.a.(1)** above to provide insurance, but only with respect to "bodily injury" or "property damage" arising out of "your products" which are distributed or sold in the regular course of the vendor's business, subject to the following additional exclusions:

1) The insurance afforded the vendor does not apply to:

a) "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence of the contract or agreement;

b) Any express warranty unauthorized by you;

c) Any physical or chemical change in the product made intentionally by the vendor;

d) Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

e) Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

f) Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;

g) Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

2) This insurance does not apply to any insured person or organization:

a) From whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products; or

b) When liability included within the "products-completed operations hazard" has been excluded under this Coverage Part with respect to such products.

(d) Any state or political subdivision with which you have agreed per Paragraph 7.a.(1) above to provide insurance, subject to the following additional provision:

This insurance applies only with respect to the following hazards for which the state or political subdivision has issued a permit in connection with premises you own, rent or control and to which this insurance applies:

1) The existence, maintenance, repair, construction, erection, or removal of advertising signs, awnings, canopies, cellar entrances, coal holes, driveways, manholes, marquees, hoist away openings, sidewalk vaults, street banners, or decorations and similar exposures; or

2) The construction, erection, or removal of elevators; or

3) The ownership, maintenance, or use of any elevators covered by this insurance.



Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(3) Any insurance provided to an additional insured designated under Paragraph **7.a.(2)** Subparagraphs **(a)**, **(b)** and **(d)** does not apply to "bodily injury", "property damage" or, "personal and advertising injury" arising out of the sole negligence or willful misconduct of the additional insured or their agents, "employees" or any other representative of the additional insured.

**b.** **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS** is hereby amended as follows:

Condition **5. Other Insurance** is amended to include:

**(1)** Where required by a written contract or agreement, this insurance is primary and / or noncontributory as respects any other insurance policy issued to the additional insured, and such other insurance policy shall be excess and / or noncontributing, whichever applies, with this insurance.

**(2)** Any insurance provided by this endorsement shall be primary to other insurance available to the additional insured except:

**(a)** As otherwise provided in **SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS, 5. Other Insurance, b. Excess Insurance;** or

**(b)** For any other valid and collectible insurance available to the additional insured as an additional insured by attachment of an endorsement to another insurance policy that is written on an excess basis. In such case, the coverage provided under this endorsement shall also be excess.

**8. Property Damage to Borrowed Equipment**

**a.** The following is hereby added to Exclusion **j. Damage to Property** of Paragraph **2., Exclusions SECTION I - COVERAGES, COVERAGE A. - BODILY INJURY AND PROPERTY DAMAGE LIABILITY:**

Paragraphs **(3)** and **(4)** of this exclusion do not apply to tools or equipment loaned to you, provided they are not being used to perform operations at the time of loss.

**b.** With respect to the insurance provided by this section of the endorsement, the following additional provisions apply:

**(1)** The Limits of Insurance shown in the Declarations are replaced by the limits designated in **Property Damage to Borrowed Equipment Section B. Limits of Insurance, 8. Property Damage to Borrowed Equipment** of this endorsement with respect to coverage provided by this endorsement. These limits are inclusive of and not in addition to the limits being replaced. The Limits of Insurance shown in Section **B. Limits of Insurance, 8. Property Damage to Borrowed Equipment** of this endorsement fix the most we will pay in any one "occurrence" regardless of the number of:

**(a)** Insureds;

**(b)** Claims made or "suits" brought; or

**(c)** Persons or organizations making claims or bring "suits".

**(2) Deductible Clause**

**(a)** Our obligation to pay damages on your behalf applies only to the amount of damages for each "occurrence" which are in excess of the deductible amount stated in Section **B. Limits of Insurance, 8. Property Damage to Borrowed Equipment** of this endorsement. The limits of insurance will not be reduced by the application of such deductible amount.

**(b)** **SECTION I - COMMERCIAL LIABILITY CONDITIONS 2. Duties in the Event of Occurrence, Offense, Claim or Suit,** applies to each claim or "suit" irrespective of the amount.


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

(c) We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

9. **Employees as Insureds - Specified Health Care Services**

It is hereby agreed that Paragraph **2.a.(1) (d)** of **SECTION II - WHO IS AN INSURED**, does not apply to your "employees" who provide professional health care services on your behalf as duly licensed:

**a.** Nurses;

**b.** Emergency Medical Technicians; or

**c.** Paramedics,

in the jurisdiction where an "occurrence" or offense to which this insurance applies takes place.

10. **Broadened Notice of Occurrence**

Paragraph **a.** of Condition **2. Duties in the Event of Occurrence, Offense, Claim or Suit (SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS)** is hereby deleted and replaced by the following:

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

This requirement applies only when the "occurrence" or offense is known to an "authorized representative".


Includes copyrighted material of Insurance Services Office, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NEW JERSEY CHANGES - LOSS INFORMATION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART ("OCCURRENCE" VERSION)**

The following Condition is added TO COMMERCIAL GENERAL LIABILITY CONDITIONS (Section IV):

**10. Your Right to Loss Information**

We will provide the first Named Insured shown in the Declarations the following loss information relating to this and any preceding general liability Coverage Part we have issued to you during the previous three years:

**a.** A list or other record of each "occurrence" of which we were notified in accordance with paragraph **2.a.** of the Duties in the Event of Occurrence, Offense, Claim or Suit Condition in this Section. We will include a brief description of the "occurrence" and information on whether any claim arising out of the "occurrence" is open or closed.

**b.** A summary by policy year, of payments made and amounts reserved, stated separately under any applicable General Aggregate Limit and Products-Completed Operations Aggregate Limit.

Amounts reserved are based on our judgment. They are subject to change and should not be regarded as ultimate settlement values.

You must not disclose this information to any claimant or any claimant's representative without our consent.

We will provide this information only if we receive a written request from the first Named Insured during the policy period. We will provide this information within 45 days of receipt of the request.

We compile claim and "occurrence" information for our own business purposes and exercise reasonable care in doing so. In providing this information to the first Named Insured, we make no representations or warranties to insureds, insurers or others to whom this information is furnished by or on behalf of any insured.

 Copyright, Insurance Services Office, Inc., 1992

# 2004 NOTICE TO POLICYHOLDERS COMMERCIAL GENERAL LIABILITY COVERAGE FORM AND ENDORSEMENTS

This is a summary of the major changes to **GA 101** Commercial General Liability Coverage Form and related endorsements. No coverage is provided by this summary nor can it be construed to replace any provisions of your policy or endorsements. You should read your policy and review your declaration page for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, **THE PROVISIONS OF THIS POLICY SHALL PREVAIL.**

The areas within the policy that broaden, reduce or clarify coverage are highlighted below. This notice does not reference every editorial change made in your policy.

## BROADENINGS IN COVERAGE TO GA 101 12 04 - Commercial General Liability Coverage Form

### POLLUTION EXCLUSION

The exception to the Pollution Exclusion which provides coverage for bodily injury arising out of smoke, fumes, vapors or soot from building heating equipment has been expanded to also include water heaters and cooling and dehumidifying equipment in a building.

### CONDITIONS

We have revised the Liberalization Condition so that it applies to changes made 60 days rather than 45 days prior to the inception of the policy period.

## REDUCTIONS IN COVERAGE TO GA 101 12 04 - Commercial General Liability Coverage Form

### REVISED MOBILE EQUIPMENT COVERAGE:

The definitions of "mobile equipment" and "auto" have been revised. Any land vehicle that had been classified as a piece of mobile equipment under your previous policy, will now be considered an auto if that vehicle is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. With this change, coverage is no longer provided for these types of land vehicles since they are now defined to be autos rather than mobile equipment and subject to the Aircraft, Auto and Watercraft exclusion in your policy. However, the operation of machinery or equipment that is attached to, or part of, such a vehicle will still be covered by your policy.

A corresponding definition change has been made to the Commercial Automobile. Mobile equipment which was excluded from the automobile policy will now meet the definition of "auto" if it is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

### EXCLUSION - ELECTRONIC DATA

An exclusion for Electronic Data has been added to **GA 101** to reinforce that coverage for electronic data is not intended to be provided. This may be considered a reduction in coverage.

### EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

An exclusion has been added to **GA 101** to exclude coverage for bodily injury and property damage under Coverage **A.** and personal and advertising injury under Coverage **B.** which arises directly or indirectly out of any action or omission that violates or is alleged to violate the Telephone Consumer Protection Act (TCPA), the CAN-SPAM Act of 2003, including any amendments of or addition to such laws, or any other statute, ordinance or regulation that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

This is a reduction in coverage in states where, absent the exclusion, courts would consider coverage to be provided for violations of the afore mentioned acts or of other similar statutes, regulations or ordinances.


Includes copyrighted material of ISO Properties, Inc., with its permission.

### EXCLUSION - MEDICAL PAYMENTS - ATHLETICS ACTIVITIES

The Athletics Activities exclusion under Coverage C - Medical Payments has been revised to more clearly express what types of athletic activities are excluded with respect to medical payments. Medical expenses are not intended to be provided to a person injured while practicing, instructing or participating in any physical exercises or games, sports or athletic contests. This may be considered a reduction in coverage.

### DEFINITIONS

The definition of Pollutant is amended to specifically mention petroleum in addition to petroleum products and petroleum by-products.

## CLARIFICATIONS OR NO IMPACT IN COVERAGE TO GA 101 12 04 - Commercial General Liability Coverage Form

### WAR EXCLUSION

We have incorporated the war exclusion (formerly added via mandatory endorsement) into the coverage form. If the War Liability exclusion endorsement had not already been added to your policy, this is a reduction in coverage.

### POLLUTANT EXCLUSION

The Pollutant Exclusion is amended to use certain terms, "discharge, dispersal, seepage, migration, release, escape or emission", consistently throughout the exclusion.

### MATERIAL PUBLISHED PRIOR TO COVERAGE TERM

This exclusion which applies to only personal and advertising injury is clarified as to when coverage will not apply.

### OTHER INSURANCE

Prior to this revision, if you were added as an additional insured to another policy, the policy would be excess over that insurance for damages arising out of the premises or operations. The Other Insurance Condition has been revised so that now if you are added as an additional insured to another policy this policy is excess over that insurance for damages arising out of both the premises or operations and products and completed operations.

## ENDORSEMENTS

## BROADENINGS IN COVERAGE

**GA 4136 12 04 - Pollution Exclusion - Named Peril Limited Exception for a Short Term Pollution Event**

**GA 4137 12 04 - Pollution Exclusion - Limited Exception for a Short-Term Pollution Event**

**GA 368 12 04 - Total Pollution Exclusion with a Building Equipment Exception and a Hostile Fire Exception**

The exception to the Pollution Exclusion in these endorsements which provides coverage for bodily injury arising out of smoke, fumes, vapors or soot from building heating equipment has been expanded to also include water heaters and cooling and dehumidifying equipment in a building.

**GA 367 12 04 - Exclusion - Internet Service Providers and Internet Access Providers Errors and Omissions**

**CG 22 99 12 04 - Professional Liability Exclusion - Web-Site Designers**

With this revised endorsement attached to your policy, internet providers and web-site designers are provided personal and advertising injury coverage for false arrest, malicious prosecution and wrongful eviction offenses. This coverage was not previously afforded under your policy.

**GA 4145 12 04 - Principals Protective Liability Coverage**

The exception to the Pollution Exclusion in this endorsement which provides coverage for bodily injury arising out of smoke, fumes, vapors or soot from building heating equipment has been expanded to also include water heaters and cooling and dehumidifying equipment. The Pollutant Exclusion is also


Includes copyrighted material of ISO Properties, Inc., with its permission.



amended to use certain terms, "discharge, dispersal, seepage, migration, release, escape or emission", consistently throughout the exclusion.

## REDUCTIONS IN COVERAGE

### Existing Endorsements

**GA 366 12 04 - Exclusion - Volunteer Workers**

If you previously had volunteer workers who operated autos, aircraft or watercraft not owned by, or rented or loaned to any insured, liability arising out of the ownership, maintenance or entrustment to others of any aircraft, auto or watercraft operated by volunteer workers will no longer be covered under your policy.

### New Endorsements

**GA 397 08 04 - Exclusion - Silica**

This exclusion excludes coverage for bodily injury and property damage under Coverage A and personal and advertising injury under Coverage B for any injury or damage arising from silica or any derivative of silica.

**CG 23 01 12 04 - Exclusion - Real Estate Agents Errors or Omissions**

**GA 395 04 04 - Exclusion - Travel Agents Errors or Omissions**

**GA 396 04 04 - Exclusion - Lawyers Professional**

These new endorsements may replace another version in which a profession was specified or may be new to your policy. The professional services of a real estate agent, travel agent or lawyer will be excluded. To the extent that professional services may be covered under your policy, attachment of this endorsement may result in a reduction of coverage.

## CLARIFICATIONS OR NO IMPACT IN COVERAGE

**GA 237 12 04 - Electronic Data Liability**

This revised endorsement indicates that the Electronic Data Exclusion that was added to your General Liability coverage form(s) does not apply to the coverage provided under this endorsement.

## OTHER COVERAGE PARTS WHICH MAY IMPACT YOU

**GA 115 12 04 - Liquor Liability Coverage Form (Occurrence)**

Prior to this revision, this exclusion precluded coverage when your liquor license was suspended, expired, cancelled or revoked. The exclusion has been revised so that now it applies if your liquor license was suspended, expired, cancelled, revoked or not in effect.

**PA 109 12 04 - Cemetery Liability**

The form is reorganized but the coverages remain unchanged. We also change the statement "in the charge of the insured" to "in the care, custody or control of the insured" to parallel usage under the **GA 101.**

**PA 121 12 04 - Funeral Service Provider Professional Liability** and all state variations of this form

The form is amended to correspond to language and references within **GA 101.** We delete references to policy period and refer the defined term "coverage term". The reference in Who is an Insured is amended to Paragraph **3.** instead of **4.** Under Duties we clarify that offense refers to "personal and advertising injury" and the nature of the cooperation required. We clarify that related incidents will be treated as one and as having occurred in the earliest "coverage term".


Includes copyrighted material of ISO Properties, Inc., with its permission.

# GENERAL LIABILITY
# NOTICE TO POLICYHOLDERS - EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This Notice does **not** form a part of your insurance contract. The Notice is designed to alert you to coverage changes when the exclusion for violation of statutes that govern e-mails, fax phone calls or other methods of sending material or information is attached to this policy. If there is any conflict between this Notice and the policy (including its endorsements), the provisions of the policy (including its endorsements) apply. Please read your policy, and the endorsement attached to your policy, carefully.

This notice contains a brief synopsis of the following endorsement:

- **CG 00 67 03 05** - Exclusion - Violation of Statutes That Govern E-mails, Fax, Phone Calls or Other Methods of Sending Material or Information

When the above referenced endorsement is attached to your policy, coverage is excluded for bodily injury and property damage under Coverage **A** and personal and advertising injury under Coverage **B**, arising directly or indirectly out of any action or omission that violates or is alleged to violate the Telephone Consumer Protection Act (TCPA), the CAN-SPAM Act of 2003 (including any amendment of or addition to such laws), or any other statute, ordinance or regulation that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

This is a reduction in coverage in states where, absent the wording of this endorsement, courts would consider coverage to be provided for violations of the above-mentioned acts or of other similar statutes, regulations or ordinances.

 ©ISO Properties, Inc., 2004

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability:**

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage B - Personal and Advertising Injury Liability:**

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

 ©ISO Properties, Inc., 2004

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION - DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SCHEDULE**

| **Description of Professional Services:** |
|---|
| **1. PRINTING** |
| **2.** |
| **3.** |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to any professional services shown in the Schedule, the following exclusion is added to Paragraph **2., Exclusions** of **Section I - Coverage A - Bodily Injury and Property Damage Liability** and Paragraph **2., Exclusions** of **Section I - Coverage B - Personal and Advertising Injury Liability**:

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.

 Copyright, Insurance Services Office, Inc., 1997

# THE CINCINNATI INSURANCE COMPANY

## COMMERCIAL UMBRELLA LIABILITY COVERAGE PART DECLARATIONS

RENEWAL OF PRN 300 22 95

Attached to and forming part of POLICY NUMBER PRN 300 22 95 Effective Date: 03-01-2010

**NAMED INSURED** is the same as it appears in the Common Policy Declarations unless another entry is made here.

**LIMITS OF INSURANCE**
$ 10 ,000,000 Each Occurrence Limit $ 10 ,000,000 Aggregate Limit

**ADVANCE PREMIUM $ 5,314**
Applicable to Premium, if box is checked:
☐ Subject to Annual Adjustment
☐ Subject to Audit (see Premium Computation Endorsement for Rating Basis)

**SCHEDULE OF UNDERLYING INSURANCE**

| Insurer, Policy Number & Period: | Underlying Insurance: | Underlying Limits: |
|---|---|---|
| (a) LIBERTY INS CO<br>TO BE DETERMINED<br>03-01-2010 TO 2011 | Employer's Liability | Bodily Injury by Accident:<br>$ 500,000 Each Accident<br>Bodily Injury by Disease:<br>$ 500,000 Each Employee<br>Bodily Injury by Disease:<br>$ 500,000 Policy Limit |
| (b) CINCINNATI INS CO<br>PRN 300 22 95<br>03-01-2010 TO 2011 | ☒ Commercial General Liability Including:<br>☒ Products-Completed Operations Coverage<br>☐ Cemetery Professional<br>☐ Druggist Professional<br>☐ Funeral Service Provider<br>☐ Pedorthists Professional<br>or<br>☐ Business Liability Including:<br>☐ Funeral Service Provider<br>☐ Druggist Professional | Bodily Injury and Property Damage Liability:<br>$ 1,000,000 Each Occurrence Limit<br>$ 2,000,000 General Aggregate Limit<br>$ 2,000,000 Products-Completed Operations Aggregate Limit<br>Personal and Advertising Injury Limit:<br>$ 1,000,000 Any One Person or Organization |
| (c) SAME AS (b) | Automobile Liability Including:<br>☐ Owned Autos<br>☐ Non-Owned Autos<br>☐ Hired Autos<br>☒ Any Auto | Bodily Injury Liability Limit:<br>$ ______ Each Person<br>$ ______ Each Occurrence<br>Property Damage Liability Limit:<br>$ ______ Each Occurrence<br>or<br>Bodily Injury Liability and / or Property Damage Liability or Both Combined Limit:<br>$ 1,000,000 Each Occurrence |

**FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| US511 | 09/02 | US101UM | 12/04 | US4060 | 12/04 | US4062 | 11/05 |
| US4063 | 01/06 | UA302 | 12/04 | US3009 | 12/04 | US302 | 12/04 |
| US352 | 12/04 | US407 | 12/04 | | | | |

# ADDITIONAL SCHEDULE OF UNDERLYING INSURANCE

Attached to and forming part of Policy No. **PRN 300 22 95** Effective Date: **03-01-2010**

| Insurer, Policy Number & Period: | Underlying Insurance: | Underlying Limits: |
|---|---|---|
| (d) CINCINNATI INS CO<br>PRN 300 22 95<br>03-01-2010 TO 2011 | EMPLOYEE BENEFIT LIABILITY | 1,000,000 EACH EMPLOYEE<br>3,000,000 AGGREGATE |

# COMMERCIAL UMBRELLA - TABLE OF CONTENTS

**Coverage Part Provision:** **Begins on Page:**


**Preamble** ..... 3

**SECTION I - COVERAGE:** ..... 3

**A. Insuring Agreement** ..... 3

**B. Exclusions:** ..... 4

1. Asbestos ..... 4
2. Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights ..... 4
3. Contractual Liability ..... 4
4. Damage to Impaired Property or Property Not Physically Injured ..... 4
5. Damage to Property ..... 4
6. Damage to Your Product ..... 4
7. Damage to Your Work ..... 4
8. Distribution of Material in Violation of Statutes ..... 5
9. Electronic Chatrooms or Bulletin Boards ..... 5
10. Electronic Data ..... 5
11. Employer's Liability Limitation ..... 5
12. Employment-Related Practices ..... 5
13. Expected or Intended Injury ..... 5
14. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses ..... 6
15. Infringement of Copyright, Patent, Trademark or Trade Secret ..... 6
16. Pollutant - Auto ..... 6
17. Pollutant - Other Than Auto ..... 7
18. Recall of Products, Work or Impaired Property ..... 9
19. Unauthorized Use of Another's Name or Product ..... 9
20. Uninsured / Underinsured Motorist ..... 9
21. War ..... 9
22. Workers' Compensation ..... 9

**C. Defense and Supplementary Payments** ..... 9

**SECTION II - WHO IS AN INSURED** ..... 10

**SECTION III - LIMITS OF INSURANCE** ..... 11

**SECTION IV - CONDITIONS:** ..... 12

1. Appeals ..... 12
2. Audit ..... 13
3. Bankruptcy ..... 13
4. Duties in the Event of Occurrence, Claim or Suit ..... 13
5. First Named Insured ..... 13
6. Legal Action Against Us and Loss Payments ..... 13
7. Liberalization ..... 14
8. Maintenance of Underlying Insurance ..... 14
9. Other Insurance ..... 14
10. Premium ..... 14
11. Representations ..... 14
12. Separation of Insureds ..... 14
13. Transfer of Rights of Recovery Against Others to Us ..... 15
14. When We Do Not Renew ..... 15

**SECTION V - DEFINITIONS:** ..... 15

1. "Advertisement" ..... 15
2. "Authorized representative" ..... 15
3. "Auto" ..... 15
4. "Bodily injury" ..... 16
5. "Coverage term" ..... 16
6. "Coverage territory" ..... 16



Includes copyrighted material of ISO Properties, Inc., with its permission.

**Coverage Part Provision:** **Begins on Page:**


7. "Electronic data" ........ 16
8. "Employee" ........ 16
9. "Executive officer" ........ 16
10. "Hostile fire" ........ 16
11. "Impaired property" ........ 16
12. "Insured contract" ........ 16
13. "Leased worker" ........ 17
14. "Loading or unloading" ........ 17
15. "Mobile equipment" ........ 18
16. "Occurrence" ........ 18
17. "Personal and advertising injury" ........ 18
18. "Pollutants" ........ 19
19. "Products-completed operations hazard" ........ 19
20. "Property damage" ........ 19
21. "Subsidiary" ........ 19
22. "Suit" ........ 19
23. "Temporary worker" ........ 20
24. "Ultimate net loss" ........ 20
25. "Underlying insurance" ........ 20
26. "Underlying limit" ........ 20
27. "Workplace" ........ 20
28. "Your product" ........ 20
29. "Your work" ........ 20

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT** ........ 21




Includes copyrighted material of ISO Properties, Inc., with its permission.

# COMMERCIAL UMBRELLA LIABILITY COVERAGE FORM

Various provisions in this Coverage Part restrict this insurance. Read the entire Coverage Part carefully to determine rights, duties and what is and is not covered.

Throughout this Coverage Part the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this Coverage Part. The words "we", "us" and "our" refer to the Company providing this insurance.

The word "insured" means any person or organization qualifying as such under **SECTION II - WHO IS AN INSURED.**

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION V - DEFINITIONS.**

## SECTION I - COVERAGE

### A. Insuring Agreement

1. We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies:
   a. Which is in excess of the "underlying insurance"; or
   b. Which is either excluded or not insured by "underlying insurance".
2. This insurance applies to "bodily injury", "personal and advertising injury" or "property damage" only if:
   a. The "bodily injury", "personal and advertising injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
   b. The "bodily injury" or "property damage" occurs during the policy period shown in the Declarations; or
   c. The "personal and advertising injury" results from an "occurrence" that takes place during the policy period shown in the Declarations; and
   d. Prior to the "coverage term" in which "bodily injury" or "property damage" occurs, or a "personal and advertising injury" offense is committed, you did not know, per Paragraph **5.** below, that the "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, or that the "personal and advertising injury" offense had been committed or had begun to be committed, in whole or in part.
3. "Bodily injury" or "property damage" which:
   a. Occurs during the "coverage term"; and
   b. Was not, prior to the "coverage term", known by you, per Paragraph **5.** below, to have occurred;

   includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the "coverage term" in which it first became known by you.
4. "Personal and advertising injury" caused by an offense which:
   a. Was committed during the "coverage term"; and
   b. Was not, prior to the "coverage term", known by you, per Paragraph **5.** below, to have been committed;

   includes any continuation, change or resumption of that "personal and advertising injury" offense after the end of the "coverage term" in which it first became known by you.
5. You will be deemed to know that "bodily injury" or "property damage" has occurred, or that a "personal and advertising injury" offense has been committed at the earliest time when any "authorized representative":
   a. Reports all, or any part, of the "bodily injury", "personal and advertising injury" or "property damage" to us or any other insurer;
   b. Receives a written or verbal demand or claim for damages because of the "bodily injury", "personal and advertising injury" or "property damage";
   c. First observes, or reasonably should have first observed, the "bodily injury" or "property damage", or the offense that caused the "personal and advertising injury";
   d. Becomes aware, or reasonably should have become aware, by any means, other than as described in **c.** above, that "bodily injury" or "prop-


Includes copyrighted material of ISO Properties, Inc., with its permission.

erty damage" had occurred or had begun to occur, or that the "personal and advertising injury" offense had been committed or had begun to be committed; or

e. Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury", "personal and advertising injury" or "property damage" is substantially certain to occur.

6. The amount we will pay for damages is limited as described in **SECTION III - LIMITS OF INSURANCE.**

No other obligation or liability to pay sums or perform acts or services is covered, unless expressly provided for under **SECTION I - COVERAGE, C. Defense and Supplementary Payments.**

**B. Exclusions**

This insurance does not apply to:

1. **Asbestos**

Any liability arising out of, attributable to or any way related to asbestos in any form or transmitted in any manner.

2. **Breach of Contract, Failure to Perform, Wrong Description and Violation of Another's Rights**

"Personal and advertising injury":

a. Arising out of breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

b. Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

c. Arising out of the wrong description of the price of goods, products or services stated in your "advertisement"; or

d. Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

3. **Contractual Liability**

Any liability for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "bodily injury", "personal and advertising injury" or "property damage":

a. That the insured would have in the absence of the contract or agreement; or

b. Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury", "personal and advertising injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

4. **Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

a. A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

b. A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

5. **Damage to Property**

"Property damage" to property owned by any insured, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.

6. **Damage to Your Product**

"Property damage" to "your product" arising out of it or any part of it.

7. **Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.


Includes copyrighted material of ISO Properties, Inc., with its permission.

**8. Distribution of Material in Violation of Statutes**

Any liability arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**9. Electronic Chatrooms or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**10. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate "electronic data".

**11. Employer's Liability Limitation**

Any liability arising from any injury to:

**a.** An "employee" of the insured sustained in the "workplace";

**b.** An "employee" of the insured arising out of the performance of duties related to the conduct of the insured's business; or

**c.** The spouse, child, parent, brother or sister of that "employee" as a consequence of **a.** or **b.** above.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply when such insurance is provided by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance, or would have been provided by such listed "underlying insurance" except for the exhaustion by payment of claims of its limits of insurance, and then only for such hazards for which coverage is provided by such "underlying insurance", unless otherwise excluded by this Coverage Part.

**12. Employment-Related Practices**

Any liability arising from any injury to:

**a.** A person arising out of any:

**(1)** Refusal to employ that person;

**(2)** Termination of that person's employment; or

**(3)** Other employment-related practices, policies, acts or omissions including but not limited to coercion, criticism, demotion, evaluation, failure to promote, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

**b.** The spouse, child, parent, brother or sister of that person as a consequence of any injury to that person at whom any of the employment-related practices described in Paragraphs **(1)**, **(2)**, or **(3)** above is directed.

This exclusion applies:

**a.** Whether the insured may be liable as an employer or in any other capacity; and

**b.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**13. Expected or Intended Injury**

"Bodily injury" or "property damage" which may reasonably be expected to result from the intentional or criminal acts of the insured or which is in fact expected or intended by the insured, even if the injury or damage is of a different degree or type than actually intended or expected.

However, this exclusion does not apply to:

**a.** "Bodily injury" resulting from the use of reasonable force to protect persons or property; or

**b.** "Bodily injury" or "property damage" resulting from the use of reasonable force to prevent or eliminate danger


Includes copyrighted material of ISO Properties, Inc., with its permission.

in the operation of "autos" or watercraft.

**14. Falsity, Prior Publication, Criminal Act and Media and Internet Type Businesses**

"Personal and advertising injury":

**a.** Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

**b.** Arising out of oral or written publication of material whose first publication took place before the later of the following:

**(1)** The inception of this Coverage Part; or

**(2)** The "coverage term" in which insurance coverage is sought;

**c.** Arising out of a criminal act committed by or at the direction of the insured; or

**d.** Committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

However, Paragraph **d.** does not apply to Paragraphs **17.a., b., c., d.** and **i.** of "personal and advertising injury" under **SECTION V - DEFINITIONS.**

For the purposes of Paragraph **d.**, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**15. Infringement of Copyright, Patent, Trademark or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement in your "advertisement", of copyright, trade dress or slogan.

**16. Pollutant - Auto**

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**(1)** That are, or that are contained in any property that is:

**(a)** Being transported or towed by, handled, or handled for movement into, onto or from, an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion;

**(b)** Otherwise in the course of transit by or on behalf of the insured; or

**(c)** Being stored, disposed of, treated or processed in or upon an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion;

**(2)** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the insured for movement into or onto an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion; or

**(3)** After the "pollutants" or any property in which the "pollutants" are contained are moved from an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion to the place where they are finally delivered, disposed of or abandoned by the insured.

Paragraph **(1)** above does not apply to "bodily injury" or "property damage" arising from fuels, lubricants, or other operating fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their


Includes copyrighted material of ISO Properties, Inc., with its permission.

behalf in any other fashion or its parts, if:

(a) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(b) The "bodily injury" or "property damage" does not arise out of the operation of any equipment listed in Paragraphs **f.(2)** and **(3)** of the definition of "mobile equipment".

However, this exception to Paragraph **(1)** does not apply if the fuels, lubricants, or other operating fluids, exhaust gases or other similar "pollutants" are intentionally discharged, dispersed, emitted or released.

Paragraphs **(2)** and **(3)** above do not apply to an "occurrence" that occurs away from premises owned by or rented to an insured with respect to "pollutants" not in or upon an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion if:

(a) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of an "auto" that an insured owns, hires, borrows, rents, leases, or that is operated on their behalf in any other fashion; and

(b) The discharge, dispersal, seepage, migration, release, emission or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**b.** Any liability caused by "pollutants" and arising from the operation, maintenance, use, "loading or unloading" of an "auto", for which insurance coverage is excluded by "underlying insurance".

**17. Pollutant - Other Than Auto**

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

However, Paragraph **a.(1)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, but only to the extent insurance is provided at the "underlying limit" specified in the Schedule of Underlying Insurance for the "underlying insurance" listed and subject to all its terms, limitations and conditions:

(a) "Bodily injury", if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use by the building's occupants or their guests;

(b) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor, and the owner or lessee of such premises, site or location has been added to your "underlying insurance" as an additional insured with respect to your ongoing operations or "your work" performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(c) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(2)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;



Includes copyrighted material of ISO Properties, Inc., with its permission.

**(3)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible;

**(4)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations, if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

However, Paragraph **a.(4)** of this exclusion does not apply to the following if such liability is covered by "underlying insurance" listed in the Schedule of Underlying Insurance, but only to the extent insurance is provided at the "underlying limit" specified in the Schedule of Underlying Insurance for the "underlying insurance" listed and subject to all its terms, limitations and conditions:

**(a)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(b)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(c)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(5)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations, if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

**b.** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or emission of "pollutants" at any time.

**c.** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this Paragraph **c.** does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement,


Includes copyrighted material of ISO Properties, Inc., with its permission.

or such claim or "suit" by or on behalf of a governmental authority.

d. Any liability caused by "pollutants", for which insurance coverage is excluded by "underlying insurance".

**18. Recall of Products, Work or Impaired Property**

Any liability or damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

a. "Your product";

b. "Your work"; or

c. "Impaired Property";

if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**19. Unauthorized Use of Another's Name or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag or any other similar tactics to mislead another's potential customers.

**20. Uninsured / Underinsured Motorist**

Any liability or obligation to any insured or anyone else under any uninsured motorist, underinsured motorist, automobile no-fault or first party personal injury law.

**21. War**

Any liability, however caused, arising directly or indirectly, out of:

a. War, including undeclared or civil war;

b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack by any government, sovereign or authority using military personnel or other agents; or

c. Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**22. Workers' Compensation**

Any liability or obligation of the insured under any workers' compensation, unemployment compensation, disability benefits or similar law. However, this exclusion does not apply to liability of others assumed by you under an "insured contract" in existence at the time of "occurrence".

**C. Defense and Supplementary Payments**

1. We will have the right and duty to defend the insured against any "suit" seeking damages because of "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies. We will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "personal and advertising injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result when:

   a. The applicable limits of the "underlying insurance" and any other insurance have been exhausted by payment of claims; or

   b. Damages are sought for "bodily injury", "personal and advertising injury" or "property damage" which are not covered by "underlying insurance" or other insurance.

2. Our right and duty to defend ends when the applicable Limits of Insurance, as stated in the Declarations, has been exhausted by payment of claims.

3. We have no duty to investigate, settle or defend any claim or "suit" other than those circumstances described in Paragraph **C.1.** However, we do have the right to participate in the investigation, settlement or defense of any claim or "suit" to which this insurance applies. If we exercise this right, we will do so at our expense.

4. If there is no underlying insurer or other insurance obligated to do so, we will pay the following when we provide a defense:

   a. All expenses we incur.

   b. The cost of bail bonds up to $3,000. We do not have to furnish these bonds.

   c. The cost of bonds to appeal a judgment or award in any claim or "suit" we defend and the cost of bonds to



Includes copyrighted material of ISO Properties, Inc., with its permission.

release attachments, but only for bond amounts within the applicable Limits of Insurance. We do not have to furnish these bonds.

**d.** Reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including the actual loss of earnings.

**e.** All costs taxed against the insured in the "suit".

**5.** If there is no underlying insurer obligated to do so, we will pay the following for an "occurrence" to which this insurance applies, even if we have no duty to provide a defense:

**a.** Prejudgment interest awarded against the insured on that part of the judgment we become obligated to pay and which falls within the applicable Limit of Insurance. If we make an offer to pay the applicable Limits of Insurance, we will not pay any prejudgment interest based on the period of time after the offer.

**b.** All interest awarded against the insured on the full amount of any judgment that accrues:

**(1)** After entry of the judgment; and

**(2)** Before we have paid, offered to pay or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

**6.** The payments described in Paragraphs **4.** and **5.** above will not reduce the Limits of Insurance provided by this Coverage Part when defense or supplementary payments provided by the "underlying insurance" do not reduce their Limits of Insurance. However, when defense or supplementary payments provided by the "underlying insurance" reduce their Limits of Insurance then such expense payments paid by us will reduce the Limits of Insurance provided by this Coverage Part.

**7.** If we are prevented by law or otherwise from carrying out any of the provisions of **SECTION I - COVERAGE, C. Defense and Supplementary Payments,** we will pay any expense incurred with our written consent.

## SECTION II - WHO IS AN INSURED

**1.** Except for liability arising out of the ownership, maintenance, occupancy or use of an "auto":

**a.** If you are designated in the Declarations as:

**(1)** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

**(2)** A partnership or joint venture, you are an insured. Your members, partners and their spouses are also insureds, but only with respect to the conduct of your business.

**(3)** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

**(4)** An organization other than a partnership, joint venture, or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders. Each of the following is also a Named Insured:

**(a)** Any "subsidiary" company of such organization, including any "subsidiary" of such "subsidiary":

**1)** Existing at the inception of this Coverage Part; or

**2)** Formed or acquired on or after the inception of this Coverage Part.

**(b)** Any other company controlled and actively managed by such organization or any "subsidiary" thereof:

**1)** At the inception of this Coverage Part; or

**2)** If the control and active management thereof is acquired on or after the inception of this Coverage Part.

**(5)** A trust, you are an insured. Your trustees are also insureds, but only


Includes copyrighted material of ISO Properties, Inc., with its permission.

with respect to their duties as trustees.

**b.** Each of the following is also an insured:

**(1)** Any "employee" of yours while acting within the scope of their duties as such.

**(2)** Any person or organization while acting as your real estate manager.

**(3)** Any person or organization having proper temporary custody of your property if you die, but only:

**(a)** With respect to liability arising out of the maintenance or use of that property; and

**(b)** Until your legal representative has been appointed.

**(4)** Your legal representative if you die, but only with respect to duties as such.

**2.** Only with respect to liability arising out of the ownership, maintenance, occupancy or use of an "auto":

**a.** You are an insured.

**b.** Anyone else while using with your permission an "auto" you own, hire or borrow is also an insured except:

**(1)** The owner or any other person or organization (except your "executive officers" or principals) from whom you hire or borrow an "auto", unless such persons or organizations are insureds in your "underlying insurance" listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is provided by such "underlying insurance". This exception does not apply if the "auto" is a trailer or semi-trailer connected to an "auto" you own.

**(2)** Your "employee", if the "auto" is owned by that "employee" or a member of his or her household, unless:

**(a)** Such "employee" is an insured with respect to that "auto" in the "underlying insurance" listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is provided by such "underlying insurance"; or

**(b)** The "bodily injury" or "property damage" is sustained by a co-"employee" of such "employee".

**(3)** Someone using an "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos", unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from an "auto".

**c.** Anyone liable for the conduct of an insured described in Paragraphs **2.a.** and **b.** above is also an insured, but only if they are provided insurance coverage for such liability by valid and collectible "underlying insurance" listed in the Schedule of Underlying Insurance and then only for such hazards for which coverage is provided by such "underlying insurance".

**3.** At your option and subject to the terms of this insurance, any additional insureds not addressed by Paragraphs **1.** and **2.** above covered in the "underlying insurance" listed in the Schedule of Underlying Insurance are also insureds, but only to the extent that insurance is provided for such additional insureds thereunder.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III - LIMITS OF INSURANCE**

**1.** The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

**a.** Insureds;

**b.** Claims made or "suits" brought; or

**c.** Persons or organizations making claims or bringing "suits".

**2.** The Aggregate Limit is the most we will pay for all damages:

**a.** Included in the "products-completed operations hazard";

**b.** Because of "bodily injury" by disease sustained by your "employees" arising out of and in the course of their employment by you; or



Includes copyrighted material of ISO Properties, Inc., with its permission.

c. Because of "bodily injury", "personal and advertising injury" or "property damage" not included within **a.** or **b.** above. However, this Aggregate Limit will not apply to damages which are not subject to an Aggregate Limit in the "underlying insurance".

The Aggregate Limit applies separately to **a.**, **b.** and **c.** The Aggregate Limit described in **c.** will apply only to damages not subject to **a.** or **b.** above.

**3.** Subject to the Limit of Insurance described in **2.c.** above:

**a.** Only in the event that "underlying insurance" specifically listed in the Schedule of Underlying Insurance provides an annual Aggregate Limit of Insurance for damages that would not be subject to **2.a.** or **b.** above that is applicable separately to each:

**(1)** Location owned by, or rented or leased to you solely with respect to damages which are the result of a claim or "suit" for "bodily injury" or "property damage" which can be attributed to operations at only a single location, then the Aggregate Limit described in **2.c.** above applies separately to each location owned by, or rented or leased to you.

**(2)** Of your construction projects solely with respect to damages which are the result of a claim or "suit" for "bodily injury" or "property damage" which can be attributed only to ongoing operations and only at a single construction project, then the Aggregate Limit described in **2.c.** above applies separately to each of your construction projects.

**b.** Only with respect to the application of Limits of Insurance described in **3.a.** above, the following terms location and construction project will have the following meanings:

**(1)** Location means premises involving the same or connecting lots, or premises whose connection is interrupted only by a street, roadway, waterway or right-of-way of a railroad.

**(2)** Construction project means a location you do not own, rent or lease where ongoing improvements, alterations, installation, demolition or maintenance work is performed by you or on your behalf. All connected ongoing improvements, alterations, installation, demolition or maintenance work performed by you or on your behalf at the same location for the same persons or entities, no matter how often or under how many different contracts, will be deemed to be a single construction project.

**4.** Subject to the limits described in **2.** and **3.** above, the Each Occurrence Limit is the most we will pay for the "ultimate net loss":

**a.** In excess of the applicable limits of "underlying insurance"; or

**b.** If an "occurrence" is not covered by "underlying insurance", but covered by the terms and conditions of this Coverage Part,

Because of all "bodily injury", "personal and advertising injury" and "property damage" arising out of any one "occurrence".

We will not pay more than the Limit of Insurance shown in this Coverage Part's Declarations for each "occurrence" because any Personal Umbrella Liability Policy(ies) is / are attached to this policy.

**5.** Subject to the limits described in **2.**, **3.** and **4.** above and to the terms and conditions of the "underlying insurance":

**a.** If the limits of "underlying insurance" have been reduced by payment of claims, this Coverage Part will continue in force as excess of the reduced "underlying insurance"; or

**b.** If the limits of "underlying insurance" have been exhausted by payment of claims, this Coverage Part will continue in force as "underlying insurance".

**6.** The Limits of Insurance of this Coverage Part apply separately to each "coverage term".

**SECTION IV - CONDITIONS**

1. **Appeals**

If the insured or any insurer who provides the applicable "underlying insurance" elects not to appeal a judgment which exceeds the "underlying limit", we may elect to do so at our own expense. We shall be liable for the taxable costs and disbursements and interest incidental thereto, but in no event shall this provision increase our liability beyond:

**a.** Our applicable Limits of Insurance for all "ultimate net loss";

**b.** Our applicable Defense and Supplementary Payments as described in **SEC-**


Includes copyrighted material of ISO Properties, Inc., with its permission.

TION I - COVERAGE, C. **Defense and Supplementary Payments**; and

c. The expense of such appeal.

2. **Audit**

If this Coverage Part is subject to Audit, as indicated in the Declarations, then the following Condition applies:

a. The premium shown in the Premium Computation Endorsement as Advance Premium is a deposit premium. At the close of each audit period, we will compute the earned premium for that period. If:

(1) The earned premium is less than the deposit premium, we will return the excess to the first Named Insured; or

(2) The earned premium is greater than the deposit premium, the difference will be due and payable to us by the first Named Insured upon notice from us. The due date for audit and retrospective premiums is the date shown as the due date on the bill.

However, in no event will the earned premium be less than the Minimum Premium stated in the Premium Computation Endorsement.

b. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

3. **Bankruptcy**

Bankruptcy or insolvency of the insured or the insured's estate shall not relieve us of any obligations under this Coverage Part.

4. **Duties in the Event of Occurrence, Claim or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" which may result in a claim or "suit". To the extent possible, notice should include:

(1) How, when and where the "occurrence" took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence".

This requirement applies only when the "occurrence" is known to an "authorized representative".

b. If a claim is made or "suit" is brought against any insured that is likely to involve this Coverage Part, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

This requirement will not be considered breached unless the breach occurs after such claim or "suit" is known to an "authorized representative".

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

5. **First Named Insured**

The person or organization first named in the Declarations will act on behalf of all other insureds where indicated in this Coverage Part.

6. **Legal Action Against Us and Loss Payments**

a. No legal action may be brought against us unless there has been full compliance with all the terms of this Coverage Part nor until the amount of the insured's obligation to pay has been finally determined as provided below. No person or organization has any right under this Coverage Part to bring us into any action to determine the liability of the insured.

b. We shall be liable for payment of the "ultimate net loss" for any "occurrence" to which this Coverage Part applies:

(1) For "occurrences" not covered by "underlying insurance"; or


Includes copyrighted material of ISO Properties, Inc., with its permission.

(2) In excess of the "underlying limit" applicable to the "occurrence" only after the insurers who provide the applicable "underlying insurance" have paid or become obligated to pay the amount of the "underlying limit" applicable to the "occurrence".

Our payment will be made following final determination of the amount of the insured's obligation to pay either by final judgment against the insured or by written agreement with the insured, the claimant, the underlying insurers and us.

**7. Liberalization**

If, within 60 days prior to the beginning of this Coverage Part or during the policy period, we make any changes to any forms or endorsements of this Coverage Part for which there is currently no separate premium charge, and that change provides more coverage than this Coverage Part, the change will automatically apply to this Coverage Part at the latter of:

**a.** The date we implemented the change in your state; or

**b.** The date this Coverage Part became effective; and

Will be considered as included until the end of the current policy period. We will make no additional premium charge for this additional coverage during the interim.

**8. Maintenance of Underlying Insurance**

**a.** While this Coverage Part is in effect, the insured shall maintain in force the "underlying insurance" listed in the Schedule of Underlying Insurance as collectible insurance. The terms, conditions and endorsements of "underlying insurance" will not materially change and renewals or replacements of "underlying insurance" will not be more restrictive in coverage.

**b.** Limits of "underlying insurance" will not be reduced, except for any reduction or exhaustion in the aggregate limits of insurance due to payment of claims which are in accordance with **SECTION I - COVERAGE, A. Insuring Agreement**, Paragraph **2.** of this Coverage Part.

**c.** In the event you fail or neglect to maintain "underlying insurance" as required, this Coverage Part will apply as though such "underlying insurance" was in force and collectible at the time a claim is presented to us which is in accordance with **SECTION I - COVERAGE, A. Insuring Agreement**, Paragraph **2.** of this Coverage Part.

**d.** The limits of "underlying insurance" shall be deemed applicable, regardless of any defense which the insurer who provides the "underlying insurance" may assert because of the insured's failure to comply with any Condition of the policy or the inability of the insurer to pay by reason of bankruptcy or insolvency.

**9. Other Insurance**

This insurance is excess over, and shall not contribute with any other insurance, whether primary, excess, contingent or on any other basis. This condition will not apply to insurance specifically written as excess over this Coverage Part.

**10. Premium**

The premium for this Coverage Part shall be as stated in the Declarations. The advance and anniversary premiums are not subject to adjustment, except as stated in the Declarations, or as stated in an endorsement issued by us to form a part of this Coverage Part.

You shall maintain records of such information as is necessary for premium computation, and shall, if requested by us, send copies of such records to us at the end of the "coverage term" and at such times during the policy period as we may direct.

**11. Representations**

**a.** By acceptance of this Coverage Part, you agree that the statements in the Declarations are your agreements and representations, that this Coverage Part is issued in reliance upon the truth of such representations and that this Coverage Part embodies all agreements existing between you and us or any of our agents relating to this insurance.

**b.** However, to the extent that the following applies in the "underlying insurance" listed specifically in the Schedule of Underlying Insurance, it will also apply to this Coverage Part:

Based on our reliance upon your representations as to existing hazards, if unintentionally you should fail to disclose all such hazards at the inception date of this Coverage Part, we will not reject coverage under this Coverage Part based solely on such failure.

**12. Separation of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:


Includes copyrighted material of ISO Properties, Inc., with its permission.

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

**13. Transfer of Rights of Recovery Against Others to Us**

a. If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

b. Any recoveries shall be applied as follows:

(1) First, we will reimburse anyone, including the insured, the amounts actually paid by them that were in excess of our payments;

(2) Next, we will be reimbursed to the extent of our actual payment; and

(3) Lastly, any amounts left after meeting the obligations outlined in (1) and (2) above will be distributed to anyone else known to us at the time a recovery is made and who is legally entitled to such recovery.

Expenses incurred in the recovery shall be apportioned among all interests in the ratio of their respective recoveries as finally settled. If there is no recovery as a result of our attempts, we shall bear all of the recovery expenses.

c. If prior to an "occurrence" to which this Coverage Part would apply, you and the issuer of your applicable "underlying insurance" listed specifically in the Schedule of Underlying Insurance waive any right of recovery against a person or organization for injury or damage, we will also waive any rights we may have against such person or organization.

**14. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. "Advertisement" includes a publicity article. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an "advertisement".

2. "Authorized representative" means:

a. If you are:

(1) An individual, you and your spouse are "authorized representatives".

(2) A partnership or joint venture, your members, your partners, and their spouses are "authorized representatives".

(3) A limited liability company, your members and your managers are "authorized representatives".

(4) An organization other than a partnership, joint venture or limited liability company, your "executive officers" and directors are "authorized representatives". Provided you are not a publicly traded organization, your stockholders are also "authorized representatives".

(5) A trust, your trustees are "authorized representatives".

b. Your "employees" assigned to manage your insurance program, or assigned to give or receive notice of an "occurrence", claim or "suit" are also "authorized representatives".

3. "Auto" means:

a. Any land motor vehicle, trailer or semitrailer designed for travel on public roads; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

"Auto" does not include "mobile equipment".


Includes copyrighted material of ISO Properties, Inc., with its permission.

4. "Bodily injury" means bodily harm or injury, sickness, disease, disability, humiliation, shock, fright, mental anguish or mental injury, including care, loss of services or death resulting from any of these at any time.

5. "Coverage term" means the following individual increment, or if a multi-year policy period, increments, of time, which comprise the policy period of this Coverage Part:

   a. The year commencing on the Effective Date of this Coverage Part at 12:01 AM standard time at your mailing address shown in the Declarations, and if a multi-year policy period, each consecutive annual period thereafter, or portion thereof if any period is for a period of less than 12 months, constitute individual "coverage terms". The last "coverage term" ends at 12:00 AM standard time at your mailing address shown in the Declarations on the earlier of:

      (1) The day the policy period shown in the Declarations ends; or

      (2) The day the policy to which this Coverage Part is attached is terminated or cancelled.

   b. However, if after the issuance of this Coverage Part, any "coverage term" is extended for an additional period of less than 12 months, that additional period of time will be deemed to be part of the last preceding "coverage term".

6. "Coverage territory" means anywhere.

7. "Electronic data" means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

8. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

9. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any similar governing document.

10. "Hostile fire" means one that becomes uncontrollable or breaks out from where it was intended to be.

11. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement,

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

12. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for "property damage" by fire or explosion to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business, other than a contract or agreement pertaining to the rental or lease of any "auto", (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury", "property damage" or "personal and advertising injury" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement; or

   g. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".


Includes copyrighted material of ISO Properties, Inc., with its permission.

Paragraphs **f.** and **g.** do not include that part of any contract or agreement:

**(1)** That indemnifies a railroad for "bodily injury", "property damage" or "personal and advertising injury" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing. However, if such liability is insured by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, this Paragraph **(1)** shall not apply for such hazards for which insurance coverage is afforded by such "underlying insurance";

**(2)** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(a)** Preparing, approving or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

**(b)** Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage;

**(3)** Under which the insured, if an architect, engineer or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in Paragraph **(2)** above and supervisory, inspection, architectural or engineering activities;

**(4)** That indemnifies an advertising, public relations or media consulting firm for "personal and advertising injury" arising out of the planning, execution or failure to execute marketing communications programs. Marketing communications programs include but are not limited to comprehensive marketing campaigns; consumer, trade and corporate advertising for all media; media planning, buying, monitoring and analysis; direct mail; promotion; sales materials; design; presentations; point-of-sale materials; market research; public relations and new product development;

**(5)** Under which the insured, if an advertising, public relations or media consulting firm, assumes liability for "personal and advertising injury" arising out of the insured's rendering or failure to render professional services, including those services listed in Paragraph **(4)**, above;

**(6)** That indemnifies a web-site designer or content provider, or Internet search, access, content or service provider for injury or damage arising out of the planning, execution or failure to execute Internet services. Internet Services include but are not limited to design, production, distribution, maintenance and administration of web-sites and web-banners; hosting web-sites; registering domain names; registering with search engines; marketing analysis; and providing access to the Internet or other similar networks;

**(7)** Under which the insured, if a web-site designer or content provider, or Internet search, access, content or service provider, assumes liability for injury or damage arising out of the insured's rendering or failure to render Internet services, including those listed in Paragraph **(6)**, above;

**(8)** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

**(9)** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of an "auto" over a route or territory that person or organization is authorized to serve by public authority.

**13.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" includes supervisors furnished to you by the labor leasing firm. "Leased worker" does not include a "temporary worker".

**14.** "Loading or unloading" means the handling of property:

**a.** After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

**b.** While it is in or on an aircraft, watercraft or "auto"; or


Includes copyrighted material of ISO Properties, Inc., with its permission.

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

15. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

16. "Occurrence" means:

a. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage"; or

b. An offense that results in "personal and advertising injury".

All damages arising from the same accident, continuous or repeated exposure to substantially the same general harmful conditions, act or offense shall be deemed to arise from one "occurrence" regardless of:

(1) The frequency of repetition;

(2) The number or kind of media used; or

(3) The number of claimants.

17. "Personal and advertising injury" means injury, including "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. Abuse of process;

d. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

e. Defamation of character, including oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;


Includes copyrighted material of ISO Properties, Inc., with its permission.

f. Oral or written publication, in any manner, of material that violates a person's right of privacy;

g. The use of another's advertising idea in your "advertisement";

h. Infringing upon another's copyright, trade dress or slogan in your "advertisement"; or

i. Discrimination, unless insurance coverage therefor is prohibited by law or statute.

18. "Pollutants" mean any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, petroleum, petroleum products and petroleum by-products, and waste. Waste includes materials to be recycled, reconditioned or reclaimed. "Pollutants" include, but are not limited to, substances which are generally recognized in industry or government to be harmful or toxic to persons, property or the environment regardless of whether the injury or damage is caused directly or indirectly by the "pollutants" and whether:

a. The insured is regularly or otherwise engaged in activities which taint or degrade the environment; or

b. The insured uses, generates or produces the "pollutant".

19. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the site has been completed, if your contract calls for work at more than one site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

(2) The existence of tools, uninstalled equipment or abandoned or unused materials.

20. "Property damage" means:

a. Physical injury to or destruction of tangible property including all resulting loss of use. All such loss of use shall be deemed to occur at the time of the physical injury or destruction that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, "electronic data" is not tangible property.

21. "Subsidiary" means any organization in which more than 50% of the outstanding securities or voting rights representing the present right to vote for election of directors is owned or controlled, directly or indirectly, in any combination, by one or more of the Named Insureds.

22. "Suit" means a civil proceeding in which money damages because of "bodily injury", "personal and advertising injury" or "property damage" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such money damages are claimed and to which the insured must submit or does submit with our consent;

b. Any other alternative dispute resolution proceeding in which such money damages are claimed and to which the insured submits with our consent; or

c. An appeal of a civil proceeding.


Includes copyrighted material of ISO Properties, Inc., with its permission.

23. "Temporary worker" means a person who is furnished to you to:

    a. Substitute for a permanent "employee" on leave; or

    b. Meet seasonal or short-term workload conditions.

24. "Ultimate net loss" means the sum actually paid or payable in the settlement or satisfaction of the insured's legal obligation for damages, covered by this insurance, either by adjudication or compromise. "Ultimate net loss" does not include Defense and Supplementary Payments as described in **SECTION I - COVERAGE, C. Defense and Supplementary Payments** of this Coverage Part.

25. "Underlying insurance" means the insurance listed in the Schedule of Underlying Insurance and the insurance available to the insured under all other insurance policies applicable to the "occurrence". "Underlying insurance" also includes any type of self-insurance or alternative method by which the insured arranges for funding of legal liabilities that affords coverage that this Coverage Part covers.

26. "Underlying limit" means the total of the applicable limits of all "underlying insurance" less the amount, if any, by which the applicable limit of the applicable policy listed in the Schedule of Underlying Insurance has been reduced solely by payment of loss resulting from claims which are in accordance with **SECTION I - COVERAGE, A. Insuring Agreement**, Paragraph **2.** of this Coverage Part.

27. "Workplace" means that place and during such hours to which the "employee" sustaining injury was assigned by you, or any other person or entity acting on your behalf, to work on the date of "occurrence".

28. "Your product":

    a. Means:

       (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

           (a) You;

           (b) Others trading under your name; or

           (c) A person or organization whose business or assets you have acquired; and

       (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

    b. Includes:

       (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your product; and

       (2) The providing of or failure to provide warnings or instructions.

    c. Does not include vending machines or other property rented to or located for the use of others but not sold.

29. "Your work":

    a. Means:

       (1) Work or operations performed by you or on your behalf; and

       (2) Materials, parts or equipment furnished in connection with such work or operations.

    b. Includes:

       (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

       (2) The providing of or failure to provide warnings or instructions.


Includes copyrighted material of ISO Properties, Inc., with its permission.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**

A. **SECTION I - COVERAGE, B. Exclusions** is modified to add the following:

This insurance does not apply to:

1. Any liability:

   a. With respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   b. Resulting from the "hazardous properties" of "nuclear material" and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

2. Any liability resulting from the "hazardous properties" of "nuclear material", if

   a. The "nuclear material" (1) is at any "nuclear facility" owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom,

   b. The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

   c. The injury or damage arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this Exclusion **c.** applies only to "property damage" to such "nuclear facility" and any property thereat.

B. **SECTION V - DEFINITIONS** is hereby modified to add the following definitions:

1. "Hazardous properties" include radioactive, toxic or explosive properties;

2. "Nuclear material" means "source material", "special nuclear material" or "by-product material";

3. "Source material", "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

4. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";

5. "Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

6. "Nuclear facility" means:

   a. Any "nuclear reactor";

   b. Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", (3) or handling, processing or packaging "waste";

   c. Any equipment or device used for the processing, fabricating or alloying of "special nuclear materials", if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of


Includes copyrighted material of ISO Properties, Inc., with its permission.

plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations;

**7.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**8.** "Property damage" includes all forms of radioactive contamination of property.



Includes copyrighted material of ISO Properties, Inc., with its permission.

# NOTICE TO POLICYHOLDERS
# COMMERCIAL UMBRELLA POLICY PROGRAM

This is a summary of the major changes found in the new edition of the Commercial Umbrella Coverage Form. NO COVERAGE IS PROVIDED BY THIS SUMMARY nor can it be construed to replace any provision of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE for complete information on the coverages you are provided. If there is any conflict between the policy and this summary, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

The areas within the policy that broaden, reduce or clarify coverage are highlighted below. We have followed the policy sequence of provisions in setting out this material.

**I. BROADENING OF COVERAGE**

**A.** Section **I**, **B.** Exclusions:

Revised the **Pollutant - Other Than Auto** exclusion to provide additional exceptions, in addition to heating equipment, for equipment used to cool, dehumidify and heat water in a building.

**B.** Section **I**, **C.** Defense and Supplementary Payments:

Revised coverage for post-judgment interest so that it applies to the full amount of a judgement in lieu of only that amount within our Limit of Insurance.

**C.** Section **IV** - Conditions:

Revised the **Liberalization** Condition so that it applies to changes made 60 days, in lieu of 45, prior to the inception of the policy period.

**II. CLARIFICATION OF COVERAGE**

**A.** Section **I**, **B.** Exclusions:

1. Added the **Distribution of Material in Violation of Statutes** exclusion.
2. Added the **Electronic Data** exclusion.
3. Added total pollutant exclusion verbiage to the **Pollutant - Other Than Auto** exclusion for the "personal and advertising injury" hazard, although any liability arising from "pollutants" excluded by "underlying insurance" was already excluded.
4. Replaced the verbiage in the **War** exclusion with more restrictive language previously added by a mandatory endorsement.

**B.** Section **I**, **C.** Defense and Supplementary Payments revised to clarify that:

1. The amount of pre-judgment interest covered is only the amount attributable to the portion of a judgement that falls within the applicable Limit of Insurance; and
2. Defense and Supplementary Payments do not reduce the limit of insurance, unless such payments reduce the "underlying insurance" limit of insurance. Such as when the assumed defense obligations to an indemnitee reduce the underlying Commercial General Liability Limits of insurance.

**C.** Section **II** - Who Is An Insured:

Paragraph **1.c.**, which addressed "mobile equipment" subject to motor vehicle registration has been deleted, as such vehicles are now considered "autos", and as such is addressed by Paragraph **2.** of this Section.

**D.** Section **IV** - Conditions:

Revised the **Other Insurance** Condition to reinforce the fact that:

1. Coverage is excess of all other insurance, except that written specifically to be excess of this policy; and
2. This policy will not contribute its Limit of Insurance until all other insurance, except that written specifically to be excess of this policy, has been exhausted.

**E.** Section **V** - Definitions:

1. The definition of "auto" has been revised to include, in addition to motor vehicles and trailers designed to travel on public roads, any other land vehicle subject to motor vehicle insurance law in the jurisdiction where it is licensed and garaged.
2. The definition of "mobile equipment" has been revised to clarify that:

a. Self-propelled vehicles with certain types of permanently attached vehicles will be considered "autos"; and

b. The definition does not include vehicles subject to motor vehicle laws, as such vehicles are considered "autos".

## III. REDUCTIONS OF COVERAGE

Section V - Definitions

The definition of "pollutant" is amended to specifically mention petroleum in addition to petroleum products and petroleum by-products.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MOBILE EQUIPMENT SUBJECT TO MOTOR VEHICLE INSURANCE LAWS - LIMITATION

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified to add the following:

This insurance does not apply to:

Any liability arising out of the ownership, maintenance, occupancy, operation, use, "loading or unloading" of any land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law, unless such liability is covered by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is afforded by such "underlying insurance", unless otherwise excluded by this Coverage Part.


Includes copyrighted material of Insurance Services Office, Inc., with its permission

# NOTICE TO POLICYHOLDERS - MOBILE EQUIPMENT SUBJECT TO MOTOR VEHICLE INSURANCE LAWS - LIMITATION

This is a notice of a change in your policy. NO COVERAGE IS PROVIDED BY THIS NOTICE nor can it be construed to replace any provisions of your policy. YOU SHOULD READ YOUR POLICY AND REVIEW YOUR DECLARATIONS PAGE for complete information on the coverage you are provided. If there is any conflict between the policy and this notice, THE PROVISIONS OF THE POLICY SHALL PREVAIL.

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**US 4062** Mobile Equipment Subject to Motor Vehicle Insurance Laws - Limitation has been added to your policy.

This endorsement makes the umbrella follow-form to the primary insurance with respect to mobile equipment subject to motor vehicle insurance laws. This eliminates possible gaps and arguments over which underlying policy, i.e., CGL or auto, should apply to such mobile equipment. Other coverage gaps may still exist arising from the revised definitions of "mobile equipment" and "auto".

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF DESIGNATED PROFESSIONAL SERVICES

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified to add the following:

This insurance does not apply to:

Any liability due to the rendering of or failure to render any professional service shown in the Schedule.

**SCHEDULE**

**1.** **PRINTERS**

**2.**

**3.**



Includes copyrighted materials of ISO Properties, Inc., with its permission.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PRINTERS ERRORS AND OMISSIONS LIMITATION

This endorsement modifies insurance provided under the following:

**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**

**SECTION I - COVERAGE, B. Exclusions,** Paragraph **2.** is modified as follows:

Exclusion **a. Professional Liability Limitation** is hereby deleted and replaced by the following:

This insurance does not apply to:

Any liability or damages arising from "professional liability". However:

**(1)** This exclusion will not apply if coverage for "professional liability" is provided by valid and collectible "underlying insurance" at the "underlying limit" specified by a policy or policies of insurance listed in the Schedule of Underlying Insurance, but only for such hazards for which coverage is afforded by such "underlying insurance", unless otherwise excluded or limited by this Coverage Part; and

**(2)** Irrespective of **a.** above, under no circumstances does this insurance apply to damages claimed for any loss, cost or expense incurred for the correction, repair or replacement of:

**(a)** "Your product" or

**(b)** "Your work".

Paragraph **(2)** does not apply:

**(a)** If the damages are a result of work performed on your behalf by a subcontractor; or

**(b)** To damages for expenses claimed for the withdrawal or inspection of such products or work because of any known or suspected defect or deficiency therein.



Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLLUTANT EXCLUSION - OTHER THAN AUTO

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified as follows:

Exclusion **17. Pollutant - Other Than Auto** (Exclusion **1.q.** in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made) is hereby deleted and replaced by the following:

**Pollutant - Other Than Auto**

This insurance does not apply to:

**a.** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, emission or escape of "pollutants":

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

**(2)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(3)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

**(4)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

Subparagraphs **a.(1)** and **a.(4)** do not apply:

**(a)** To "bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"; or

**(b)** If insurance is provided to the insured by "underlying insurance" specifically listed in the Schedule of Underlying Insurance at the "underlying limit" scheduled, but only to the extent "bodily injury" or "property damage" coverage is provided by that "underlying insurance" specifically listed in the Schedule of Underlying Insurance and subject to all its terms and conditions.

**(5)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to or assess the effects of, "pollutants".

**b.** "Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape emission of "pollutants" at any time.

**c.** Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**d.** Any liability caused by "pollutants" excluded by "underlying insurance".


Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PERSONAL PROPERTY
# CARE, CUSTODY OR CONTROL EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

**SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified to add the following:

This insurance does not apply to:

"Property damage" to personal property not owned by an insured and in the care, custody or control of an insured, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property.


Includes copyrighted material of ISO Properties, Inc., with its permission.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYEE BENEFIT LIABILITY

This endorsement modifies insurance provided under the following:

**COMMERCIAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART**
**PROFESSIONAL UMBRELLA LIABILITY COVERAGE PART - CLAIMS-MADE**

This policy is modified to add the following:

I. **SECTION I - COVERAGE, A. Insuring Agreement(s)** is modified to add the following:

**EMPLOYEE BENEFIT LIABILITY:**

We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages because of any negligent act, error or omission of the insured or any other person for whose acts the insured is legally liable arising out of the administration of the insured's employee benefit programs.

This insurance applies only to negligent acts, errors or omissions:

a. Whose damages are in excess of the "underlying insurance" provided by an Employee Benefit Liability policy listed in the Schedule of Underlying Insurance; and

b. Which occur during the policy period.

II. **SECTION I - COVERAGE, B. Exclusions** (and in the Professional Umbrella Liability Coverage Part and the Professional Umbrella Liability Coverage Part - Claims-Made only: Subparagraph **1.**) is modified to add the following exclusion:

This insurance does not apply to:

Any liability arising out of employee benefit programs unless such liability is covered by valid and collectible "underlying insurance" as listed in the Schedule of Underlying Insurance, and then only for such hazards for which coverage is afforded by such "underlying insurance".

41091
BB&T HUFFAKER & TRIMBLE
P O BOX 6217
CHATTANOOGA TN 37401-6217

Dear Agent:

Our Commercial Lines Team has taken considerable care to process this policy correctly. We think you will be pleased with its neatness and accuracy. HOWEVER, IF THE POLICY HAS NOT BEEN PRODUCED TO YOUR SATISFACTION PLEASE INDICATE THE PROBLEMS AND RETURN DIRECTLY TO OUR ATTENTION VIA FAX (513) 881-8656 OR e-mail CLD_Service@cinfin.com. We will see that the corrected policy is processed on a priority basis.

Thank you for placing this coverage with The Cincinnati Insurance Companies!

Best Regards,

The Commercial Lines Department

Policy Number: PRN 300 22 95/PRA 300 22 95

Effective Date: 03-01-2010

Named Insured: NATIONAL PRINT GROUP INC

Underwriter: CHRIS MEDINGER

Rater: CHERYL WILLIAMS

Typist: JEFFERY WELLS

| PREMIUM | COMMISSION |
|---|---|
| 68,626 ANNUAL/INST PREM | 15% ALL OTHER |
| 5,314 ANNUAL | 15% COMMERCIAL UMBRELLA |
| 4 ANNUAL | 0% FLORIDA REVENUE |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# GENERAL CHANGE ENDORSEMENT

Attached to and forming part of Policy Number PRN 300 22 95

Issued to NATIONAL PRINT GROUP INC

Effective Date of Endorsement 07-06-2010

Agent BB&T HUFFAKER & TRIMBLE 41-091
CHATTANOOGA TN

**PREMIUM INFORMATION**

| | Additional Premium | Return Premium |
|---|---|---|
| Due at Endorsement Effective Date | 100 | |

Subsequent ________ Installments ____ Increased by ____ Decreased by $ ________

Revised Installment Payments (Not Including Auto Premium)

First Installment $ ________ Remaining Installment(s) $ ________

It is agreed that the policy is amended as indicated by X

____ Policy Installment Premium Amended to: ________

____ Named Insured

____ Mailing Address

____ Form(s) Added

____ Form(s) Deleted

All Other Reasons for Change

AMENDING GA501 TO INCLUDE:
ADDITIONAL INSURED 29940 100

ADDING FORM GA4113

ADDING FORM CG2404

07-28-2010 JWZ
IA 407 09 09 ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WAIVER OF TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART.

**SCHEDULE**

**Name of Person or Organization:**

THE VENETIAN RESORT - HOTEL CASINO
3555 LAS VEGAS BOULEVARD SOUTH
LAS VEGAS NV 89109

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

The TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US Condition (Section IV – COMMERCIAL GENERAL LIABILITY CONDITIONS) is amended by the addition of the following:

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

 Copyright, Insurance Services Office, Inc., 1992

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - OWNERS, LESSEES OR CONTRACTORS - SCHEDULED PERSON OR ORGANIZATION - YOUR WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

**Name of Person or Organization (Additional Insured):**
THE VENETIAN RESORT - HOTEL CASINO
3555 LAS VEGAS BOULEVARD SOUTH
LAS VEGAS NV 89109

**WHO IS AN INSURED** (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability arising out of "your work" for that Additional Insured by you or on your behalf.



Includes copyrighted material of Insurance Services Office, Inc., with its permission.

THE CINCINNATI INSURANCE COMPANY
**GENERAL CHANGE ENDORSEMENT**

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

Attached to and forming part of Policy No. PRN 3002295
Issued to: NATIONAL PRINT GROUP, INC.
Effective Date of Endorsement 03/01/2011

Agency: BB&T HUFFAKER & TRIMBLE 41-091

Additional Premium Due at Endorsement Effective Date WAIVED

Subsequent Quarterly Installments Increased by $4
Revised Installment Payments (Not Including Auto Premium)
First Installment $16,084 Remaining Installment(s) $16,084

```
AMENDING GA501 TO AMENDING
   BUILD PRM BK OFF     61212   A)600     56.442     34
   PROD INCLUDED
```

User ID: SABNEY
Activity Date: 03/07/2011 Ratebook: 01/01/2011 (FL) Quote Number: 1201588

ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED

# THE CINCINNATI INSURANCE COMPANY

## LIABILITY PREMIUM ADJUSTMENT STATEMENT

INSURED: NATIONAL PRINT GROUP INC POLICY NO: PRN 3002295

AGENT: BB&T INSURANCE SERVICES INC DBA BB&T HUFFAKER & TRIMBLE (41091)

POLICY PERIOD

From 03/01/09 To 03/01/10

TERM OF AUDIT

From 03/01/09 To 03/01/10

ADDITIONAL PREMIUMS ARE DUE UPON PRESENTATION OF A STATEMENT

| CLASS# CODE | CLASSIFICATION | PREMIUM BASIS A. Area B. Payroll C. Sales E. Cost/ Each/ Other | | RATES | | DEPOSIT PREMIUM | | EARNED PREMIUM | | DIFFERENCE | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Prod/ Comp. | All Other | Prod/ Comp. | All Other | Prod/ Comp. | All Other | Prod/ Comp. | All Other |
| 58408 TN | PRINTING (PROFIT) | C | 58646834 | 0.000 | 0.041 | 0 | 2771 | 0 | 2405 | 0 | -366 |
| 58408 NV | PRINTING (PROFIT) | C | 0 | 0.000 | 0.095 | 0 | 608 | 0 | 0 | 0 | -608 |

| | | |
|---|---|---|
| Total Earned Premium: | $0 | $2,405 |
| Deposit Premium: | $0 | $3,379 |
| Return Premium: | $0 | ($974) |
| Net Return Premium: | ($974) | |

IA 405 03 94 7/2/2010 (SLK)

# EXHIBIT 2

# BACKUS, CARRANZA & BURDEN

*Attorneys and Counselors at Law*


*Attorneys:*

LELAND EUGENE BACKUS
EDGAR CARRANZA
JACK P. BURDEN
SHEA ANN BACKUS
JAMES J. CONWAY

*Paralegals:*

ROBERT W. COZART
DEBORA J. HALBERT


*Our File No.: 1388.03*

Email address of sender: gbackus@backuslaw.com

April 9, 2012

**ATTORNEY/CLIENT CONFIDENTIAL COMMUNICATION{PRIVATE }**
**EMAIL TRANSMISSION ONLY**

Notice: This message originates from the law firm of Backus, Carranza & Burden. This message and any file(s) or attachment(s) transmitted with it are confidential, intended only for the named recipient, and may contain information that is a trade secret, proprietary, protected by the attorney work product doctrine, subject to the attorney-client privilege, or is otherwise protected against unauthorized use or disclosure. This message and any file(s) or attachment(s) transmitted with it are transmitted based on a reasonable expectation of privacy consistent with ABA Formal Opinion No. 99-413. Any disclosure, distribution, copying, or use of this information by anyone other than the intended recipient, regardless of address or routing, is strictly prohibited. If you receive this message in error, please contact the offices of Backus Carranza at 702-872-5555 and advise the sender by immediate reply and delete the original message. Personal messages express only the view of the sender and are not attributable to Backus, Carranza & Burden.

Janice M. Michaels, Esq.
Adam R. Fulton, Esq.
Wood Smith Henning & Berman LLP
7670 West Lake Mead Boulevard
Suite 250
Las Vegas, NV 89128-6652
Via email: jmichaels@wshblaw.com

*Re: Our Client: Cincinnati Insurance Companies*

*Your Clients:* *SN Investment Properties, LLC ("SNIP")*
*Harsch Investment Properties ("HIP")*
*Harsch Investment Properties Nevada, LLC ("HIPN")*
*Policy No.* *PRN 300 22 95*

Dear Janice and Adam:

Cincinnati Insurance Company (the "Company") upon further investigation into the allegations set forth in the pleadings in case no. A-11-646266-C ("Newson Lawsuit") and other materials that have been provided to the Company hereby responds to the tender of defense and indemnity submitted by your law firm on behalf of your clients above-mentioned.

**THE POLICY**

The Company has issued policy number PRN 300 22 95 (the "Policy") to the Named Insured, National Print Group, Inc. on an occurrence basis for the period March 1, 2010 to March 1, 2011 with limits of liability under the Commercial General Liability Coverage, GA 501 10 01, of $1,000,000 for each occurrence limit and $2,000,000 for general aggregate limit ("Underlying Limits"). The Policy further provides a medical expense limit of $5,000. Under the Commercial Umbrella Liability Coverage, USC504 12 04, the limits of insurance are $10,000,000 per occurrence and $10,000,000 aggregate limit ("Umbrella Limits").

**RESERVATION OF RIGHTS**

We have now concluded our preliminary coverage review and investigation. This letter will serve to advise you of the potential bars or limitations to the coverage afforded to the Named Insured for the damages sought in the Newson Lawsuit under the Policy based upon the investigation completed to date. The Company will provide a complete defense under the Policy at present for SN Investment Properties, LLC ("SNIP"), Harsch Investment Properties ("HIP"), and Harsch Investment Properties Nevada, LLC ("HIPN") for the allegations in the Newson Lawsuit under a reservation of rights to limit or deny payment of damages on various grounds detailed below.

The Company has elected to appoint Janice M. Michaels, Esq. of Wood Smith Henning & Berman, LLP to defend SNIP, HIP and HIPN in the Newson Lawsuit, but will not contribute toward any pre-tender defense fees and costs. We advise SNIP, HIP and HIPN through your law offices that they are each entitled to retain their own personal counsel, at each of their respective expense, to associate with Ms. Michaels of the Wood Smith Henning & Berman, LLP law firm to further protect their potentially uninsured exposure. While a defense is to be provided to SNIP, HIP and HIPN in the Newson

Lawsuit under the Policy, it is to be expressly understood that the Company is responsible only according to the terms, limits and conditions of the Policy.

The Company reserves its right to amend or supplement this reservation as further review, investigation and discovery warrant. The Company also reserves the right to seek reimbursement from SNIP, HIP and/or HIPN for claim expenses incurred on each of their respective behalves in defending the claims in the Newson Lawsuit should it ultimately be determined that no duty to defend or indemnify existed. The Company also reserves its right to file a declaratory judgment action at any time to determine its duties of defense or indemnity in regard to your tender and this reservation of rights letter.

This letter sets forth the facts upon which we rely at this time in evaluating coverage. Should you have any information that is contrary to these facts that may impact the coverage for SNIP, HIP or HIPN or our evaluation, this information should be provided to the undersigned. In our last correspondence, we further requested additional information which has not been provided. SNIP, HIP and HIPN each has a continuing duty to cooperate with the Company in investigating and evaluating the claims in the Newson Lawsuit.

**NAMED INSURED**

The Defendants/Third-Party Plaintiffs, SN Investment Properties, LLC; Harsch Investment Properties, LLC; and Harsch Investment Properties Nevada, LLC's Third-Party Complaint ("Third-Party Complaint") names National Las Vegas, Inc. ("NLVI"), a Nevada corporation, and National Las Vegas, LLC ("NLVLLC"), a Nevada limited liability company as Third-Party Defendants and express indemnitors, and further alleges, *inter alia*, that SNIP, HIP and HIPN entered into written contracts with NLVI and NLVLLC. The Third Amendment to Lease between SN Investment Properties, LLC and National Las Vegas, Inc. ("NLVI") ("Third Amendment") does not name National Print Group, Inc., the Named Insured, but the investigation of the Company has revealed that Doug Newson is listed as the Resident Agent for NLVI, which status is listed as Merge Dissolved. NLVLLC is in Default status. The Third Amendment to the Lease is not with the Named Insured, but with NLVI.

Amendment No. 2 to Lease between RMS Limited Partnership and National Print Group, Inc. ("Second Amendment") dated December 20, 2005 did at that time name the Named Insured, but the Second Amendment to the understanding of the Company is no longer in force and effect and was not in effect as to National Print Group, Inc. on the date of the incident of December 20, 2010. The filings on the internet with the Nevada Secretary of State denote that NLVI was merger dissolved and that the merge out was filed on September 26, 2007. The Second Amendment stated that in May of 2005, National Print Group, Inc. changed the name of the business in Las Vegas to National Print Las Vegas, not NLVI. The records of the County of Clark Clerk's Office indicate that on July 12, 2011, the National Print Group, Inc. filed a fictitious firm name for NLVI. This filing post dated the date of the Newson Lawsuit incident.

The Third Amendment was entered into on May 27, 2009 and was ostensibly in effect at the time of the incident which is the subject matter of the Newson Lawsuit.

Under the Policy in the Commercial General Liability Coverage Form, Section II, the Policy defines "Who is an Insured" as follows:

1. If you are designated in the Declarations as:

***

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. ...

***

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Insurance under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier. ...

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

Only National Print Group, Inc. was shown in the Declarations as the Named Insured. Neither NLVI nor NLVLLC are listed under the Declarations. NLVI was not in existence when the Third-Party Complaint was filed. NLVLLC which does not appear to be involved in any written agreement or amendment was in existence, but currently is in default status.

The Company previously entered into a Non-Waiver Agreement with the Named Insured dated October 25, 2011 which preserved the right of the Company to assert any defenses to coverage under the above provisions of the Policy. To the extent that there is no duty to defend or indemnify the Named Insured under the Policy, no further duty would be available to SNIP, HIP or HIPN under the Policy.

**ADDITIONAL INSURED STATUS**

In our investigation into whether SNIP, HIP or HIPN enjoy additional insured status under the Policy we note that the original lease titled Industrial Lease between RMS Limited Partnership and Castle Manufacturing, Inc. ("Original Lease"), the entities

that were listed as additional insureds by Exhibit 10.03A were RMS Limited Partnership and Crystal Diamond, Inc. The actual Exhibit 10.03A described these listed additional insureds simply by name and not relationship to the Original Lease. Section 10.03(A) of the Original Lease stated the following:

> All such policies shall be written to apply to all bodily injury, property damage, [sic] personal injury losses and shall be endorsed to include Landlord and its agents, beneficiaries, partners, employees, and any deed of trust holder or mortgagee of Landlord or any ground lessor as additional insureds. (A list of the current persons and entities to be named as additional insureds is attached hereto as Exhibit 10.03(A))

Our investigation further indicates that SNIP is the current owner and ostensibly as such the Landlord of the subject premises located at 4545 W. Diablo Drive, Las Vegas, Nevada. The Original Lease further provides in Section 10.03 that the Tenant is to "procure and maintain" certain general liability insurance which insurance is to "be endorsed to include Landlord and its agents, beneficiaries, partners, employees, and any deed of trust holder or mortgagee of Landlord or any ground lessor as additional insureds. (A list of the current persons and entities to be named as additional insureds is attached hereto as Exhibit 10.03(A).)"

None of the documentation provided to the Company infers that HIP or HIPN were intended by the Original Lease language to be named as additional insureds.

Under the Policy, pursuant to the Commercial General Liability Extended Liability Endorsement, GA 227 02 07, the Policy was modified to provide in Paragraph 7, **Automatic Additional Insured – Specified Relationships** coverage. Paragraph 7(a)(2)(a) provides coverage is extended to a "lessor of a premises leased to you with whom you have agreed per Paragraph 7.a.(1) above to provide insurance, but only with respect to liability arising out of the ownership, maintenance or use of that part of a premises leased to you, subject to the following additional exclusions: This insurance does not apply to: 1) Any "occurrence" which takes place after you cease to be a tenant in that premises. 2) Structural alterations, new construction or demolition operations performed by or on behalf of such additional insured."

The CGL Coverage, GA 101 12 04, provides a further exclusion is Paragraph 2(r) **Additional Insured Prior Knowledge** which provides:

> An additional insured added by attachment of an endorsement to this Coverage Part that is seeking coverage for a claim or "suit," if that additional insured knew, per the following paragraph, that "bodily injury" or "property damage" had occurred or had begun to occur, in whole or in part, prior to the "coverage term" in which such "bodily injury" or "property damage" occurs or begins to occur.

An additional insured added by attachment of an endorsement to this Coverage Part will be deemed to have known that "bodily injury" or "property damage" has occurred or has begun to occur at the earliest time when that additional insured, or any one of its owners, members, partners, managers, executive officers, "employees" assigned to manage that additional insured's insurance program, or "employee" assigned to give or receive notice of an "occurrence," "personal and advertising injury" offense, claim or "suit":

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage;"
(3) First observes, or reasonably should have first observed, the "bodily injury" or "property damage;"
(4) Becomes aware, or reasonably should have become aware, by any means other than as described in (3) above, that "bodily injury" or "property damage" had occurred or had begun to occur; or
(5) <u>Becomes aware, or reasonably should have become aware, of a condition from which "bodily injury" or "property damage" is substantially certain to occur</u>. [emphasis supplied]

In our preliminary investigation into coverage that may be afforded to your clients under this policy, we have discovered that the Clark County Assessor's records indicate that the current owner of the subject property (Parcel 162-30-402-002) is SNIP and further indicate that that ownership dates back to January 9, 2007.

We previously advised you that the Certificate of Liability Insurance issued by the Producer, BB&T Huffaker & Trimble listed HIP and all of "it's affiliates" as Certificate Holder for CIC policy number PRN3002295, effective March 1, 2010 to March 1, 2011. At this time frame neither HIP nor its affiliate HIPN were a "lessor" who leased property to the Named Insured. The Certificate of Liability Insurance was received by HIP on March 2, 2010. This Certificate further stated in bold and conspicuous print the following:

> **THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER, THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW**

The Company has been informed that the managing member of SNIP is neither HIP nor HIPN, but Harsch Investment Properties Management, LLC ("HIPM") and the managing members of HPIM are the Jordan Schnitzer 2001 Irrevocable Trust and the Jordan Schnitzer Revocable Living Trust. None of these entities have any affiliate ownership with HIP or HIPN.

The Complaint in the underlying Newson Lawsuit alleged that SNIP, HIP and HIPN were "the owners and occupiers" of the leased property and "owed a duty" to Douglas Newson "to regularly inspect the subject property, and to maintain and repair it…." Accordingly, the four corners of the Complaint do not allege that these entities were lessor or landlords which might trigger coverage. We know of no factual support for the validity of the allegations relative to HIP or HIPN. However, in liberally construing this Complaint language it does appear to the Company that the allegations could be construed to allege that SNIP, HIP and/or HIPN were the lessor of the subject property, thus giving rise ostensibly to a duty to defend. *United National Ins. Co. v. Frontier Ins. Co., Inc.,* 120 Nev. 678, 99 P.3d 1153 (2004).

**CONCLUSION**

The Company reserves all of its rights under the Policy to limit or deny coverage as explained herein. Please note that Ms. Michaels of the Wood Smith Henning & Berman law firm will continue to represent the interests of SNIP, HIP and HIPN in this suit filed against each of them by Douglas Newson and Christine Newson, such undertaking is upon the express understanding that it will not be construed as a waiver of any of the rights which the Company may have under the Policy, nor as an admission of any liability whatsoever of the Company to the Named Insured or any Additional Insured.

Please feel free to call the undersigned if you have any questions or comments at (702) 872-5555. In particular, please advise the undersigned immediately if you are aware of further or different facts that could have a bearing on the Company's position regarding potential coverage of the Newson Lawsuit. All of your correspondence concerning coverage should be directed to the undersigned. Any questions you, SNIP, HIP or HIPN have concerning the defense should be directed to the undersigned.

We have attached the current Revised Guidelines for Reporting and Handling by Panel Counsel governing reporting to the Company. We request that all such reports for the present time be directed to the attention of the undersigned together with all appropriate guideline compliant billing. Please forward for consideration by Cincinnati Insurance Company your defense billings and costs from the date of your tender letter forward for review and processing.

Respectfully yours,

**BACKUS, CARRANZA & BURDEN**

Leland Eugene Backus, Esq.

LEB

CC: Elizabeth A. Schirm, M.S.M., MLIS, AINS via email

# EXHIBIT 3

# INDUSTRIAL LEASE

between

RMS LIMITED PARTNERSHIP,
a Nevada limited partnership
(Landlord)

and

Castle Manufacturing, Inc.
a Nevada corporation
(Tenant)

**TABLE OF CONTENTS**

**INDUSTRIAL LEASE**


| Article | Title | Page |
|---|---|---|
| I | Definitions | 1 |
| II | Premises | 2 |
| III | Term | 3 |
| IV | Rental; Adjustments | 3 |
| V | Security Deposit | 9 |
| VI | Use of Premises | 10 |
| VII | Utilities and Services | 13 |
| VIII | Maintenance and Repairs | 14 |
| IX | Alterations, Additions and Improvements | 15 |
| X | Indemnification and Insurance | 18 |
| XI | Damage or Destruction | 22 |
| XII | Condemnation | 23 |
| XIII | Relocation | 24 |
| XIV | Assignment and Subletting | 24 |
| XV | Default and Remedies | 26 |
| XVI | Attorneys Fees: Costs of Suit | 30 |
| XVII | Subordination and Attornment | 31 |
| XVIII | Quiet Enjoyment | 32 |
| XIX | Parking | 32 |
| XX | Rules and Regulations | 33 |
| XXI | Estoppel Certificates | 33 |
| XXII | Entry by Landlord | 34 |
| XXIII | Landlord's Lease Undertakings-Exculpation from Personal Liability; Transfer of Landlord's Interest | 35 |
| XXIV | Holdover Tenancy | 36 |
| XXV | Notices | 36 |
| XXVI | Brokers | 36 |
| XXVII | Miscellaneous | 37 |
| XXVIII | Floor Load Limits | 40 |
| XXIX | [Intentionally Omitted] | 40 |
| XXX | [Intentionally Omitted] | 41 |


**EXHIBITS**


| | |
|---|---|
| Exhibit 1.02 | Floor Plan of the Premises |
| Exhibit 10.03(A) | List of Additional Insureds |
| Exhibit 20.01 | Rules and Regulations |
| Exhibit 27.20 | Tenant Operations Inquiry |
| Exhibit 27.21 | Guaranty |

# INDUSTRIAL LEASE

**[FORM NET LEASE/MULTI-TENANT]**

THIS LEASE ("Lease"), dated November 2, 1995, is made and entered into by and between RMS LIMITED PARTNERSHIP, a Nevada limited partnership ("Landlord") and CASTLE MANUFACTURING, INC., a Nevada corporation ("Tenant"), upon the following terms and conditions:

## ARTICLE I - DEFINITIONS

Unless the context otherwise specifies or requires, the following terms shall have the following meanings:

1.01 Building. The term "Building" shall mean that certain office/warehouse building located in the Diablo Industrial Center at 4545 W. Diablo Dr., Las Vegas, Nevada ("Building E"), together with all related site land, improvements, parking facilities, common areas, driveways, sidewalks and landscaping. The total rentable square feet in the Building are 49,600 square feet.

1.02 Premises. The term "Premises" shall mean Space No. A in the Building, as more particularly outlined on the drawing attached hereto as Exhibit 1.02 and incorporated herein by reference.

1.03 Rentable Area of the Premises. The term "Rentable Area of the Premises" shall mean 49,600 square feet, which Landlord and Tenant have stipulated as the Rentable Area of the Premises.

1.04 Lease Term. The terms "Lease Term" or "Term" shall mean the period between the Commencement Date and the Expiration Date (as such terms are hereinafter defined), unless sooner terminated or renewed as otherwise provided in this Lease.

1.05 Commencement Date. Subject to adjustment as provided in Article III, the term "Commencement Date" shall mean the date of November 10, 1995.

- see Article III for renewal info.

1.06 Expiration Date. Subject to adjustment as provided in Article III, the term "Expiration Date" shall mean the date of December 31, ~~2001~~ 2000. (See letter from Burton, Bartlett & Glogovac dtd. Sept 4, 1996)

1.07 Base Rent. Subject to adjustment as provided in Article IV, the term "Base Rent" shall mean the amount of $22,568 per month, paid by Tenant to Landlord for the Tenant's Permitted Use of the Premises (as hereinafter defined). The foregoing Base Rent is based on a rental rate of $0.455 per rentable square foot per month.

1.08 **Tenant's Percentage Share**. The term "Tenant's Percentage Share" shall mean 9.71% with respect to Operating Expenses (as hereinafter defined), 9.71% with respect to Property Taxes (as hereinafter defined), 9.71% with respect to Insurance Expenses (as hereinafter defined) and 9.71% with respect to Tenant's law compliance obligations under Section 6.02(C) of this Lease and for all other purposes under this Lease.

1.09 Security Deposit. The term "Security Deposit" shall mean those monies, in the amount of $22,568, paid by Tenant to Landlord for Tenant's full and faithful performance of every term, covenant and condition of this Lease.

1.10 **Tenant's Permitted Use**. The term "Tenant's Permitted Use" shall mean only office and the manufacturing, storage and distribution of novelty and adult oriented products and no other use. Tenant's Permitted Use shall specifically not include the retail sale of products or services of any kind or nature on or from the Premises. Any showroom located on the Premises for wholesale buyers shall be limited to the space designated as the showroom on attached Exhibit 1.02 and no products of Tenant shall be displayed in any windows or otherwise visible to the general public from outside the Premises.

1.11 **Landlord's Address For Notices**. The term "Landlord's Address for Notices" shall mean RMS Limited Partnership, ~~201~~ 50 W. Liberty Street, ~~P.O. Box 201~~ Suite 650, Reno, Nevada, ~~89504~~ 89501 (As of 9/96).

1.12 **Tenant's Address For Notices**. The term "Tenant's Address for Notices" shall mean 4545 Diablo Drive, Suite A, Las Vegas, Nevada 89118.

1.13 **Broker(s)**. The term "Broker" or "Brokers" shall mean the person(s) and/or entity(ies) of (i) Cornerstone Company representing Landlord and (ii) CB Commercial Real Estate Group representing Tenant.

1.14 **Guarantors**. The term "Guarantor" or "Guarantors" shall mean the person(s) and/or entity(ies) of Taylor R. Coleman, as more particularly described in the Guaranty referenced in Section 27.21.

**ARTICLE II - PREMISES**

2.01 **Lease of Premises**. Landlord hereby leases the Premises to Tenant, and Tenant hereby leases the Premises from Landlord, upon all of the terms, covenants and conditions contained in this Lease. On the Commencement Date, Landlord shall deliver the Premises to Tenant.

2.02 **Acceptance of Premises**. The Tenant has examined the Premises, the title to the Premises, the sidewalks and structures adjoining the Premises, any subsurface conditions, and the present

uses and nonuses of the Premises. The Tenant accepts the Premises in its present condition, without representation or warranty, express or implied, in fact or by law, by the Landlord, and without recourse to the Landlord as to title, the nature, condition, or usability of the Premises, or with respect to the suitability or fitness of the Premises for the conduct or Tenant's Permitted Use or for any other purpose. The Landlord shall not be responsible for any latent defect or change of condition in the Building or Premises or title to the Building or Premises, and the Base Rent shall not be withheld or diminished on account of any defect in Landlord's title to the Premises, any change in the condition of the Premises, any damage occurring to the Premises, or the existence of any violations of the laws or regulations of any governmental authority with regard to the Premises.

## ARTICLE III - TERM

3.01 The Term of this Lease shall begin on the Commencement Date, and end on the Expiration Date, unless terminated sooner as provided below.

3.02 If the Landlord is unable to deliver possession of the Premises upon the Commencement Date, neither the Landlord nor its agents shall be liable for any damages caused to the Tenant by reason of the delay nor shall this Lease become void or voidable. However, the Tenant shall not be liable for the payment of Base Rent until the Landlord delivers possession of the Premises to it and the Term of this lease shall be extended by the length of time possession by the Tenant has been delayed.

3.03 Provided that Tenant is not in ~~default under the Lease,~~ the Tenant may renew the Lease Term for one additional 5-year term commencing on January 1, 2002 and expiring on ~~December 31, 2007~~ ("Renewal Term"), provided that Tenant gives Landlord written notice at least nine months prior to the expiration of the Lease Term, which means that notice shall be given on or before March 31, 2001. The Base Rent during the Renewal Term shall be based on the then prevailing rental rate for the Premises, but in no event shall the Base Rent during the Renewal Term be less than the Base Rent in effect during the last year of the Lease Term. For purposes of this Lease, the "prevailing rental rate" shall mean the total rental rate being quoted by Landlord to third-party tenants at the time of the Renewal Term for similar space, including all fixed and/or indexed rental adjustments and all rental adjustments for taxes and expenses for the leased premises within the Building.

## ARTICLE IV - RENTAL; ADJUSTMENTS

4.01 **Definitions.**

(A) "Property Taxes" shall mean all taxes, charges and assessments (whether they be general or special) which

Landlord pays or becomes obligated to pay for a calendar year because of, or in connection with, the ownership, leasing, or operating of the Building. Property Taxes shall not include income or franchise taxes, capital stock, inheritance, estate, gift, or any other taxes imposed upon or measured by Landlord's gross income or profits, unless the same shall be imposed in lieu of real estate taxes or other ad valorem taxes. Property Taxes shall include all fees and costs, including attorneys' fees, appraisals and consultants' fees, incurred by Landlord in seeking to obtain a reduction of, or a limit on the increase in, any Property Taxes, regardless of whether any reduction or limitation is obtained. Taxes for any calendar year shall be Property Taxes which are due for payment or are paid during such year. If at any time during the Lease Term the method of taxation then prevailing shall be altered so that any new tax, assessment, levy, imposition or charge shall be imposed upon Landlord in place or partly in place of any Property Taxes, or contemplated increase in any Property Taxes, and shall be measured by or be based in whole or in part upon the Building or the rents or other income from the Building, then all such new taxes, assessments, levies, impositions or charges, to the extent that they are so measured or based, shall be included in Property Taxes to the extent that such items would be payable if the Building was the only property of Landlord subject to same and the income received by Landlord from the Building was the only income of Landlord. Property Taxes shall also include any personal property taxes imposed upon the furniture, fixtures, machinery, equipment, apparatus, systems and appurtenances of Landlord used in connection with the Building.

(B) "Operating Expenses" shall mean all costs, fees, disbursements and expenses paid or incurred by or on behalf of Landlord in the operation, ownership, maintenance, management, replacement and repair of the Building (excluding Property Taxes and Insurance Expenses, as hereinafter defined). Operating Expenses shall not include costs of alteration of the premises of tenants of the Building, depreciation charges, interest and principal payments on mortgages, ground rental payments, real estate brokerage and leasing commissions, expenses incurred in enforcing obligations of tenants of the Building, salaries and other compensation of executive officers of the managing agent of the Building senior to the Building manager, costs of any special service provided to any one tenant of the Building but not to tenants of the Building generally, and costs of marketing or advertising the Building.

(C) "Insurance Expenses" shall mean all costs, fees, disbursements and expenses paid or incurred by or on behalf of Landlord for premiums for hazard, "all risk", casualty, rent interruption and liability insurance and all other insurance,

obtained by Landlord in connection with or relating to the Building.

If the Building does not have one hundred percent (100%) occupancy during an entire calendar year, then the variable cost components of Property Taxes, Operating Expenses and Insurance Expenses shall be adjusted so that the total amount of Property Taxes, Operating Expenses and Insurance Expenses equals the total amount which would have been paid or incurred by Landlord had the Building been one hundred percent (100%) occupied for the entire calendar year.

4.02 **Base Rent**. During the Lease Term, Tenant shall pay to Landlord as rental for the Premises the Base Rent described in Section 1.07 above, subject to the following adjustments (herein collectively called the "Rent Adjustments"):

+4% per year

(A) The Base Rent payable by Tenant to Landlord, as described in Section 1.07, shall, after year-1 of the Term and based on a 4% cumulative increase each year, be increased to (i) $23,470.72 per month in months 13 through 24 of the Term, (ii) $24,409.55 per month in months 25 through 36 of the Term, (iii) $25,385.93 per month in months 37 through 48 of the Term and (iv) $26,401.37 per month in months 49 through the end of Term.

(B) During each calendar year of the Lease Term, the Base Rent payable by Tenant to Landlord, as adjusted pursuant to Section 4.02(A) above, shall be increased by Tenant's Percentage Share of the Property Taxes for such year (the "Tax Adjustment").

(C) During each calendar year of the Lease Term, the Base Rent payable by Tenant to Landlord, as adjusted pursuant to Section 4.02(A) above, also shall be increased by Tenant's Percentage Share of the Operating Expenses paid or incurred by Landlord during such year (the "Operating Expense Adjustment").

(D) During each calendar year of the Lease Term, the Base Rent payable by Tenant to Landlord, as adjusted pursuant to Section 4.02(A) above, also shall be increased by Tenant's Percentage Share of the Insurance Expenses for such year (the "Insurance Adjustment").

(E) The Tax Adjustment, the Operating Expense Adjustment and the Insurance Adjustment are hereinafter referred to collectively as the "Tax, Operating Expense and Insurance Adjustments."

4.03 **Adjustment Procedure; Estimates.** The Tax, Operating Expense and Insurance Adjustments specified in Sections 4.02(B), 4.02(C) and 4.02(D) shall be determined and paid as follows:

(A) During each calendar year of the Lease Term, Landlord shall give Tenant written notice of Landlord's estimate of amounts payable under Sections 4.02(A), 4.02(B) and 4.02(C) for that calendar year. On or before the first day of each calendar month during the calendar year, Tenant shall pay to Landlord one-twelfth (1/12th) of the estimated annual amount. Landlord may, by written notice to Tenant, revise its estimate for the year in question, and subsequent payments by Tenant for that year shall be based upon the revised estimate. Landlord may not revise the estimate more than once every three (3) months.

(B). Within ninety (90) days after the close of each calendar year in which any Rent Adjustment is made or as soon thereafter as is practicable, Landlord shall deliver to Tenant a statement of that year's Property Taxes, Operating Expenses and Insurance Expenses, and the actual Tax, Operating Expense and Insurance Expense Adjustments to be made pursuant to Sections 4.02(B), 4.02(C) and 4.02(D) for such calendar year, as determined and certified by Landlord (the "Landlord's Statement") and such Landlord's Statement shall be binding upon Landlord and Tenant, except as provided in Section 4.04 below. If the amount of the actual Tax Adjustment, Insurance Adjustment or Operating Expense Adjustment is more than the estimated payments for the Tax Adjustment, Insurance Adjustment or Operating Expense Adjustment for such calendar year made by Tenant, Tenant shall pay the deficiency to Landlord upon receipt of Landlord's Statement. If the amount of the actual Tax Adjustment, Insurance Adjustment or Operating Expense Adjustment is less than the estimated payments for such calendar year made by Tenant, any excess shall be credited against Rent (as hereinafter defined) next payable by Tenant under this Lease or, if the Lease Term has expired, any excess thereof shall be paid to Tenant. No delay in providing the statements described in this Section 4.03(B) shall act as a waiver of Landlord's right to payment under Sections 4.02(B), 4.02(C) or 4.02(D) above. Notwithstanding the foregoing, Tenant's right to receive any credit or payment pursuant to the preceding sentences of this Section 4.03(B) is conditioned on this Lease being in full force and effect and Tenant not being in default under this Lease on the date such credit or payment is due.

(C) If this Lease shall terminate on a day other than the end of a calendar year, the amount of the Tax, Operating Expense and Insurance Adjustments to be paid pursuant to Sections 4.02(B), 4.02(C) and 4.02(D) that are applicable to the calendar year in which such termination occurs, shall be

prorated on the basis of the number of days from January 1 of the calendar year to the termination date. The termination of this Lease shall not affect the obligations of Landlord and Tenant, pursuant to Sections 4.03(B) and 4.03(C), to be performed after such termination.

4.04 <u>Review of Landlord's Statement</u>. Provided this Lease is in full force and effect and that Tenant is not then in default under this Lease and provided further that Tenant strictly complies with the provisions of this Section 4.04, Tenant shall have the right, once each calendar year, to reasonably review supporting data for any portion of a Landlord's Statement that Tenant claims is incorrect, in accordance with the following procedure:

(A) Tenant shall, within thirty (30) business days after any such Landlord's Statement is delivered, deliver a written notice to Landlord specifying the portions of the Landlord's Statement that are claimed to be incorrect, and Tenant shall simultaneously pay to Landlord all amounts due from Tenant to Landlord as specified in the Landlord's Statement. Except as expressly set forth in subsection (C) below, in no event shall Tenant be entitled to withhold, deduct, or offset any monetary obligation of Tenant to Landlord under the Lease pending the completion of and regardless of the results of any review of records under this Section 4.04. The right of Tenant under this Section 4.04 may only be exercised once for any Landlord's Statement, and if Tenant fails to meet any of the above conditions as a prerequisite to the exercise of such right, the right of Tenant under this Section 4.04 for a particular Landlord's Statement shall be deemed waived.

(B) Tenant acknowledges that Landlord maintains its records for the Building at Landlord's manager's corporate offices and Tenant agrees that any review of records under this Section 4.04 shall be at the sole expense of Tenant and shall be conducted by an independent firm of certified public accountants, reasonably acceptable to Landlord. Tenant acknowledges and agrees that any records reviewed under this Section 4.04 constitute confidential information of Landlord, which shall not be disclosed to anyone other than the accountants performing the review and the principals of Tenant who receive the results of the review. The disclosure of such information to any other person, whether or not caused by the conduct of Tenant, shall constitute a material breach of this Lease. Anything in this subsection to the contrary notwithstanding, Landlord shall provide to Tenant during Tenant's review of the Landlord's statement, upon request by Tenant, at the expense of Landlord, an initial summary of supporting data for any portion of a Landlord's Statement that Tenant claims is incorrect. Thereafter, any further review of records shall be at the sole expense of Tenant and as otherwise provided under this Section 4.04.

(C) Any errors disclosed by the review shall be promptly corrected by Landlord, provided, however, that if Landlord disagrees with any such claimed errors, Landlord shall have the right to cause another review to be made by an independent firm of certified public accountants, reasonably acceptable to Landlord. In the event of a disagreement between the two accounting firms, the review that discloses the least amount of deviation from the Landlord's Statement shall be deemed to be correct. In the event that the results of the review of records (taking into account, if applicable, the results of any additional review caused by Landlord) reveal that Tenant has overpaid obligations for a preceding period, the amount of such overpayment shall be credited against Tenant's subsequent installment obligations to pay the estimated Tax, Operating Expense and Insurance Adjustments. In the event that such results show that Tenant has underpaid its obligations for a preceding period, Tenant shall be liable for Landlord's actual accounting fees, and the amount of such underpayment shall be paid by Tenant to Landlord with the next succeeding installment obligation of estimated Tax, Operating Expense and Insurance Adjustments. Additionally, in the event the foregoing review discloses that Landlord's Statement has overstated Landlord's actual expenses for a particular year by more than 10%, Landlord shall bear the reasonable cost of such review.

4.05 Payment. Concurrently with the execution hereof, Tenant shall pay Landlord Base Rent for the first calendar month of the Lease Term. Thereafter the Base Rent described in Section 1.07, as adjusted in accordance with Section 4.02, shall be payable in advance on the first day of each calendar month. If the Commencement Date is other than the first day of a calendar month, the prepaid Base Rent for such partial month shall be prorated in the proportion that the number of days this Lease is in effect during such partial month bears to the total number of days in the calendar month. All Rent, and all other amounts payable to Landlord by Tenant pursuant to the provisions of this Lease, shall be paid to Landlord, without notice, demand, abatement, deduction or offset, in lawful money of the United States at Landlord's office in the Building or to such other person or at such other place as Landlord may designate from time to time by written notice given to Tenant. No payment by Tenant or receipt by Landlord of a lesser amount than the correct Rent due hereunder shall be deemed to be other than a payment on account; nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed to effect or evidence an accord and satisfaction; and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy in this Lease or at law or in equity.

4.06 Late Charge; Interest. Tenant acknowledges that the late payment of Base Rent or any other amounts payable by Tenant to

Landlord hereunder (all of which shall constitute additional rent to the same extent as Base Rent) will cause Landlord to incur administrative costs and other damages, the exact amount of which would be impracticable or extremely difficult to ascertain. Landlord and Tenant agree that if Landlord does not receive any such payment on or before five (5) business days after the date the payment is due, Tenant shall pay to Landlord, as additional rental, (i) a late charge equal to five percent (5%) of the overdue amount to cover such additional administrative costs; and (ii) interest on the delinquent amounts at the lesser of the maximum rate permitted by law if any or twelve percent (12%) per annum from the date due to the date paid.

4.07 __Additional Rental__. For purposes of this Lease, all amounts payable by Tenant to Landlord pursuant to this Lease, whether or not denominated as such, shall constitute additional rental hereunder. Such additional rental, together with the Base Rent and Rent Adjustments, shall sometimes be referred to in this Lease as "Rent".

4.08 __Additional Taxes__. In addition to the Rent and other charges to be paid by Tenant hereunder, Tenant shall reimburse Landlord upon demand for all taxes payable by or imposed upon Landlord upon or with respect to: any fixtures or personal property located in the Premises; any leasehold improvements made in or to the Premises by or for Tenant; the Rent payable hereunder, including, without limitation, any gross receipts tax, sales tax, license fee or excise tax levied by any governmental authority; the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy of any portion of the Premises (including, without limitation, any applicable possession interest taxes); or this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

4.09 __Base Rent Credit__. Provided Tenant is not in default under any of the terms, covenants and conditions of the Lease, Tenant shall be entitled to a Base Rent credit in the amount of $22,568 per month from the Commencement Date through the month ending December 31, 1995.

__ARTICLE V - SECURITY DEPOSIT__

5.01 __Deposit__. Upon the execution of this Lease, Tenant shall deposit with Landlord the Security Deposit, described in Section 1.09 above, as security for Tenant's performance of all its obligations hereunder. Landlord shall return such sum to Tenant within thirty (30) days after the expiration of this Lease if Tenant has performed all obligations under this Lease. Prior to the time that Tenant is entitled to the return of the Security Deposit, Landlord may intermingle the Security Deposit with its own funds and use the Security Deposit for whatever purposes it

desires. Tenant shall not receive any interest on the Security Deposit.

5.02 **Default**. If Tenant defaults in the performance of any of its obligations under this Lease, including, but not limited to, the payment of the Rent, the Landlord may use, apply, or retain all or any part of the Security Deposit for the payment of any unpaid Rent, or for any other amount which the Landlord may be required to spend by reason of the Tenant's default, including any damages or deficiency in the reletting of the Premises, regardless of whether the accrual of such damages or deficiency occurs before or after an eviction or a summary reentry or other reentry by the Landlord. In the event of any bankruptcy or other proceeding initiated by or against Tenant, it is agreed that the Security Deposit shall be deemed to be applied by Landlord to Rent, sales tax and all other charges due from Tenant to Landlord for the last month of the Term and each preceding month until such Security Deposit is fully applied.

5.03 **Assignment**. Tenant shall not assign or encumber the Security Deposit without Landlord's written consent, and any assignment or encumbrance without such consent shall not bind the Landlord. Regardless of any assignment of this Lease by the Tenant, the Landlord may return the Security Deposit to the original Tenant, in the absence of evidence satisfactory to the Landlord of an assignment of the right to receive the Security Deposit or any part of the balance of the Security Deposit.

## ARTICLE VI - USE OF PREMISES

6.01 **Tenant's Permitted Use**. Tenant shall use the Premises only for Tenant's Permitted Use as set forth in Section 1.10 above and shall not use or permit the Premises to be used for any other purpose without the prior written consent of Landlord. Tenant shall, at its sole cost and expense, obtain all governmental licenses and permits required to allow Tenant to conduct Tenant's Permitted Use. Landlord disclaims any warranty that the Premises are suitable for Tenant's use and Tenant acknowledges that it has had a full opportunity to make its own determination in this regard.

6.02 **Compliance With Laws and Other Requirements**.

(A) Tenant shall comply with all applicable federal, state, county, and municipal laws and regulations governing Tenant's use of the Premises (collectively "Applicable Laws").

(B) Tenant shall not use the Premises, or permit the Premises to be used, in any manner which: (i) violates any Applicable Law; (ii) causes or is reasonably likely to cause damage to the Building or the Premises; (iii) violates a requirement or condition of any fire and extended insurance

policy covering the Building and/or the Premises, or increases the cost of such policy; (iv) constitutes or is reasonably likely to constitute a nuisance, annoyance or inconvenience to other tenants or occupants of the Building or its equipment, facilities or systems; (v) interferes with, or is reasonably likely to interfere with, the transmission or reception of microwave, television, radio, telephone or other communication signals by antennae or other facilities located in the Building; or (vi) violates the Rules and Regulations described in Article XX.

(C) In addition to any other amounts payable by Tenant to Landlord hereunder, Tenant shall pay to Landlord, as and when billed to Tenant and as additional rental, Tenant's Percentage Share of the cost of any improvements, capital expenditures, repairs or replacements to the Building, or any equipment or machinery used in connection with the Building, if any such item is required under any Applicable Law which was not applicable to the Building at the time the Building was constructed; provided, however, that any such costs which are properly charged to a capital account shall not be payable in a single year but shall instead be amortized over their useful lives, as determined by the Landlord in accordance with generally acceptable accounting principles, and only the annual amortization amount (prorated based on the number of days of the Lease term in the calendar year) shall be payable by the Tenant with respect to any calendar year.

6.03 <u>Hazardous Materials</u>.

(A) No Hazardous Materials (as defined herein) shall be Handled (as defined herein) upon, about, above or beneath the Premises or any portion of the Building by or on behalf of a Responsible Party (as defined herein), unless the Hazardous Materials are listed in Exhibit 27.20 hereto and then only in the quantities listed in the exhibit. Any such Hazardous Materials so Handled, or the presence of which is a result of the act or omission of a Responsible Party, shall be known as Tenant's Hazardous Materials. Notwithstanding the foregoing, normal quantities of those Hazardous Materials customarily used in the conduct of general administrative and executive office activities (e.g., copier fluids and cleaning supplies) may be Handled at the Premises without Landlord's prior written consent. Tenant's Hazardous Materials shall be Handled at all times in compliance with all applicable Environmental Laws (as defined herein).

(B) Notwithstanding the obligation of Tenant to indemnify Landlord pursuant to this Lease, Tenant shall, at its sole cost and expense, promptly take all actions required by any federal, state or local governmental agency or political subdivision, or necessary for Landlord to make full

economic use of the Premises or any portion of the Building, which requirements or necessity arises from the Handling of Tenant's Hazardous Materials upon, about, above or beneath the Premises or any portion of the Building. Such actions shall include, but not be limited to, the investigation of the environmental condition of the Premises or any portion of the Building, the preparation of any feasibility studies or reports and the performance of any cleanup, remedial, removal or restoration work. Tenant shall take all actions necessary to restore the Premises or any portion of the Building to the condition existing prior to the introduction of Tenant's Hazardous Materials, notwithstanding any less stringent standards or remediation allowable under applicable Environmental Laws. Tenant shall nevertheless obtain Landlord's written approval prior to undertaking any actions required by this Section, which approval shall not be unreasonably withheld so long as such actions would not potentially have a material adverse long-term or short-term effect on the Premises or any portion of the Building.

(C) "Environmental Laws" means and includes all now and hereafter existing statutes, laws, ordinances, codes, regulations, rules, rulings, orders, decrees, directives, policies and requirements by any federal, state or local governmental authority regulating, relating to, or imposing liability or standards of conduct concerning public health and safety or the environment.

(D) "Hazardous Materials" means: (a) any material or substance: (i) which is defined or becomes defined as a "hazardous substance", "hazardous waste," "infectious waste," "chemical mixture or substance," or "air pollutant" under Environmental Laws; (ii) containing petroleum, crude oil or any fraction thereof; (iii) containing polychlorinated biphenyls (PCB's); (iv) containing asbestos; (v) which is radioactive; (b) any other material or substance displaying toxic, reactive, ignitable or corrosive characteristics, as all such terms are used in their broadest sense, and are defined or become defined by Environmental Laws, or (c) materials which cause a nuisance upon or waste to the Premises or any portion of the Building.

(E) "Handle," "handle," "Handled," "handled," "Handling" or "handling" shall mean any installation, handling, generation, storage, treatment, use, disposal, discharge, release, manufacture, refinement, presence, migration, emission, abatement, removal, transportation, or any other activity of any type in connection with or involving Hazardous Materials.

(F) "Responsible Party" shall mean Tenant, its subtenants and its assignees, and their respective

contractors, clients, officers, directors, employees, agents, and invitees, or any of them, as the case may be.

(G) Tenant agrees to maintain only the Hazardous Materials listed in Schedule 1 to Exhibit 6.03(A) in the Premises and in or at the Building and only in the quantities listed in Schedule 1 to Exhibit 6.03(A). Tenant also agrees that changes to the type and quantities of such Tenant's Hazardous Materials may be done only with the prior written consent of the Landlord, which consent shall not be unreasonably withheld. Tenant further agrees that Landlord shall have the right to inspect the Premises to verify the types and quantities of the materials stored therein.

(H) Tenant agrees to execute affidavits, representations and the like from time to time at Landlord's request conveying Tenant's best knowledge and belief regarding the presence of Hazardous Materials in the Premises or in or at the Building.

**ARTICLE VII - UTILITIES AND SERVICES**

7.01 **Services**. Landlord shall provide the normal utility service connection into the Premises and Tenant, at its sole expense, shall arrange with the appropriate utility company to install all necessary connections and without fail to maintain in continuous operation during the entire term of the Lease, all such utility service, whether or not Tenant is in actual possession of the Premises. Tenant shall pay for all water, gas, heat, light, power, sweeping and other janitorial services, rubbish and trash disposal, sewer and any other utilities and services supplied in, about or related to the Premises, together with any taxes thereon, connection charges and deposits, and also shall pay for all electrical light bulbs, lamps and tubes in connection therewith. If any such utilities and services are not separately metered to Tenant, Tenant shall pay a reasonable portion to be determined by Landlord of all charges jointly metered with other premises. Landlord reserves the right during the Term of this Lease to grant easements or public utility purposes on, over, or below the Premises without any abatement in rent, provided that said easements do not unreasonably interfere with the normal operation of the business conducted by Tenant in the Premises. Landlord shall not be required to pay for any service, supplies or upkeep in connection with the Premises. Tenant shall arrange for and pay for all telephone service and equipment, including any additions or alterations to the existing telephone service boards and conduit, which shall be completed without interference to the service and/or equipment of other tenants in the Building and which shall be appropriately labeled upon the termination of this Lease.

Any amounts which Tenant is required to pay to Landlord pursuant to this Section 7.01 shall be payable upon demand by Landlord and shall constitute additional rent or Rent under this Lease.

7.02 **Interruption of Services.** Landlord shall not be liable for any failure to furnish, stoppage of, or interruption in furnishing any of the services or utilities described in Section 7.01, when such failure is caused by accident, breakage, repairs, strikes, lockouts, labor disputes, labor disturbances, governmental regulation, civil disturbances, acts of war, moratorium or other governmental action, or any other cause beyond Landlord's reasonable control, and, in such event, Tenant shall not be entitled to any damages nor shall any failure or interruption abate or suspend Tenant's obligation to pay Rent as required under this Lease or constitute or be construed as a constructive or other eviction of Tenant. Further, in the event any governmental authority or public utility promulgates or revises any law, ordinance, rule or regulation, or issues mandatory controls or voluntary controls relating to the use or conservation of energy, water, gas, light or electricity, the reduction of automobile or other emissions, or the provision of any other utility or service, Landlord may take any reasonably appropriate action to comply with such law, ordinance, rule, regulation, mandatory control or voluntary guideline without affecting Tenant's obligations hereunder. Tenant recognizes that any security services provided by Landlord at the Building are for the protection of Landlord's property and under no circumstances shall Landlord be responsible for, and Tenant waives any rights with respect to, providing security or other protection for Tenant or its employees, invitees or property in or about the Premises or the Building.

## ARTICLE VIII - MAINTENANCE AND REPAIRS

8.01 **Landlord's Obligations.**

(A) During the Lease Term, Landlord shall, at its expense, maintain only the roof, foundation and the structural soundness of the exterior walls (excluding all windows, plate glass, doors and pest control and extermination) of the portion of the Building containing the Premises in good repair and condition except for reasonable wear and tear. Landlord also shall maintain, at its expense, subject to reimbursement as part of Operating Expenses, (i) the downspouts and fire safety sprinkler system of the Building, (ii) all Building related site land, parking facilities, common areas, driveways, sidewalks and landscaping, and (iii) if Landlord elects, in its sole discretion, the Building heating, ventilation and air conditioning systems. If Tenant determines that any such repair or maintenance by Landlord is required, Tenant shall promptly give written notice to Landlord of the need for such repair or maintenance and unless Landlord in good faith disagrees with such determination by Tenant, Landlord shall proceed with reasonable promptness to perform such maintenance.

(B) Tenant shall, at its sole cost, pay for any damage to the roof, foundation and/or external walls caused by any act, omission, negligence or fault of Tenant or any employee, agent or contractor of Tenant.

(C) Landlord shall not be liable to Tenant, except as otherwise expressly provided in this Lease, for any damage or inconvenience caused by Landlord's fulfillment of the obligations under this Section 8.01. Tenant shall not be entitled to any abatement or reduction of Rent by reason of any repairs, alterations or additions made by Landlord under this Lease.

8.02 **Tenant's Obligations**.

(A) During the Lease Term, Tenant shall, at its risk and at its own sole cost and expense, maintain all other parts of the Building and other improvements in or on the Premises in good repair and condition (including all necessary replacements), including, but not limited to, heating, ventilation and air conditioning systems (if Landlord has elected not to maintain under Section 8.01), all glass elements, doors, repainting of the exterior doors or other exposed parts of the Building which reasonably require periodic repainting to prevent deterioration and other common area maintenance. However, Landlord reserves the right to perform all or any portion of common area maintenance (including, without limitation, exterior painting) and in such instance Tenant agrees to pay Landlord for the common area maintenance based on Tenant's Percentage Share with respect to Operating Expenses. In connection with Tenant's maintenance and repair of the heating, ventilation and air conditioning systems, Tenant shall provide Landlord during the Term of this Lease and any subsequent renewal of this Lease with a duplicate original of a maintenance contract, in form and substance acceptable to Landlord, with an HVAC maintenance firm acceptable to Landlord.

(B) Tenant shall take good care of all property and its fixtures, including all landscaping, and suffer no waste. Tenant shall engage a certified pest control firm to perform regular (not less frequent than monthly but more frequent if Landlord determines the need therefor) extermination for pests including, but not limited to, roaches, rodents and termites.

(C) Should Tenant neglect to keep and maintain the Premises as required in this Section 8.02, the Landlord shall have the right, but not the obligation, to have the work done and any reasonable costs plus a ten percent (10%) overhead charge shall be charged to Tenant as additional rental and

shall become payable by Tenant with the payment of the rental next due under this Lease.

(D) Tenant shall, at its own cost and expense, repair or replace any damage or injury to all or any part of the Premises and Building, caused by any act or omission by Tenant or Tenant's agents, employees, invitees, licensees or visitors. If Tenant fails to make such repairs or replacements promptly, Landlord may, at its option, make such repairs or replacements and Tenant shall reimburse the cost, plus a ten percent (10%) overhead charge to Landlord on demand.

(E) Tenant shall not commit or allow any waste or damage to be committed on any portion of the Premises, and at the termination of this Lease, by lapse of time or otherwise, Tenant shall deliver the Premises to Landlord, broom clean with all debris removed, in as good condition as at the date of first possession of Tenant, ordinary wear and tear excepted. Tenant understands that "ordinary wear and tear" does not mean Tenant shall be relieved of performing its obligations under this Lease relating to maintenance, repairs and replacements as provided for in the Lease. The cost and expense of any repairs necessary to restore the condition of the Premises shall be borne by Tenant, and if Landlord undertakes to restore the Premises, it shall have a right of reimbursement against Tenant.

8.03 **Landlord's Rights**. Landlord and its contractors shall have the right, at all reasonable times, to enter upon the Premises to make any repairs to the Premises or the Building reasonably required or deemed reasonably necessary by Landlord and to erect such equipment, including scaffolding, as is reasonably necessary to effect such repairs. During the pendency of such repairs, Landlord shall use reasonable efforts to minimize any material interruption of Tenant's business. However, if such repairs by Landlord are required to remedy an emergency situation or to cure a breach or default by Tenant under this Lease, Landlord shall not be obligated to minimize such interference.

## ARTICLE IX - ALTERATIONS, ADDITIONS AND IMPROVEMENTS

9.01 **Landlord's Consent; Conditions**. Tenant shall not make or permit to be made any alterations, additions, or improvements in or to the Premises ("Alterations") without the prior written consent of Landlord. Tenant shall submit to Landlord, in writing, all such requests for approval of alterations. Tenant shall further provide the Landlord written notice of all proposed or contemplated alterations, however tentative. Landlord may condition consent on such requirements as Landlord in its sole discretion deems necessary or desirable including without limitation: (i) Tenant's submission to Landlord, for Landlord's

prior written approval, of all plans and specifications relating to the Alterations; (ii) Landlord's prior written approval of the time or times when the Alterations are to be performed; (iii) Landlord's prior written approval of the contractors and subcontractors performing work in connection with the Alterations; (iv) Tenant's receipt of all necessary permits and approvals from all governmental authorities having jurisdiction over the Premises prior to the construction of the Alterations; (v) Tenant's written notice of whether the Alterations include the Handling of any Hazardous Materials, pursuant to Section 6.03; (vi) Tenant's delivery to Landlord of such bonds and insurance as Landlord shall reasonably require; and (vii) Tenant's payment to Landlord of all costs and expenses incurred by Landlord because of Tenant's Alterations, including but not limited to costs incurred in reviewing the plans and specifications for, and the progress of, the Alterations.

9.02 <u>Performance of Alterations Work</u>. All work relating to the Alterations shall be performed in compliance with the plans and specifications approved by Landlord, all applicable laws, ordinances, rules, regulations and directives of all governmental authorities having jurisdiction and the requirements of all carriers of insurance on the Premises and the Building, the Board of Underwriters, Fire Rating Bureau, or similar organization. All work shall be performed in a diligent, first class manner and so as not to unreasonably interfere with any other tenants or occupants of the Building. All costs incurred by Landlord relating to the Alterations shall be payable to Landlord by Tenant as additional rent upon demand.

9.03 <u>Liens</u>. Tenant shall pay when due all costs for work performed and materials supplied to the Premises. Tenant shall keep Landlord, the Premises and the Building free from all liens, stop notices and violation notices relating to the Alterations or any other work performed for, materials furnished to or obligations incurred by Tenant and Tenant shall protect, indemnify, hold harmless and defend Landlord, the Premises and the Building of and from any and all loss, cost, damage, liability and expense, including attorneys' fees, arising out of or related to any such liens or notices. Further, Tenant shall give Landlord not less than seven (7) business days prior written notice before commencing any Alterations in or about the Premises to permit Landlord to post appropriate notices of non-responsibility. Tenant shall also secure, prior to commencing any Alterations, at Tenant's sole expense, a completion and lien indemnity bond satisfactory to Landlord for such work. During the progress of such work, Tenant shall, upon Landlord's request, furnish Landlord with sworn contractor's statements and lien waivers covering all work theretofore performed. Tenant shall satisfy or otherwise discharge all liens, stop notices or other claims or encumbrances within ten (10) days after Landlord notifies Tenant in writing that any such lien, stop notice, claim or encumbrance has been filed. If Tenant

fails to pay and remove such lien, claim or encumbrance within such ten (10) days, Landlord, at its election, may pay and satisfy the same and in such event the sums so paid by Landlord, with interest from the date of payment at the rate set forth in Section 4.06 hereof for amounts owed Landlord by Tenant shall be deemed to be additional rent due and payable by Tenant at once without notice or demand.

9.04 Lease Termination. Except as provided in this Section 9.04, upon expiration or earlier termination of this Lease, Tenant shall surrender the Premises to Landlord in the same condition as when received, subject to reasonable wear and tear.

(A) All Alterations shall become a part of the Premises and shall become the property of Landlord upon the expiration or earlier termination of this Lease, unless Landlord shall, by written notice given to Tenant, require Tenant to remove some or all of Tenant's Alterations. If Landlord requires Tenant to remove some or all of Tenant's Alterations, Tenant shall promptly remove the designated Alterations and shall promptly repair any resulting damage, all at Tenant's sole expense.

(B) All business and trade fixtures, machinery and equipment, furniture, movable partitions and items of personal property owned by Tenant or installed by Tenant at its expense in the Premises shall be and remain the property of Tenant; upon the expiration or earlier termination of this Lease, Tenant shall, at its sole expense, remove all such items and repair any damage to the Premises or the Building caused by such removal. If Tenant fails to remove any such items or repair such damage promptly after the expiration or earlier termination of the Lease, Landlord may, but need not, do so with no liability to Tenant, and Tenant shall pay Landlord the cost thereof upon demand.

9.05 Roof Access. ANYTHING IN THIS LEASE TO THE CONTRARY NOTWITHSTANDING, TENANT SHALL NOT AND SHALL NOT PERMIT ANY OF ITS EMPLOYEES, AGENTS, CONTRACTORS OR INVITEES TO ENTER ON OR IN ANY WAY MOVE ABOUT ON THE ROOF OF THE BUILDING, FOR ANY PURPOSES WHATSOEVER, WITHOUT THE PRIOR CONSENT OF, COORDINATION WITH, AND SUPERVISION OF THE LANDLORD OR ITS SELECTED AGENTS OR CONTRACTORS.

## ARTICLE X - INDEMNIFICATION AND INSURANCE

10.01 Indemnification. Tenant shall protect, indemnify, hold harmless and defend Landlord and any mortgagee or ground lessor, and each of their respective partners, directors, officers, agents and employees, successors and assigns, from and against:

(A) any and all loss, cost, damage, liability or expense as incurred (including but not limited to actual attorneys'

fees and legal costs) arising out of or related to any claim, suit or judgment brought by or in favor of any person or persons for damage, loss or expense due to, but not limited to, bodily injury, including death, or property damage sustained by such person or persons which arises out of, is occasioned by or is in any way attributable to the use or occupancy of the Premises or any portion of the Building by Tenant or the acts or omissions of Tenant or its agents, employees, contractors, clients, invitees or subtenants except that caused by the intentional or negligent acts or omissions of Landlord or its agents or employees. Such loss or damage shall include, but not be limited to, any injury or damage to, or death of, Landlord's employees or agents or damage to the Premises or any portion of the Building.

(B) any and all environmental damages which arise from: (i) the Handling of any Tenant's Hazardous Materials, as defined in Section 6.03 or (ii) the breach of any of the provisions of this Lease. For the purpose of this Lease, "environmental damages" shall mean (a) all claims, judgments, damages, penalties, fines, costs, liabilities, and losses (including without limitation, diminution in the value of the Premises or any portion of the Building, damages for the loss of or restriction on the use of rentable or usable space or of any amenity of the Premises or any portion of the Building, and from any adverse impact of Landlord's marketing of space); (b) all reasonable sums paid for settlement of claims, attorneys' fees, consultants' fees and experts' fees; and (c) all costs incurred by Landlord in connection with investigation or remediation relating to the Handling of Tenant's Hazardous Materials, whether or not required by Environmental Laws, necessary for Landlord to make full economic use of the Premises or any portion of the Building, or otherwise required under this Lease. To the extent that Landlord is strictly liable under any Environmental Laws, Tenant's obligation to Landlord and the other indemnities under the foregoing indemnification shall likewise be without regard to fault on Tenant's part with respect to the violation of any Environmental Law which results in liability to the indemnitee. Tenant's obligations and liabilities pursuant to this Section 10.01 shall survive the expiration or earlier termination of this Lease.

(C) any and all testing or investigation as may be requested by any governmental agency or lender for the purpose of investigating the presence of Tenant's Hazardous Materials that may not be in compliance with Environmental Laws.

Notwithstanding anything to the contrary contained herein, nothing in this Section 10.01 shall be interpreted, construed or used to (i) affect, limit, reduce or abrogate any insurance coverage provided by any insurers to either Tenant or Landlord or

(ii) infer or imply that Tenant is a partner, joint venturer, agent, employee, or otherwise acting by or at the direction of Landlord.

10.02 <u>Property Insurance</u>.

(A) At all times during the Lease Term, Tenant shall procure and maintain, at its sole expense, "all-risk" property insurance, in an amount not less than one hundred percent (100%) of the replacement cost covering (i) all leasehold improvements in and to the Premises which are made at the expense of Tenant; and (ii) Tenant's trade fixtures, equipment and other personal property from time to time situated in the Premises, including, without limitation, all floor and wall coverings. The proceeds of such insurance shall be used for the repair or replacement of the property so insured, except that if not so applied or if this Lease is terminated following a casualty, the proceeds applicable to the leasehold improvements shall be paid to Landlord and the proceeds applicable to Tenant's personal property shall be paid to Tenant.

(B) Landlord, at its sole cost and expense, but subject to reimbursement as an Operating Expense, shall procure and maintain in full force and effect at all times during the Lease Term, fire and extended coverage "all risk" insurance on the Building, including the Premises' leasehold improvements, but not Tenant's furnishings, fixtures and other personal property placed on the Premises. Landlord shall, from time to time, supply Tenant with a certificate showing each insurance to be in full force and effect. Landlord shall maintain coverage of not less than the replacement cost of the Building and such improvements (excluding foundation, grading and excavation costs).

10.03 <u>Liability Insurance</u>.

(A) At all times during the Lease Term, Tenant shall procure and maintain, at its sole expense, general liability insurance applying to the use and occupancy of the Premises and the business operated by Tenant. Such insurance shall have a minimum combined single limit of liability of at least $2,000,000 per occurrence and a general aggregate limit of at least $3,000,000. All such policies shall be written to apply to all bodily injury, property damage, personal injury losses and shall be endorsed to include Landlord and its agents, beneficiaries, partners, employees, and any deed of trust holder or mortgagee of Landlord or any ground lessor as additional insureds. (A list of the current persons and entities to be named as additional insureds is attached hereto as Exhibit 10.03(A).) Such liability insurance shall be written as primary policies, not excess or contributing with

or secondary to any other insurance as may be available to the Landlord or additional insureds.

(B) Prior to the sale, storage, use or giving away of alcoholic beverages on or from the Premises by Tenant or another person, Tenant, at its own expense, shall obtain a policy or policies of insurance issued by a responsible insurance company and in a form acceptable to Landlord, which protects Landlord and the Premises against any and all damages, claims, liens, judgments, expenses and costs, including actual attorney's fees, arising under any present or future law, statute, or ordinance of the State of Nevada or other governmental authority having jurisdiction of the Premises, by reason of any storage, sale, use or giving away of alcoholic beverages on or from the Premises. Such policy or policies of insurance shall have a minimum combined single limit of $1,000,000 per occurrence and shall apply to bodily injury, fatal or nonfatal; injury to means of support; and injury to property of any person. Such policy or policies of insurance shall name the Landlord and its agents, beneficiaries, partners, employees and any mortgagee of Landlord or any ground lessor of Landlord as additional insureds. (A list of the current persons and entities to be named as additional insureds is attached hereto as Exhibit 10.03.)

10.04 __Workers' Compensation Insurance__. At all times during the Lease Term, Tenant shall procure and maintain Workers' Compensation Insurance in accordance with the laws of the State of Nevada, and Employers' Liability insurance with a limit not less than $1,000,000 Bodily Injury Each Accident; $1,000,000 Bodily Injury By Disease - Each Person; and $1,000,000 Bodily Injury by Disease - Policy Limit.

10.05 __Automobile Liability Insurance__. At all times during the Lease Term, Tenant shall provide and maintain, at its sole expense, commercial automobile liability insurance including owned, non-owned and hired vehicles, applying to the use of any vehicles arising out of the operations of Tenant. Such insurance shall apply to bodily injury and property damage in a combined single limit of not less than $1,000,000 per accident.

10.06 __Policy Requirements__. All insurance required to be maintained by Tenant shall be issued by insurance companies authorized to do insurance business in the State of Nevada and rated not less than A-VII in Best's Insurance Guide and a Standard and Poor's claims paying ability rating of not less than AA. A certificate of insurance (or, at Landlord's option, copies of the applicable policies) evidencing the insurance required under this Article X shall be delivered to Landlord immediately following execution by Landlord of the Lease. No such policy shall be subject to cancellation or modification without thirty (30) days

# INDUSTRIAL LEASE

between

RMS LIMITED PARTNERSHIP,
a Nevada limited partnership
(Landlord)

and

Castle Manufacturing, Inc.
a Nevada corporation
(Tenant)

prior written notice to Landlord and to any deed of trust holder, mortgagee or ground lessor designated by Landlord to Tenant. Tenant shall furnish Landlord with a replacement certificate with respect to any insurance not less than thirty (30) days prior to the expiration of the current policy. Tenant shall have the right to provide the insurance required by this Article X pursuant to blanket policies, but only if such blanket policies expressly provide coverage to the Premises and the Landlord as required by this Lease.

10.07 **Waiver of Subrogation**. Landlord, Tenant and all parties claiming under them hereby waive any right of recovery against each other for injury or loss covered by insurance, to the extent that such injury or loss is covered under said insurance policies. Any policy of insurance to be provided by Tenant pursuant to this Article X shall contain a clause denying the insurer any right of subrogation against Landlord.

10.08 **Failure to Insure**. If Tenant fails to maintain any insurance which Tenant is required to maintain pursuant to this Article X, Tenant shall be liable to Landlord for any loss or cost resulting from such failure to maintain. Tenant may not self-insure against any risks required to be covered by insurance without Landlord's prior written consent.

## ARTICLE XI - DAMAGE OR DESTRUCTION

11.01 **Total Destruction**. Except as provided in Section 11.03 below, this Lease shall automatically terminate if the Premises are totally destroyed.

11.02 **Partial Destruction of Premises**. If the Premises are damaged by any casualty and, in Landlord's opinion, the Premises (exclusive of any Alterations made to the Premises by Tenant) can be restored to its pre-existing condition within ninety (90) days after the date of the damage or destruction, Landlord shall, upon written notice from Tenant to Landlord of such damage, except as provided in Section 11.03, promptly and with due diligence repair any damage to the Premises (exclusive of any Alterations to the Premises made by Tenant, which shall be promptly repaired by Tenant at its sole expense) and, until such repairs are completed, the Rent shall be abated from the date of damage or destruction in the same proportion that the rentable area of the portion of the Premises which is unusable by Tenant in the conduct of its business bears to the total rentable area of the Premises. If such repairs cannot, in Landlord's opinion, be made within said ninety (90) day period, then Landlord may, at its option, exercisable by written notice given to Tenant within thirty (30) days after the date of the damage or destruction, elect to make the repairs within a reasonable time after the damage or destruction, in which event this Lease shall remain in full force and effect but the Rent shall be abated as provided in the preceding sentence; if Landlord does

not so elect to make the repairs, then either Landlord or Tenant shall have the right, by written notice given to the other within sixty (60) days after the date of the damage or destruction, to terminate this Lease as of the date of the damage or destruction.

11.03 **Exceptions to Landlord's Obligations.** Notwithstanding anything to the contrary contained in this Article XI, Landlord shall have no obligation to repair the Premises if either: (a) the Building in which the Premises are located is so damaged as to require repairs to the Building exceeding twenty percent (20%) of the full insurable value of the Building; or (b) Landlord elects to demolish the Building in which the Premises are located; or (c) the damage or destruction occurs less than two (2) years prior to the Termination Date, exclusive of option periods. Further, Tenant's Rent shall not be abated if either (i) the damage or destruction is repaired within five (5) business days after Landlord receives written notice from Tenant of the casualty, or (ii) Tenant, or any officers, partners, employees, agents or invitees of Tenant, or any assignee or subtenant of Tenant, is, in whole or in part, responsible for the damage or destruction.

11.04 **Waiver.** The provisions contained in this Lease shall supersede any contrary laws now or hereafter in effect relating to damage or destruction.

## ARTICLE XII - CONDEMNATION

12.01 **Taking.** If the entire Premises or so much of the Premises as to render the balance unusable by Tenant shall be taken by condemnation, sale in lieu of condemnation or in any other manner for any public or quasi-public purpose (collectively "Condemnation"), this Lease shall terminate on the date that title or possession to the Premises is taken by the condemning authority, whichever is earlier.

12.02 **Award.** In the event of any Condemnation, the entire award for such taking shall belong to Landlord. Tenant shall have no claim against Landlord or the award for the value of any unexpired term of this Lease or otherwise. Tenant may make a separate claim with the condemning authority, at Tenant's own expense, for the value of its property and for moving and relocation expenses if such claim does not reduce or adversely affect the amount of Landlord's award.

12.03 **Temporary Taking.** No temporary taking of the Premises shall terminate this Lease or entitle Tenant to any abatement of the Rent payable to Landlord under this Lease; provided, further, that any award for such temporary taking shall belong to Tenant to the extent that the award applies to any time period during the Lease Term and to Landlord to the extent that the award applies to any time period outside the Lease Term. Anything to the contrary notwithstanding, Tenant shall have the right to terminate this

Lease should any temporary taking of the Premises occur for more than five (5) consecutive business days.

## ARTICLE XIII - RELOCATION

13.01 **Relocation**. Landlord shall have the right, at its option upon not less than ninety (90) days prior written notice to Tenant, to relocate Tenant and to substitute for the Premises described above other space in the Building of approximately the same dimensions and size as the Premises described in Section 1.02 above and equally suitable for Tenant's Permitted Use. If Tenant is already in occupancy of the Premises, then Landlord shall also be fully responsible for all reasonable costs of moving Tenant, including (i) removing and reinstalling all improvements and equipment, (ii) any loss of business resulting from the relocation, (iii) telephone relocation expenses and (iv) new stationery. If such costs are incurred directly by Tenant, Tenant shall submit accurate documentation to Landlord for such expenses prior to reimbursement.

## ARTICLE XIV - ASSIGNMENT AND SUBLETTING

14.01 **Restriction**. Without the prior written consent of Landlord, Tenant shall not, either voluntarily or by operation of law, assign, encumber, or otherwise transfer this Lease or any interest herein, or sublet the Premises or any part thereof, or permit the Premises to be occupied by anyone other than Tenant or Tenant's employees. An assignment, subletting or other action in violation of the foregoing shall be void and, at Landlord's option, shall constitute a material breach of this Lease. For purposes of this Section 14.01, an assignment shall include any transfer of any interest in this Lease or the Premises by Tenant pursuant to a merger, division, consolidation or liquidation, or pursuant to a change in ownership of Tenant involving a transfer of voting control in Tenant (whether by transfer of partnership interests, corporate stock or otherwise). Notwithstanding anything contained in this Article XIV to the contrary, Tenant expressly covenants and agrees not to enter into any lease, sublease, license, concession or other agreement for use, occupancy or utilization of the Premises which provides for rental or other payment for such use, occupancy or utilization based in whole or in part on the net income or profits derived by any person from the property leased, used, occupied or utilized (other than an amount based on a fixed percentage or percentages of receipts or sales), and that any such purported lease, sublease, license, concession or other agreement shall be absolutely void and ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

14.02 **Notice to Landlord**. If Tenant desires to assign this Lease or any interest herein, or to sublet all or any part of the Premises, then at least twenty (20) business days prior to the

effective date of the proposed assignment or subletting, Tenant shall submit to Landlord in connection with Tenant's request for Landlord's consent:

(A) A statement containing (i) the name and address of the proposed assignee or subtenant; (ii) such financial information with respect to the proposed assignee or subtenant as Landlord shall reasonably require; (iii) the type of use proposed for the Premises; and (iv) all of the principal terms of the proposed assignment or subletting; and

(B) Four (4) originals of the assignment or sublease on a form approved by Landlord and four (4) originals of the Landlord's Consent to Sublease or Assignment and Assumption of Lease and Consent.

14.03 **Landlord's Recapture Rights**. At any time within twenty (20) business days after Landlord's receipt of all (but not less than all) of the information and documents described in Section 14.02 above, Landlord may, at its option by written notice to Tenant, elect to: (i) sublease the Premises or the portion thereof proposed to be sublet by Tenant upon the same terms as those offered to the proposed subtenant; (ii) take an assignment of the Lease upon the same terms as those offered to the proposed assignee; or (iii) terminate the Lease in its entirety or as to the portion of the Premises proposed to be assigned or sublet, with a proportionate adjustment in the Rent payable hereunder if the Lease is terminated as to less than all of the Premises. If Landlord does not exercise any of the options described in the preceding sentence, then, during the above-described twenty (20) business day period, Landlord shall either consent or deny its consent to the proposed assignment or subletting.

14.04 **Landlord's Consent; Standards**. Landlord's consent shall not be unreasonably withheld; but, in addition to any other grounds for denial, Landlord's consent shall be deemed reasonably withheld if, in Landlord's good faith judgment: (i) the proposed assignee or subtenant does not have the financial strength to perform its obligations under this Lease or any proposed sublease; (ii) the business and operations of the proposed assignee or subtenant are not of comparable quality to the business and operations being conducted by other tenants in the Building; (iii) the proposed assignee or subtenant intends to use any part of the Premises for a purpose not permitted under this Lease or otherwise not acceptable to Landlord; (iv) either the proposed assignee or subtenant, or any person who directly or indirectly controls, is controlled by, or is under common control of the proposed assignee or subtenant, occupies space in the Building, or is negotiating with Landlord to lease space in the Building; or (v) the use of the Premises or the Building by the proposed assignee or subtenant would, in Landlord's reasonable judgment, significantly increase the pedestrian traffic in and out of the Building or vehicular

traffic to the Building or would require any alterations to the Building to comply with applicable laws.

14.05 [Intentionally Omitted]

14.06 <u>Landlord's Costs</u>. If Tenant shall assign this Lease or shall sublet all or any part of the Premises or shall request the consent of Landlord to any assignment, subletting or other act, Tenant shall pay to Landlord a fee of Five Hundred Dollars ($500.00) as additional rent. This fee reflects Landlord's costs related to the proposed action by Tenant, including Landlord's reasonable attorneys' fees.

14.07 <u>Continuing Liability of Tenant</u>. Notwithstanding any assignment or sublease, Tenant shall remain as fully and primarily liable for the payment of Rent and for the performance of all other obligations of Tenant contained in this Lease to the same extent as if the assignment or sublease had not occurred. Additionally, any act or omission of any assignee or subtenant, other than Landlord, that violates the terms of this Lease shall be deemed a violation of this Lease by Tenant.

14.08 <u>Non-Waiver</u>. The consent by Landlord to any assignment or subletting shall not relieve Tenant, or any person claiming through or by Tenant, of the obligation to obtain the consent of Landlord, pursuant to this Article XIV, to any further assignment or subletting. In the event of an assignment or subletting, Landlord may collect rent from the assignee or the subtenant without waiving any rights under this Lease and collection of Rent from a person other than Tenant shall not be deemed a waiver of any of Landlord's rights under this Article XIV, an acceptance of assignee or subtenant as Tenant, or a release of Tenant from the performance of Tenant's obligations under this Lease.

## <u>ARTICLE XV - DEFAULT AND REMEDIES</u>

15.01 <u>Events of Default By Tenant</u>. The occurrence of any of the following shall constitute a material default and breach of this Lease by Tenant:

(A) The failure by Tenant to pay Base Rent or make any other payment required to be made by Tenant hereunder as and when due and the continuation of such failure for five (5) days from receipt of written notice of such failure to pay Base Rent.

(B) The abandonment of the Premises by Tenant or the vacation of the Premises by Tenant for fourteen (14) consecutive days (with or without the payment of Rent), if, in the reasonable opinion of Landlord, such abandonment by Tenant adversely impacts Landlord's ability to market to tenants

other portions of the Building or other buildings in the Diablo Industrial Center.

(C) The making by Tenant of any assignment of this Lease or any sublease of all or part of the Premises, except as expressly permitted under Article XIV of this Lease.

(D) The failure by Tenant to observe or perform any other provision of this Lease to be observed or performed by Tenant, other than those described in Sections 15.01(A), 15.01(B) or 15.01(C) above, if such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant. However, if the nature of the default is such that it cannot be cured within the thirty (30) day period, no default shall be deemed to exist if Tenant (i) commences the curing of the default promptly within the thirty (30) day period, (ii) fully cures the default within sixty (60) days after the occurrence of the default. The thirty (30) day notice described herein shall be in lieu of, and not in addition to, any notice required under law now or hereafter in effect requiring that notice of default be given prior to the commencement of an unlawful detainer or other legal proceeding.

(E) The making by Tenant of any general assignment for the benefit of creditors, the filing by or against Tenant of a petition under any federal or state bankruptcy or insolvency laws (unless, in the case of a petition filed against Tenant, the same is dismissed within thirty (30) days after filing); the appointment of a trustee or receiver to take possession of substantially all of Tenant's assets at the Premises or Tenant's interest in this Lease or the Premises, when possession is not restored to Tenant within thirty (30) days; or the attachment, execution or other seizure of substantially all of Tenant's assets located at the Premises or Tenant's interest in this Lease or the Premises, if such seizure is not discharged within thirty (30) days.

15.02 __Landlord's Right To Terminate Upon Tenant Default__. In the event of any default by Tenant as provided in Section 15.01 above, Landlord shall have the right without notice or demand to Tenant (Tenant hereby irrevocably waiving all notices and demands, statutory or otherwise, including without limitation, any notice otherwise required in connection with any forcible entry and detainer action), to terminate this Lease or Tenant's right to possession of the Premises without terminating this Lease, in which event Landlord shall be entitled to receive from Tenant:

(A) The worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(B) The worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss Tenant proves could have been reasonably avoided; plus

(C) The worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(D) Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

(E) At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

As used in subparagraphs (A) and (B) above, "worth at the time of award" shall be computed by discounting such amounts at the then highest lawful rate of interest, but in no event to exceed one percent (1%) per annum plus the rate established by the Federal Reserve Bank of Chicago, on advances made to member banks under Sections 13 and 13a of the Federal Reserve Act ("discount rate") prevailing on the date of execution of this Lease by Landlord. As used in paragraph (C) above, "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

15.03 <u>Landlord's Right To Continue Lease Upon Tenant Default</u>. In the event of a default of this Lease and abandonment of the Premises by Tenant, if Landlord does not elect to terminate this Lease as provided in Section 15.02 above, Landlord may from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease. Without limiting the foregoing, Landlord may continue this Lease in effect after Tenant's breach and abandonment and recover Rent as it becomes due. Landlord may, but shall have no obligation to re-let all or any part of the Premises. In the event Landlord at its sole discretion elects to re-let the Premises, to the fullest extent permitted by law, the proceeds of any reletting shall be applied:

(A) first, to pay to Landlord all costs and expenses of such reletting (including without limitation, costs and expenses of retaking or repossessing the Premises, removing persons and property therefrom, securing new tenants, including expenses for redecoration, alterations and other costs in connection with preparing the Premises for the new

tenant, and if Landlord shall maintain and operate the Premises, the costs thereof) and receivers' fees incurred in connection with the appointment of and performance by a receiver to protect the Premises and Landlord's interest under this Lease and any necessary or reasonable alterations;

(B) second, to the payment of any indebtedness of Tenant to Landlord other than Rent due and unpaid hereunder;

(C) third, to the payment of Rent due and unpaid hereunder; and

(D) fourth, the residue, if any, shall be held by Landlord and applied in payment of other or future obligations of Tenant to Landlord as the same may become due and payable, and Tenant shall not be entitled to receive any portion of such revenue.

15.04 **Right of Landlord to Perform**. All covenants and agreements to be performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense. If Tenant shall fail to pay any sum of money, other than Rent, required to be paid by it hereunder or shall fail to perform any other act on its part to be performed hereunder, Landlord may, but shall not be obligated to, make any payment or perform any such other act on Tenant's part to be made or performed, without waiving or releasing Tenant of its obligations under this Lease. Any sums so paid by Landlord and all necessary incidental costs, together with interest thereon at the lesser of the maximum rate permitted by law if any or twelve percent (12%) per annum from the date of such payment, shall be payable to Landlord as additional rent on demand and Landlord shall have the same rights and remedies in the event of nonpayment as in the case of default by Tenant in the payment of Rent.

15.05 **Default Under Other Leases**. If the term of any lease, other than this Lease, heretofore or hereafter made by Tenant for any space in the Building shall be terminated or terminable after the making of this Lease because of any default by Tenant under such other lease, such fact shall empower Landlord, at Landlord's sole option, to terminate this Lease by notice to Tenant or to exercise any of the rights or remedies set forth in Section 15.02.

15.06 **Non-Waiver**. Nothing in this Article shall be deemed to affect Landlord's rights to indemnification for liability or liabilities arising prior to termination of this Lease for personal injury or property damages under the indemnification clause or clauses contained in this Lease. No acceptance by Landlord of a lesser sum than the Rent then due shall be deemed to be other than on account of the earliest installment of such Rent due, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and

satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such installment or pursue any other remedy in the Lease provided. The delivery of keys to any employee of Landlord or to Landlord's agent or any employee thereof shall not operate as a termination of this Lease or a surrender of the Premises.

15.07 **Cumulative Remedies**. All rights and remedies of Landlord are cumulative. The exercise of one or more rights or remedies shall not be taken to exclude or waive the right to exercise any other. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord deems desirable. In addition to the other remedies provided in the Lease, including, but not limited to, the rights set forth in Section 15.02, Landlord shall be entitled to a restraint by injunction of the attempted, threatened or actual violation of any of the covenants, conditions or provisions of the Lease or to a decree specifically compelling performance of any such covenants, conditions or provisions.

15.08 **Default by Landlord**. Landlord's failure to perform or observe any of its obligations under this Lease shall constitute a default by Landlord under this Lease only if such failure shall continue for a period of thirty (30) days (or the additional time, if any, that is reasonably necessary promptly and diligently to cure the failure) after Landlord receives written notice from Tenant specifying the default. The notice shall give in reasonable detail the nature and extent of the failure and shall identify the Lease provision(s) containing the obligation(s). If Landlord shall default in the performance of any of its obligations under this Lease (after notice and opportunity to cure as provided herein), Tenant may pursue any remedies available to it under the law and this Lease. Anything to the contrary notwithstanding, Tenant shall have the right to cure any default by Landlord which default creates an emergency situation with immediate adverse impact on the operations of the Tenant and Landlord shall reimburse the Tenant for the reasonable cost of such cure by Tenant.

## ARTICLE XVI - ATTORNEYS FEES; COSTS OF SUIT

16.01 **Attorneys' Fees**. If either Landlord or Tenant shall commence any action or other proceeding against the other arising out of, or relating to, this Lease or the Premises, the prevailing party shall be entitled to recover from the losing party, in addition to any other relief, its actual attorneys fees irrespective of whether or not the action or other proceeding is prosecuted to judgment and irrespective of any court schedule of reasonable attorneys' fees. In addition, Tenant shall reimburse Landlord, upon demand, for all reasonable attorneys' fees incurred in collecting Rent or otherwise seeking enforcement against Tenant, its sublessees and assigns, of Tenant's obligations under this Lease.

16.02 **Indemnification**. Should Landlord be made a party to any litigation instituted by Tenant against a party other than Landlord, or by a third party against Tenant, Tenant shall indemnify, hold harmless and defend Landlord from any and all loss, cost, liability, damage or expense incurred by Landlord, including attorneys' fees, in connection with the litigation.

## ARTICLE XVII - SUBORDINATION AND ATTORNMENT

17.01 **Subordination**. This Lease, and the rights of Tenant under this Lease, are subject and subordinate to the interests of (i) all present and future ground leases and master leases of all or any part of the Building; (ii) present and future mortgages and deeds of trust encumbering all or any part of the Building or the underlying real estate; (iii) all past and future advances made under any such mortgages or deeds of trust; and (iv) all renewals, modifications, replacements and extensions of any such ground leases, master leases, mortgages and deeds of trust; provided, however, that any lessor under any such ground lease or master lease or any mortgagee or beneficiary under any such mortgage or deed of trust shall have the right to elect, by written notice given to Tenant, to have this Lease made superior in whole or in part to any such ground lease, master lease, mortgage or deed of trust. Upon demand, Tenant shall execute, acknowledge and deliver any instruments reasonably requested by Landlord or any such lessor, mortgagee or beneficiary (hereafter, for the purposes of this Section 17.01, a "Successor Landlord") to effect the purposes of this Section 17.01. Such instruments may contain, among other things, provisions to the effect that the Successor Landlord shall (i) not be liable for any act or omission of Landlord or its predecessors, if any, prior to the date of such Successor Landlord's succession to Landlord's interest under this Lease; (ii) not be subject to any offsets or defenses which Tenant might have been able to assert against Landlord or its predecessors, if any, prior to the date of such Successor Landlord's succession to Landlord's interest under this Lease; (iii) not be liable for the return of any security deposit under the Lease unless the same shall have actually been deposited with such Successor Landlord; and (iv) be entitled to receive notice of any Landlord default under this Lease plus a reasonable opportunity to cure such default prior to Tenant having any right or ability to terminate this Lease as a result of such Landlord default.

17.02 **Attornment**. Provided that, as a condition of such attornment, all rights and obligations of Landlord are fully assumed by the person or persons to whom Tenant attorns, if requested to do so, Tenant shall attorn to and recognize as Tenant's landlord under this Lease any superior lessor, superior mortgagee or other purchaser or person taking title to the Building by reason of the termination of any superior lease or the foreclosure of any superior mortgage or deed of trust, and Tenant shall, upon demand, execute any documents reasonably requested by

any such person to evidence the attornment described in this Section 17.02.

17.03 <u>**Mortgage and Ground Lessor Protection**</u>. Tenant agrees to give any holder of any mortgage and any ground lessor, by registered or certified mail, a copy of any notice of default served upon the Landlord by Tenant, provided that prior to such notice Tenant has been notified in writing (by way of service on Tenant of a copy of Assignment of Rents and Leases, or otherwise) of the address of such mortgage holder or ground lessor (hereafter the "Notified Party"). Tenant further agrees that if Landlord fails to cure the default, then the Notified Party shall have the right and an additional 15 days, on behalf of Landlord, to cure or correct such default under the provisions of Section 15.08. Until the time allowed for the Notified Party to cure such default has expired without cure, Tenant shall have no right to, and shall not, terminate this Lease on account of Landlord's default.

## ARTICLE XVIII - QUIET ENJOYMENT

18.01 Provided that Tenant performs all of its obligations hereunder, Tenant shall have and peaceably enjoy the Premises during the Lease Term, subject to all of the terms and conditions contained in this Lease.

## ARTICLE XIX - PARKING

19.01 Tenant, its employees and invitees, are hereby granted the non-exclusive privilege to use parking spaces in the parking area servicing the Building. Tenant shall abide by all rules and regulations regarding the use of the parking area as may now exist or as may hereinafter be promulgated by Landlord. Landlord reserves the right to modify, re-stripe and otherwise change the location of drives, parking spaces and parking area servicing the Building. Landlord may, but shall have no obligation to, designate certain parking spaces for trucks, handicapped persons or designated tenants as Landlord, in its sole discretion, may deem necessary for the professional and efficient operation of the parking area and the Building. Landlord shall have the right to reasonably restrict the number and location of truck/tractor trailers for the overall benefit of all tenants, it being agreed by Tenant that it is not the intent of this Lease to provide unrestricted parking for truck/tractor trailers. Tenant agrees not to overburden the parking facilities and agrees to cooperate with Landlord and other tenants in the use of parking facilities. Tenant will reimburse Landlord upon demand for any damage caused to the parking surfaces or facilities caused by Tenant's or any of its employees', agents' or invitees' trucks/tractor trailers or any other vehicles. Landlord reserves the right in its absolute discretion to determine whether parking facilities are becoming crowded and, in such event, to allocate parking spaces among Tenant and other tenants. At no time shall the parking of any vehicle be

permitted in the fire lanes or handicapped parking areas servicing the Building.

## ARTICLE XX - RULES AND REGULATIONS

20.01 The Rules and Regulations attached to this Lease as Exhibit 20.01 are hereby incorporated by reference and made a part of this Lease. Tenant shall abide by, and faithfully observe and comply with the Rules and Regulations and any reasonable and nondiscriminatory amendments, modifications and/or additions thereto as may hereafter be adopted and published by written notice to Tenant by Landlord for the safety, care, security, good order and/or cleanliness of the Premises and/or the Building. Landlord shall not be liable to Tenant for any violation of such rules and regulations by any other tenant or occupant of the Building.

## ARTICLE XXI - ESTOPPEL CERTIFICATES

21.01 Tenant agrees at any time and from time to time upon not less than thirty (30) days' prior written notice from Landlord to execute, acknowledge and deliver to Landlord a statement in writing addressed and certifying to Landlord, or to the holder or assignee of any existing or prospective mortgage encumbering the Building or any part thereof (hereafter a "Mortgagee"), or to the lessor, or existing or prospective assignee of the lessor's position, under any existing or prospective ground lease of the land underlying the Building (hereafter a "Ground Lessor"), or to any prospective purchaser of the land, improvements or both comprising the Building, that (i) this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications); (ii) that Tenant has accepted possession of the Premises, which are acceptable in all respects, and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; (iii) that Tenant is in full occupancy of the Premises; (iv) that no rent has been paid more than thirty (30) days in advance; (v) that the first month's Base Rent has been paid; that Tenant is entitled to no free Rent or other concessions except as stated in this Lease; (vi) that Tenant has not been notified of any previous assignment of Landlord's or any predecessor landlord's interest under this Lease; (vii) the dates to which Base Rent, additional rental and other charges have been paid; (viii) that Tenant, as of the date of such certificate, has no charge, lien or claim of setoff under this Lease or otherwise against Base Rent, additional rental or other charges due or to become due under this Lease; and (ix) that Landlord is not in default in performance of any covenant, agreement or condition contained in this Lease or any other matter relating to this Lease or the Premises or, if so, specifying each such default. In addition, in the event that such certificate is being given to any Mortgagee or Ground Lessor, such statement may contain any other provisions customarily required by such Mortgagee

or Ground Lessor including, without limitation, an agreement on the part of Tenant to furnish to such Mortgagee or Ground Lessor, as applicable, written notice of any Landlord default and a reasonable opportunity for such Mortgagee or Ground Lessor to cure such default prior to Tenant being able to terminate this Lease. Any statement delivered pursuant to this Section 21.01 may be relied upon by Landlord or any Mortgagee, Ground Lessor or prospective purchaser to whom it is addressed and such statement, if required by its addressee, may so specifically state. If Tenant does not execute, acknowledge and deliver to Landlord the statement as and when required by this Section 21.01, Landlord is hereby granted an irrevocable power-of-attorney, coupled with an interest, to execute such statement on Tenant's behalf, which statement shall be binding on Tenant to the same extent as if executed by Tenant.

## ARTICLE XXII - ENTRY BY LANDLORD

22.01 Landlord may enter the Premises at all reasonable times to: (i) inspect the Premises; (ii) exhibit the Premises to prospective purchasers, lenders or tenants; (iii) determine whether Tenant is complying with all of its obligations under this Lease; (iv) supply janitorial and other services to be provided by Landlord to Tenant under this Lease; (v) post notices of nonresponsibility; and (vi) make repairs or improvements in or to the Building or the Premises; provided, however, that all such work shall be done as promptly as reasonably possible and so as to cause as little interference to Tenant as reasonably possible. Tenant hereby waives any claim for damages for any injury or inconvenience to, or interference with, Tenant's business, any loss of occupancy or quiet enjoyment of the Premises or any other loss occasioned by such entry. As provided for in clause (xiii) of Section 27.19 of this Lease, Landlord shall at all times have the right, but not the obligation, to obtain from Tenant and retain a key with which to unlock all of the doors in, on or about the Premises (excluding Tenant's vaults, safes and similar areas designated by Tenant in writing in advance), and Landlord shall have the right to use any and all means by which Landlord may deem proper to open such doors to obtain entry to the Premises, and any entry to the Premises obtained by Landlord by any such means, or otherwise, shall not under any circumstances be deemed or construed to be a forcible or unlawful entry into or a detainer of the Premises or an eviction, actual or constructive, of Tenant from any part of the Premises. Any entry of the Premises by Landlord shall not act as a termination of this Lease. If Landlord shall be required to obtain entry by means other than a key provided by Tenant, the cost of such entry shall be payable by Tenant to Landlord as additional rent. Anything to the contrary notwithstanding, Landlord shall, except in cases of emergency, provide reasonable prior notice to Tenant of Landlord's need to enter the Premises under this Section 22.01 and, when entering the Premises under emergency circumstances, Landlord shall be responsible for any damages to the

Premises or Tenant's property caused by Landlord's negligence or intentional acts during such emergency entry of the Premises.

## ARTICLE XXIII

## LANDLORD'S LEASE UNDERTAKINGS - EXCULPATION FROM PERSONAL LIABILITY; TRANSFER OF LANDLORD'S INTEREST

23.01 **Landlord's Lease Undertakings**. Notwithstanding anything to the contrary contained in this Lease or in any exhibits, riders or addenda attached to this Lease (collectively the "Lease Documents"), it is expressly understood and agreed by and between the parties to this Lease that: (i) the recourse of Tenant or its successors or assigns against Landlord with respect to the alleged breach by or on the part of Landlord of any representation, warranty, covenant, undertaking or agreement contained in any of the Lease Documents (collectively, "Landlord's Lease Undertakings") shall extend only to Landlord's interest in the real estate of which the Premises demised under the Lease Documents are a part ("Landlord's Real Estate") and not to any other assets of Landlord or of its constituent partners; and (ii) except to the extent of Landlord's interest in Landlord's Real Estate, no personal liability or personal responsibility of any sort with respect to any of Landlord's Lease Undertakings or any alleged breach thereof is assumed by, or shall at any time be asserted or enforceable against, Landlord, or against any of Landlord's respective directors, officers, employees, agents, constituent partners, beneficiaries, trustees or representatives.

It is expressly understood and agreed by and between the parties to this Lease, anything contained in the Lease Documents to the contrary notwithstanding, that each and all of the representations, warranties, covenants, undertakings and agreements herein made on the part of Landlord while in form purporting to be the representations, warranties, covenants, undertakings and agreements of Landlord are nevertheless each and every one of them made and intended, not as personal representations, warranties, covenants, undertakings and agreements by Landlord or for the purpose or with the intention of binding Landlord personally, but are made and intended for the purpose only of subjecting Landlord's interest in Landlord's Real Estate to the terms of this Lease and for no other purpose whatsoever, and in case of default under this Lease by Landlord (or default through, under or by any of its beneficiaries, or agents or representatives of said beneficiaries), the Tenant shall look solely to the Landlord's interest in Landlord's Real Estate.

23.02 **Transfer of Landlord's Interest**. Landlord and each successor to Landlord shall be fully released from the performance of Landlord's obligations subsequent to their transfer of Landlord's interest in the Building. Landlord shall not be liable

for any obligation under this Lease after a transfer of its interest in the Building.

## ARTICLE XXIV - HOLDOVER TENANCY

24.01 If Tenant holds possession of the Premises after the expiration or termination of the Lease Term, by lapse of time or otherwise, Tenant shall become a tenant at sufferance upon all of the terms contained herein, except as to Lease Term and Rent. During such holdover period, Tenant shall pay to Landlord a monthly rental equivalent to one hundred twenty-five percent (125%) of the Rent payable by Tenant to Landlord with respect to the last month of the Lease Term. The monthly rent payable for such holdover period shall in no event be construed as a penalty or as liquidated damages for such retention of possession. Without limiting the foregoing, Tenant hereby agrees to indemnify, defend and hold harmless Landlord, its beneficiary, and their respective agents, contractors and employees, from and against any and all claims, liabilities, actions, losses, damages (including without limitation, direct, indirect, incidental and consequential) and expenses (including, without limitation, court costs and reasonable attorneys' fees) asserted against or sustained by any such party and arising from or by reason of such retention of possession, which obligations shall survive the expiration or termination of the Lease Term.

## ARTICLE XXV - NOTICES

25.01 All notices which Landlord or Tenant may be required, or may desire, to serve on the other may be served, as an alternative to personal service, by mailing the same by registered or certified mail, postage prepaid, or may be sent by overnight courier, addressed to the Landlord at the address for Landlord set forth in Section 1.11 above and to Tenant at the address for Tenant set forth in Section 1.12 above, or, from and after the Commencement Date, to the Tenant at the Premises whether or not Tenant has departed from, abandoned or vacated the Premises, or addressed to such other address or addresses as either Landlord or Tenant may from time to time designate to the other in writing. Any notice shall be deemed to have been given and served when delivered personally or otherwise at the time the same was posted, except that any notice given by overnight courier shall be deemed given on the first business day following the date the notice is delivered by the courier provided the courier verifies delivery of the notice.

## ARTICLE XXVI - BROKERS

26.01 The parties recognize as the Broker(s) who procured this Lease, if any, the firm(s) specified in Section 1.13 and agree that Landlord shall be solely responsible for the payment of any brokerage commissions, if any, to said Broker(s), and that Tenant

shall have no responsibility therefor unless written provision to the contrary has been made a part of this Lease. If Tenant has dealt with any other person or real estate broker in respect to leasing, subleasing or renting space in the Building, Tenant shall be solely responsible for the payment of any fee due said person or firm and Tenant shall protect, indemnify, hold harmless and defend Landlord from any liability in respect thereto.

## ARTICLE XXVII - MISCELLANEOUS

27.01 **Entire Agreement**. This Lease contains all of the agreements and understandings relating to the leasing of the Premises and the obligations of Landlord and Tenant in connection with such leasing. Landlord has not made, and Tenant is not relying upon, any warranties, or representations, promises or statements made by Landlord or any agent of Landlord, except as expressly set forth herein. This Lease supersedes any and all prior agreements and understandings between Landlord and Tenant and alone expresses the agreement of the parties.

27.02 **Amendments**. This Lease shall not be amended, changed or modified in any way unless in writing executed by Landlord and Tenant. Landlord shall not have waived or released any of its rights hereunder unless in writing and executed by the Landlord.

27.03 **Successors**.. Except as expressly provided herein, this Lease and the obligations of Landlord and Tenant contained herein shall bind and benefit the successors and assigns of the parties hereto.

27.04 **Force Majeure**. If Landlord's performance of any of its obligations under this Lease is delayed due to fire, catastrophe, strikes or labor trouble, civil commotion, governmental rule, regulations, ordinance, statute or interpretation or any other cause beyond Landlord's control, the period of delay shall be added to Landlord's time for performing the obligations under this Lease, and Landlord shall have no liability because of such delay.

27.05. **Survival of Obligations**. Any obligations of Tenant accruing prior to the expiration of the Lease shall survive the termination of the Lease, and Tenant shall promptly perform all such obligations whether or not this Lease has expired.

27.06 **Light and Air**. No diminution or shutting off of any light, air or view by any structure now or hereafter erected shall in any manner affect this Lease or the obligations of Tenant hereunder, or increase any of the obligations of Landlord hereunder.

27.07 **Governing Law**. This Lease shall be governed by, and construed in accordance with, the laws of the State of Nevada.

27.08 <u>Severability</u>. In the event any provision of this Lease is found to be unenforceable, the remainder of this Lease shall not be affected, and any provision found to be invalid shall be enforceable to the extent permitted by law. The parties agree that in the event two different interpretations may be given to any provision hereunder, one of which will render the provision unenforceable, and one of which will render the provision enforceable, the interpretation rendering the provision enforceable shall be adopted.

27.09 <u>Captions</u>. All captions, headings, titles, numerical references and computer highlighting are for convenience only and shall have no effect on the interpretation of this Lease.

27.10 <u>Interpretation</u>. Tenant acknowledges that it has read and reviewed this Lease and that it has had the opportunity to confer with counsel in the negotiation of this Lease. Accordingly, this Lease shall be construed neither for nor against Landlord or Tenant, but shall be given a fair and reasonable interpretation in accordance with the meaning of its terms and the intent of the parties.

27.11 <u>Independent Covenants</u>. Each covenant, agreement, obligation or other provision of this Lease to be performed by Tenant are separate and independent covenants of Tenant, and not dependent on any other provision of the Lease.

27.12 <u>Number and Gender</u>. All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include the appropriate number and gender, as the context may require.

27.13 <u>Time is of the Essence</u>. Time is of the essence of this Lease and the performance of all obligations hereunder.

27.14 <u>Joint and Several Liability</u>. If Tenant comprises more than one person or entity, or if this Lease is guaranteed by any party, all such persons shall be jointly and severally liable for payment of rents and the performance of Tenant's obligations hereunder.

27.15 <u>Exhibits and Schedules</u>. Exhibits 1.02 (Floor Plan of the Premises), 10.03(A) (List of Additional Insureds), 20.01 (Rules and Regulations), 27.20 (Tenant Operations Inquiry) and 27.21 (Guaranty), are incorporated into this Lease by reference and made a part hereof.

27.16 <u>Offer to Lease</u>. The submission of this Lease to Tenant or its broker or other agent, does not constitute an offer to Tenant to lease the Premises. This Lease shall have no force and effect until (i) it is executed and delivered by Tenant to Landlord and (ii) it is fully reviewed and executed by Landlord; provided,

however, that, upon execution of this Lease by Tenant and delivery to Landlord, such execution and delivery by Tenant shall, in consideration of the time and expense incurred by Landlord in reviewing the Lease and Tenant's credit, constitute an offer by Tenant to Lease the Premises upon the terms and conditions set forth herein (which offer to Lease shall be irrevocable for three (3) business days following the date of delivery).

27.17 **Waiver; No Counterclaim; Choice of Laws**. To the extent permitted by applicable law, Tenant hereby waives the right to a jury trial in any action or proceeding regarding this Lease and the tenancy created by this Lease. In addition, Tenant hereby submits to local jurisdiction in the State of Nevada and agrees that any action by Tenant against Landlord shall be instituted in the State of Nevada and that Landlord shall have personal jurisdiction over Tenant for any action brought by Landlord against Tenant in the State of Nevada. To the extent permitted by applicable law, Tenant hereby waives any and all rights of redemption granted by any present or future laws.

27.18 **Electrical Service to the Premises**. Anything set forth in Section 7.01 or elsewhere in this Lease to the contrary notwithstanding, electricity to the Premises shall not be furnished by Landlord, but shall be furnished by the approved electric utility company serving the Building. Landlord shall permit Tenant to receive such service directly from such utility company at Tenant's cost (except as otherwise provided herein) and shall permit Landlord's wire and conduits, to the extent available, suitable and safely capable, to be used for such purposes.

27.19 **Rights Reserved by Landlord**. Landlord reserves the following rights exercisable without notice (except as otherwise expressly provided to the contrary in this Lease) and without being deemed an eviction or disturbance of Tenant's use or possession of the Premises or giving rise to any claim for setoff or abatement of Rent: (i) to change the name or street address of the Building; (ii) to install, affix and maintain, subject to reimbursement by Tenant, all signs on the exterior and/or interior of the Building; (iii) to designate and/or approve prior to installation, all types of signs, window shades, blinds, drapes, awnings or other similar items, and all internal lighting that may be visible from the exterior of the Premises; (iv) to display the Premises and/or the Building to mortgagees, prospective mortgagees, prospective purchasers and ground lessors at reasonable hours upon reasonable advance notice to Tenant; (v) to change the arrangement of entrances, doors, corridors, elevators and/or stairs in the Building, provided no such change shall materially adversely affect access to the Premises; (vi) to grant any party the exclusive right to conduct any business or render any service in the Building, provided such exclusive right shall not operate to prohibit Tenant from using the Premises for the purposes permitted under this Lease; (vii) to prohibit the placement of vending or dispensing

machines of any kind in or about the Premises other than for use by Tenant's employees; (viii) to prohibit the placement of video or other electronic games in the Premises; (ix) to have access for Landlord and other tenants of the Building to any mail chutes and boxes located in or on the Premises according to the rules of the United States Post Office; (x) to close the Building after normal business hours, except that Tenant and its employees and invitees shall be entitled to admission at all times under such rules and regulations as Landlord prescribes for security purposes; (xi) to install, operate and maintain security systems which monitor, by close circuit television or otherwise, all persons entering or leaving the Building; (xii) to install and maintain pipes, ducts, conduits, wires and structural elements located in the Premises which serve other parts or other tenants of the Building; and (xiii) to retain at all times master keys or pass keys to the Premises.

27.20 Tenant Operations Inquiry. As a material inducement to Landlord to enter into this Lease (i) Tenant has completed attached Exhibit 27.20, and (ii) Tenant represents and warrants to Landlord that Exhibit 27.20 is true and correct in all material respects and is not misleading.

27.21 Guaranty. Simultaneously with execution and delivery of this Lease, the Guarantors shall execute and deliver to Landlord the Guaranty in the form and content of Exhibit 27.21 hereto.

## ARTICLE XXVIII - FLOOR LOAD LIMITS

28.01 Floor Load Limits. Tenant shall not place a load upon any floor of the Premises exceeding the floor load per square foot area which it was designed to carry and which is allowed by law. Landlord reserves the right to prescribe the weight and position of all safes, business machines and mechanical equipment in the Building. Such installations shall be placed and maintained by Tenant, at Tenant's expense, in settings sufficient, in Landlord's judgment, to absorb and prevent vibration, noise and annoyance to occupants of the complex of adjacent property.

## ARTICLE XXIX - LANDLORD'S LIEN

[Intentionally Omitted]

**ARTICLE XXX - UNIFORM COMMERCIAL CODE**

[Intentionally Omitted]

LANDLORD

RMS LIMITED PARTNERSHIP
By Crystal Diamond, Inc.
Managing General Partner

By: [signature]

Its: President

TENANT

CASTLE MANUFACTURING, INC.

By: Taylor K. Coleman

Its: President




EXHIBIT 1.02

# EXHIBIT 10.03(A)

## Additional Insureds

1. RMS Limited Partnership, a Nevada limited partnership
2. Crystal Diamond, Inc., a Nevada corporation

EXHIBIT 20.01

Rules and Regulations

1. Tenant, its officers, agents, servants and employees shall not block or obstruct any of the entries, passages, doors, hallways or stairways of the Building or garage, or place, empty or throw any rubbish, litter, trash or material of any nature into such areas, or permit such areas to be used at any time except for ingress or egress of Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees.

2. The movement of furniture, equipment, machines, merchandise or materials within, into or out of the Premises or the Building not in the ordinary course of Tenant's business as permitted herein, shall be restricted to time, method and routing of movement as determined by Landlord upon request from Tenant and Tenant shall assume all liability and risk to property, the Premises and the Building in such movement. The movement of furniture, equipment, machines, merchandise or materials within, into or out of the Premises in the ordinary course of Tenant's permitted business shall also be at Tenant's sole risk and responsibility and shall be conducted in such a fashion as not to cause damage or injury to the Premises or the Building or to disturb other occupants thereof. Tenant shall not move furniture, machines, equipment, merchandise or materials within, into or out of the Premises or the Building not in the ordinary course of Tenant's permitted business without having first obtained a written permit from Landlord twenty-four (24) hours in advance. Safes and other heavy fixtures, equipment or machines intended to be kept permanently in the Premises shall be moved into the Premises or the Building only with Landlord's written consent and placed where directed by Landlord. Anything in these rules and regulations to the contrary notwithstanding, Tenant shall be able to determine, on its own, the location within the Premises of machinery and equipment, so long as such location does not create an unsafe condition on the Premises and is otherwise in compliance with the other provisions of the Lease.

3. Landlord will not be responsible for lost or stolen personal property, equipment, money or any article taken from Premises, regardless of how or when loss occurs.

4. Tenant, its officers, agents, servants and employees shall not install or operate any refrigerating, heating or air conditioning apparatus or carry on any mechanical operation or bring into the Premises any inflammable fluids or explosives without written permission of Landlord.

5. Tenant, its officers, agents, servants or employees shall not use the Premises for housing, lodging or sleeping purposes or for the cooking or preparation of food without written permission

of Landlord. Anything in these rules and regulations to the contrary notwithstanding, Tenant shall be allowed the use of a microwave oven and other similar appliances in the breakroom located on the Premises for the purpose of preparing snacks or other meals for the Tenant and its employees, so long as such use does not create an unsafe condition on the Premises or otherwise interfere with other Building tenants' use and enjoyment of their respective premises.

6. Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall not bring into the Premises or keep on Premises any fish, fowl, reptile, insect or animal without the prior written consent of the Landlord.

7. No additional locks shall be placed on any door in the Building without the prior written consent of Landlord. Landlord will furnish two keys to each lock on doors in the Premises and Landlord, upon request of Tenant, shall provide additional duplicate keys at Tenant's expense. Landlord may at all times keep a pass key to the Premises. All keys shall be returned to Landlord promptly upon termination of this Lease.

8. Tenant, its officers, agents, servants or employees shall do no painting or decorating in the Premises; or mark, paint or cut into, drive nails or screw into nor in any way deface any part of the Premises or the Building without the prior written consent of Landlord. If Tenant desires signal, communication, alarm or other utility or service connection installed or changed, such work shall be done at expense of Tenant, with the approval and under the direction of Landlord.

9. Tenant, its officers, agents, servants and employees shall not permit the operation of any musical or sound-producing instruments or device which may be heard outside the Premises, or which may emanate electrical waves or x-rays or other emissions which will impair radio or television broadcasting or reception from or in the Building, or be hazardous to health, well-being or condition of persons or property.

10. Tenant, its officers, agents, servants and employees shall, before leaving the Premises unattended, close and lock all doors and shut off all lights, business equipment and machinery. Damage resulting from failure to do so shall be paid by Tenant. Each Tenant, before closing for the day and leaving the Premises, shall see that all doors are locked. Anything in these rules and regulations to the contrary notwithstanding, Tenant shall be allowed to leave on certain automatic equipment, computers, telephone systems and other like items at the close of business, so long as such does not create an unsafe condition on the Premises or otherwise interfere with the other tenants use and enjoyment of the Building.

11. All plate and other glass now in the Premises or Building which is broken through cause attributable to Tenant, its officers, agents, servants, employees, patrons, licensees, customers, visitors or invitees shall be replaced by and at expense of Tenant under the direction of Landlord.

12. Tenant shall give Landlord prompt notice of all accidents to or defects in air conditioning equipment, plumbing, electric facilities or any part of appurtenance of the Premises.

13. The plumbing facilities shall not be used for any other purpose than that for which they are constructed, and no foreign substance of any kind shall be thrown therein, and the expense of any breakage, stoppage or damage resulting from a violation of this provision shall be borne by Tenant, who shall, or whose officers, employees, agents, servants, patrons, customers, licensees, visitors or invitees shall, have caused it. Landlord shall not be responsible for any damage due to stoppage, backup or overflow of the drains or other plumbing fixtures.

14. All contractors and/or technicians performing work for Tenant within the Premises, Building or garage facilities shall be referred to Landlord for approval before performing such work. This shall apply to all work including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and all installations affecting floors, walls, windows, doors, ceilings, equipment or any other physical feature of the Building, the Premises or garage facilities. None of this work shall be done by Tenant without Landlord's prior written approval.

15. No showcases or other articles shall be put in front of or affixed to any part of the exterior of the Building, without the prior written consent of Landlord.

16. NO TENANT OR ANY OFFICER, AGENT, EMPLOYEE, SERVANT, PATRON, CUSTOMER, VISITOR, LICENSEE OR INVITEE OF ANY TENANT SHALL GO UPON THE ROOF OF THE BUILDING, WITHOUT THE PRIOR WRITTEN CONSENT OF THE LANDLORD.

17. In the event Tenant must dispose of crates, boxes, etc. which will not fit into wastepaper baskets, it will be the responsibility of Tenant to dispose of same properly.

18. If the Premises shall become infested with vermin, roaches, or other undesirable creatures, Tenant, at its sole cost and expense, shall cause the Premises to be professionally treated from time to time to the satisfaction of Landlord and shall employ such exterminators for this purpose as shall be approved by Landlord.

19. Tenant shall not install any antenna or aerial wires, radio or television equipment or any other type of equipment inside or outside of the Building without Landlord's prior approval in writing and upon such terms and conditions as may be specified by Landlord in each and every instance.

20. Tenant shall not make or permit any use of the Premises, the Building or garage facilities which, directly or indirectly, is forbidden by law, ordinance or governmental or municipal regulation, code or order or which may be disreputable or dangerous to life, limb or property.

21. Tenant shall not advertise the business, profession or activities of Tenant in any manner which violates the letter or spirit of any code of ethics adopted by any recognized association or organization pertaining thereto, use the name of the Building for any purpose other than that of the business address of Tenant or use any picture or likeness of the Building or the complex name in any letterheads, envelopes, circulars, notices, advertisements, containers or wrapping material without Landlord's express consent in writing.

22. Tenant shall not conduct its business and/or control its officers, agents, employees, servants, patrons, customers, licensees and visitors in such a manner as to create any nuisance or interfere with, annoy or disturb any other tenant or Landlord in its operation of the Building or commit waste or suffer or permit waste to be committed in Premises.

23. The Tenant shall not install in the Premises any equipment which uses a substantial amount of electricity without the advance written consent of the Landlord. The Tenant shall ascertain from the Landlord the maximum amount of electrical current which can safely be used in the Premises, taking into account the capacity of the electric wiring in the Building and the Premises and the needs of other tenants in the Building and the complex and shall not use more than such safe capacity. The Landlord's consent to the installation of electric equipment shall not relieve the Tenant from the obligation not to use more electricity than such safe capacity.

24. The Tenant, without the prior written consent of Landlord, shall not lay linoleum or other similar floor covering within the Premises.

25. No outside storage of any material, pallets, disabled vehicles, etc., will be permitted including but not limited to trash, except in approved containers.

26. Tenant shall not allow a fire or bankruptcy sale or any auction to be held on the Premises, or allow the Premises to be

used for the storage of merchandise held for sale to the general public.

27. Canvasing, soliciting, distribution of hand-bills or any other written material peddling in the Building and the complex are prohibited, and each Tenant shall cooperate to prevent the same.

28. Tenant agrees to park in only these parking stalls designated as tenant parking. Tenant shall hold Landlord harmless for the removal and charges related thereto when Tenant, or its employees, park in spaces designated as visitor, handicapped parking, red or yellow curb areas. Tenant shall not park or allow to be kept any vehicle on the Premises, either company or personnel, which is not being used on a daily basis.

29. Tenant shall not maintain armed security in or about the Premises nor possess any weapons, explosives, combustibles or other hazardous devices in or about the Building and/or Premises.

30. No sign shall be installed or placed in or around the Building or Premises unless such is approved, installed and maintained in accordance with procedures established from time to time by Landlord for Building signs.

31. Landlord may waive any one more of these Rules and Regulations for the benefit of any particular tenant or landlords, but no such waiver by Landlord shall be construed as a waiver of such Rules and Regulations in favor of any other tenant or landlords, nor prevent Landlord from thereafter enforcing any such Rules and Regulations against any or all of the tenants of the complex.

32. These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any Lease on premises in the complex.

INITIALS:

Tenant: Taylor R Coleman

Landlord: [signature]

EXHIBIT 27.20

TENANT OPERATIONS INQUIRY

For (Facility Address & Suite Number):
4545 DIABLO DRIVE, SUITE A
LAS VEGAS, NEVADA 89118

1. Name of Company: CASTLE MANUFACTURING, INC.
2. Address (Local): 4545 DIABLO DRIVE, SUITE A, LAS VEGAS, NV 89118
   Phone Number (Local): (702) 221-4170
3. Address (Corporate): 5501 E. WASHINGTON, PHOENIX, AZ 85034
   Phone Number (Corporate): (602) 275-2339
4. What is your business? (describe briefly) MANUFACTURE, STORAGE AND DISTRIBUTION OF NOVELTY AND ADULT ORIENTED PRODUCTS.
5. What operations will you maintain at the proposed facility?
   MANUFACTURE, STORAGE AND DISTRIBUTION OF NOVELTY AND ADULT ORIENTED PRODUCTS.
6. Describe any assembly, manufacturing, machining, painting, printing or mechanical repair activities that will be part of your business operations at the proposed facility:
   MIXING AND LOW-TEMPERATURE HEATING OF PLASTIC MATERIALS WHICH WILL BE POURED INTO MOLDS, MOLDED PRODUCTS WILL BE PACKAGED IN SHRINK WRAP OR HEAT MOLD PLASTIC CONTAINERS.
7. Tenant chemical inventory at proposed facility (make additional copies, if required) (you may exclude small quantities of toner and other office supplies):

| Chemical (by chemical name where available) | What will be the average quantity on proposed premises? | What will be the maximum quantity on proposed premises? | What will be the annual quantity used? | How will the chemical be stored? |
|---|---|---|---|---|

1) PRIMARY RAW MATERIAL WILL BE A RELATIVELY INERT PLASTIC MIXTURE PREPARED BY A THIRD PARTY SUPPLIER - RECEIVED AND STORED IN 275 GAL. TOTE CONTAINERS, AND
2) SMALL QUANTITIES OF SILICONE (RELEASING AGENT FOR MOLDS) - RECEIVED AND STORED IN 2-5 GALLON CONTAINERS
AVG QUANTITY #1 4000 GAL.; MAXIMUM QTY 8,000 GAL.; ANNUAL QTY 400,00 GAL

Storage Methods (use all that apply): A) 55 gallon drum; B) 20 gallon drum; C) 2-5 gallon pallet/container; D) bulk dry packages; E) cartoned small containers (less than 2 gallon or 10 pounds) on pallets; F) on floor; G) on racks; or H) other (please describe)

8. Describe any pollution control equipment that will be used at the proposed facility (example: paint spray booth, fume hood, waste water treatment):

NONE NECESSARY

9. Will you operations generate any chemical wastes that require special disposal? (example: waste oil, waste solvent)

No

How will the chemical wastes be stored on site?

N/A NONE

How will the wastes be disposed? (example: recycled, landfilled, incinerated)

N/A

10. Does you business have an EPA Hazardous Waste Generator ID Number?

Yes ______ No ______

N/A

11. What spill prevention and containment measures will be in place for the chemicals and wastes stored at the proposed facility? (describe briefly)

N/A

12. Does your business have an Emergency Response or Contingency Plan in place in the event of a chemical incident? (please prove a copy)

Yes ____N/A____ No ________

13. Does your business have any type of Hazardous Materials training program for your employees? (describe briefly)

Yes ____N/A____ No ________

14. Do you have copies of all the Material Safety Data Sheets (MSDS) at your facility for the chemicals listed in Question No. 7? (please provide copies)

Yes ____N/A____ No ________

15. Does your business carry environmental insurance coverage in the event of a chemical incident?

Yes ____N/A____ No ________

How much coverage? (please provide a copy of the certificate of insurance) ________

16. Will you be required to make filings and notices required by SARA TITLE III for the operations at the proposed facility?

Yes ____N/A____ No ________

17. This form was prepared by the undersigned as a complete and correct description of Tenant's proposed operations at the location noted and the Landlord may rely on this information.

Taylor R Coleman
Signature

11/9/95
Date

## SCHEDULE 1 TO EXHIBIT 27.20

### List of Permissible Hazardous Materials and Quantities

EXHIBIT 27.21

Guaranty

FOR VALUE RECEIVED, and in consideration for, and as an inducement to RMS LIMITED PARTNERSHIP, a Nevada limited partnership, as Landlord, to enter into the foregoing Lease dated November 2, 1995 (the "Lease"), with CASTLE MANUFACTURING CORPORATION, a Nevada corporation, as Tenant, the undersigned, TAYLOR R. COLEMAN, hereby absolutely and unconditionally guarantees to Landlord, its successors and assigns, the prompt and full payment of all rent and all other payments to be made by Tenant under the Lease, and the full performance and observance by Tenant of all the other terms, covenants, conditions and agreements therein provided to be performed and observed by Tenant, for which the undersigned shall be jointly and severally liable with Tenant. The undersigned hereby waives any notice of nonpayment, nonperformance or nonobservance, or proof of notice or demand. The undersigned agrees that in the event of a default by Tenant under the Lease, Landlord may proceed against the undersigned before, after or simultaneously with proceeding against Tenant. This Guaranty shall not be terminated, affected, or impaired in any manner by reason of: (1) the assertion by Landlord against Tenant of any of the rights or remedies reserved to Landlord pursuant to the provisions of the Lease; (2) the commencement of summary or other proceedings against Tenant; (3) the failure of Landlord to enforce any of its rights against Tenant; or (4) the granting by Landlord of any extensions of time to Tenant. The undersigned further covenants and agrees that: (1) the undersigned shall be bound by all the provisions, terms, conditions, restrictions and limitations contained in the Lease which are to be observed or performed by Tenant thereunder, the same as if the undersigned were named therein as Tenant; and (2) this Guaranty shall be absolute and unconditional and shall be in full force and effect with respect to any amendment, addition, assignment, sublease transfer or other modification of the Lease, whether or not the undersigned shall have knowledge or have been notified of or agreed or consented thereto. If Landlord at any time is compelled to take action, by legal proceedings or otherwise, to enforce or compel compliance with the terms of this Guaranty, the undersigned shall, in addition to any other rights or remedies to which Landlord may be entitled hereunder or as a matter of law or in equity, pay to Landlord all costs, including reasonable attorneys' fees, incurred or expended by Landlord in connection therewith. In the event the Lease is disaffirmed by a Trustee in Bankruptcy for Tenant, the undersigned agrees that it shall, at the election of Landlord, either assume the Lease and perform all of the covenants, terms and conditions of Tenant thereunder or enter into a new lease, which said new lease shall be in form and substance identical to the Lease. All duties and obligations of the undersigned pursuant to this Guaranty shall be binding upon the successors and assigns of the undersigned. For purposes of this Guaranty, the word "Tenant"

shall include the successors and assigns of the undersigned. This Guaranty shall be governed by and construed in accordance with the laws of the State of Nevada.

The undersigned further agrees that, to the extent that the Tenant makes a payment or payments to the Landlord or the Landlord receives any proceeds of collateral, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or otherwise is required to be repaid to the Tenant, its estate, trustee, receiver or any other party, including, without limitation, under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligations of Tenant or part thereof which has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the date such initial payment, reduction or satisfaction occurred. The undersigned shall defend and indemnify the Landlord of and from any claim or loss under this paragraph including the Landlord's attorney and paralegal fees and expenses and other expenses in the defense of any such action or suit. The undersigned waives and shall have no right of subrogation, indemnification, reimbursement or exoneration with respect to the liabilities of Tenant under the Lease or any rights of contribution from any other guarantors of such liabilities.

Dated: 11-9, 1995.

Taylor R. Coleman
Signature

Address: 5505 San Miguel
Paradise Valley, AZ

# EXHIBIT 4

# AMENDMENT NO. 2 TO LEASE

This Amendment No. 2 to Lease dated as of December 20, 2005, is by and between RMS Limited Partnership, a Nevada limited partnership ("Landlord") and National Print Group, Inc., a Tennessee corporation ("Tenant").

Recitals

(a) By lease dated as of November 2, 1995, Landlord and Castle Manufacturing, Inc., a Nevada corporation ("Castle"), entered into a lease for certain Premises located in the Diablo Industrial Center at 4545 W. Diablo Drive, Unit A, Las Vegas, Nevada 89118 ("Premises"). The November 2, 1995 lease as amended shall be referred to in this Amendment No. 2 as the "Lease."

(b) By assignment and assumption agreement dated as of July 8, 1996, Castle assigned all rights under the Lease to Adera Corporation, a Nevada corporation formerly known as Image Rich, Inc. ("Adera"), and Adera assumed all obligations of Castle under the Lease.

(c) By letter agreement dated September 4, 1996, Landlord and Adera modified the Lease to, among other things, change the Expiration Date to December 31, 2000.

(d) By amendment to lease dated as of October 3, 2000, Landlord and Adera modified the Lease to, among other things, change the Expiration Date to December 31, 2005.

(e) On or about July 27, 2004, Tenant acquired a 100% ownership interest in Adera. In conjunction with such acquisition, Tenant executed a guaranty of the Lease.

(f) In May 2005, Tenant changed the name of the business it conducts at the Premises from "Adera Corporation" to "National Print Las Vegas."

(g) Tenant desires to renew the Lease Term.

It is therefore agreed as follows:

1. Capitalized Terms. Capitalized terms used in this Amendment and not otherwise defined shall have the meanings ascribed to such terms in the Lease.

2. Lease Term. For purposes of Section 1.06 of the Lease, the Lease Term shall be extended for 4 years, from January 1, 2006 until December 31, 2009 (the "Renewal Term"). The new Expiration Date shall be December 31, 2009.

3. Rent Adjustments. The Base Rent in year 1 of the Renewal Term shall be $29,264 per month. For purposes of Section 4.02(A) of the Lease, the Base Rent shall be increased to (i) $30,434.56 in months 13 through 24 of the Renewal Term, (ii) $31,651.94 in months 25 through 36 of the Renewal Term, and (iii) $32,918.02 in months 37 through 48 of the Renewal Term.

4. Tenant Improvements. In conjunction with this Amendment No. 2, Landlord shall remove all existing carpet installed at the Premises, and replace such carpet with new standard grade industrial carpet. The foregoing improvements shall be done by Landlord so as not to interfere unreasonably with the Tenant's continuing use of the Premises under the Lease. The Landlord shall make reasonable efforts to install such new carpet by January 31, 2006. In the event Landlord is unable for any reason to complete construction of the required improvements by January 31, 2006 (i) Landlord shall continue to work diligently to complete the construction in a prompt manner, (ii) Landlord shall not be liable to Tenant for any such delay, and (iii) the Lease, as modified by this Amendment

No 2, shall continue in full force and effect.

5. Controlling Document. To the extent the provisions of the Lease are inconsistent with the provisions of this Amendment No. 2, the terms of this Amendment No. 2 shall control.

6. Other Terms. Except as modified by this Amendment No. 2, all of the terms and conditions of the Lease, and the other documents executed by the parties in conjunction with the Lease, remain in full force and effect, and the undersigned parties agree and acknowledge that they are bound by such terms.

| | |
|---|---|
| **LANDLORD** | **TENANT** |
| RMS Limited Partnership | National Print Group, Inc. |
| By:____________________ | By: [signature] |
| Name: | Name: PHIL HARRIS |
| Title: | Title: SECRETARY |
| Crystal Diamond, Inc., General Partner | |

Seen and agreed or purposes of guaranty:

National Print Group, Inc.

By: [signature]
Name: PHIL HARRIS
Title: CEO

# EXHIBIT 5

## THIRD AMENDMENT TO LEASE

This Third Amendment to Lease is made as of May 27, 2009, between SN Investment Properties, LLC, a Delaware limited liability company ("Landlord") and National Las Vegas, Inc., a Nevada corporation ("Tenant").

### Recitals

A. RMS Limited Partnership and Castle Manufacturing, Inc., a Nevada corporation entered into a Lease dated November 2, 1995 (the "Lease"), for the Premises described therein and located at 4545 Diablo Drive, Building E, Suite A, Las Vegas, Nevada, 89118, consisting of approximately 49,600 square feet (the "Premises"). The original Expiration Date was December 31, 2001

B. The landlord's interest under the Lease was assigned and transferred to Landlord and the tenant's interest in the Lease was assigned and transferred to Tenant. The Lease Expiration Date has been changed to December 31, 2009.

C. The parties desire to amend the Lease to further extend the Lease Term for an additional thirty six (36) months, adjust the Base Rent Schedule in a manner that will include certain potential concessions and provide for changes to Tenant's Percentage Share with respect to Property Taxes, Operating Expenses, Insurance Expenses and Management Fees. In addition, the parties have agreed to amend the Lease to include a Tenant improvement scope of work, and Tenant Broker representation and commission payment for the Lease extension period.

Therefore, in consideration of the recitals and mutual covenants contained herein, the parties hereby agree as follows:

### Agreement

1. Lease Term. The Lease Term shall be extended for thirty-six (36) months through December 31, 2012.

2. Base Rent. Effective June 1, 2009, the Base Rent shall be as follows:

| | |
|---|---|
| June 1, 2009 – May 31, 2010: | $ 22,816.00/month |
| June 1, 2010 – May 31, 2011: | $ 23,500.00/month |
| June 1, 2011 – May 31, 2012: | $ 24,205.00/month |
| June 1, 2012 – December, 2012: | $ 24,932.00/month |

Concessions. Effective June 1, 2009, and so long as Tenant is not in Default of any monetary obligations to Landlord under the Lease, Landlord and Tenant mutually agree that Landlord shall reduce Tenant's Current Base Rent by $10,102.02 per month through and including December 31, 2009 up to the amount of $70,714.14 ("Base Rent Concessions"). If however, an Event of Default of any monetary obligation due to Landlord under the Lease occurs at any time during the Lease Term, Tenant's right to any Base Rent Concession shall become null and void and Tenant shall, within 10 days of written demand, immediately pay Landlord an amount equal to the total Base Rent Concessions taken by Tenant.

4. Operating Expenses. Effective January 1, 2010, Paragraphs 1.08 and 4.01 of the Lease are replaced with the following: "In addition to the Base Rent required to be paid under the Lease, Tenant shall also pay as Additional Rent, Tenant's Proportionate Share of the Building as applicable), as defined in the Lease, of Operating Expenses (defined below) in the manner set forth below. Landlord and Tenant acknowledge that if the number of buildings which constitute the Project increases or decreases, or if physical changes are made to the Premises, Building and/or Project or the configuration of any thereof, Landlord may at its discretion reasonably adjust Tenant's Proportionate Share of the Building and/or Project to reflect the change. Landlord's determination of Tenant's Proportionate Share of the Building and/or Project shall be conclusive absent manifest error. "Operating Expenses" shall mean all expenses and costs of every kind and nature which Landlord shall pay or become obligated to pay, because of or in connection with the ownership, management (including but not limited to a commercially reasonable management fee), maintenance, repair, preservation, replacement and operation of the Building and/or Project and its supporting facilities and such additional facilities now and in subsequent years as may be determined by Landlord to be necessary or desirable to the Building and/or Project (as determined in a reasonable manner) other than those expenses and costs which are specifically attributable to Tenant or which are expressly made the financial responsibility of Landlord or specific tenants of the Building or Project pursuant to this Lease.

Landlord agrees that effective January 1, 2010 Tenant's Proportionate Share of First Year Estimated Operating Expenses set forth on this proposal shall not be merely an estimate, but shall be the stated sum of $7,688.00 per month calculated as ($0.155) per Premises square foot per month. Commencing on the first anniversary of the Lease Commencement Date and continuing for the balance of the Lease Term, Landlord agrees that Landlord-controllable Operating Expenses shall not increase by more than three percent (3%) over the previous year. Operating expenses that are deemed outside Landlord's control and not subject to this annual limitation are taxes, utilities and insurance."

5. Tenant Improvements.

(A) Landlord shall contract directly with a contractor for the Tenant Improvements and shall commence "Landlord's Work" referenced in paragraph 5. A (I) through (VIII) below subject to and contingent upon Tenant's removal of all furniture and equipment from the office area and the portion of the warehouse area where work will be performed. In addition, Tenant shall dedicate a Tenant Representative, who shall be responsible for allowing the Landlord's contractor and Landlord Representative access to the Premises to perform the "Landlord's Work":

(I) Replace existing carpet with new carpet
(II) Re-paint the office area and kitchen
(III) Replace the kitchen sink and faucet
(IV) Replace the kitchen vct flooring, to include the entry way and two (2) small bathrooms
(V) Install new Landlord standard finish tile square in one of the

private offices

(VI) Strip clean and wax (heavy duty) all other offices including the reception area

(VII) Create new entry door in Tenant's shipping department area

(VIII) Remove a wall in the office separating the pre-press area and customer service area in the office.

The Tenant Improvements shall be constructed in accordance with Landlord's standard specifications and building materials.

(B) Upon Tenant meeting the terms and conditions referenced in Paragraph 5. (A) above, Landlord shall engage the services of a general contractor to perform the "Landlord's Work". Landlord will provide in-house Project Management services for the duration of the "Landlord's Work", referenced above. Tenant shall be permitted to select both carpet and paint color/s which shall be a part of Landlord's standard specifications and building materials.

(C) Tenant shall be responsible for delays and additional costs in completion of the "Landlord's Work" or by delays caused by Tenant's requests for special materials that require a lead-time for delivery. If Tenant desires any changes to the "Landlord's Work", Tenant shall first submit a written request to Landlord's Representative and Project Manager, together with all information necessary to show and explain changes from the approved Tenant improvement plans. Landlord's Project Manager shall notify Tenant in writing of the amount, if any, Landlord will charge to Tenant for any such change.

Any improvements above the agreed upon amount shall be paid by the Landlord and charged to Tenant and shall be deemed to be additional rent. The improvements shall be in accordance to Landlord's standard specifications and building materials.

6. Option to Renew. So long as Tenant has not assigned its interest under the Lease, including an assignment with Landlord's consent, and Tenant is not in default at the time of the exercise and no default arises between that time and the expiration of the then current Lease Term, Tenant, but not an assignee or successor of Tenant, shall have two (2) consecutive twelve (12) month options to extend the duration of the Lease (each an "Option Term"). During the Option Term, if any, all of the other provisions of the Lease shall remain in effect except the Base Rent shall be subject to an adjustment to a fair market rent as agreed upon by both parties, but in no event less than four percent (4%) or higher than six percent (6%) annual adjustment above the amount in effect during the last year of the then current Lease primary Term. Tenant shall exercise the option by giving written notice to Landlord not more than six (6) months or less than four (4) months prior to the expiration of the then current Lease Term.

7. Broker. Landlord and Tenant each warrant that they have dealt with no real estate broker in connection with this transaction with the exception of Greg Tassi, CB Richard Ellis located at 3993 Howard Hughes Parkway Suite 700, Las Vegas, NV 89169 who represented Tenant.
Landlord shall pay a four percent (4%) commission to Tenant's broker per a separate agreement. The commission to be paid is based on the Lease extension period which is effective January 1, 2010 through December 31, 2012. Landlord and Tenant each agree to hold the other harmless from and against any and all damages, costs and expenses resulting from any claim(s) for a brokerage commission or finder's fee that may be asserted against either of them by any broker or finder other than those named above with whom the other has dealt.

8. Confidentiality. Tenant and its employees, agents and brokers shall keep confidential all matters concerning the terms of this Amendment and the negotiations which led to it and shall not disclose the fact or substance of the negotiations or the terms to anyone without the prior written consent of the Landlord. Notwithstanding the foregoing, the provisions and preceding negotiations may be revealed to Tenant's accountants, attorneys and lenders so long as each such recipient is advised of the necessity for them to also maintain the confidentiality of the information. If any third party demands entitlement to the benefit of similar terms or conditions on the basis that Tenant received such treatment, it will be deemed to be the result of a violation of this confidentiality requirement by Tenant and such violation shall constitute an event of Default under the Lease.

All capitalized terms used in this Amendment and not otherwise defined shall have the meanings set forth in the Lease. Except as modified by this Amendment, all other terms and conditions of the Lease shall be unchanged and remain in full force and effect.

THE SUBMISSION OF THIS LEASE AMENDMENT FOR EXAMINATION AND NEGOTIATION DOES NOT CONSTITUTE AN OFFER TO LEASE OR A RESERVATION OF OR OPTION FOR THE PREMISES. THIS DOCUMENT AND THE OBLIGATIONS HEREUNDER SHALL BECOME EFFECTIVE AND BINDING ON THE PARTIES ONLY UPON APPROVAL BY LANDLORD'S LENDER AND EXECUTION AND DELIVERY OF THIS LEASE AMENDMENT BY TENANT AND BY LANDLORD.

| Landlord | Tenant |
|---|---|
| SN Investment Properties, LLC, a Delaware limited liability company | National Las Vegas, Inc., a Nevada corporation |
| By: Harsch Investment Properties Management, LLC, its Manager | |
| By: ____ | By: ____ |
| Title: VP | Title: CEO |